IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Court of Appeals No. 17-10138 |
| ) | |
| Plaintiff, ) | District Court No. 15-00041-01 |
| ) | |
| vs. ) | |
| ) | |
| JUSTIN WHITE CRUZ, ) | |
| ) | |
| Defendant. ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD,
CHIEF JUDGE
JULY 5, 2016; 1:38 P.M.
HAGATNA, GUAM

**Motion to Suppress**

Proceedings recorded *mechanical stenography*, transcript produced by computer.

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

APPEARANCES


Appearing on behalf of plaintiff:


**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: CLYDE LEMONS, JR., AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, GU 96910
(671) 472-7332


Appearing on behalf of defendant:


**LAW OFFICE OF WILLIAM L. GAVRAS**
**BY: WILLIAM L. GAVRAS, ESQ.**
101 Salisbury Street
Dededo, GU 96929
(671) 632-4357


ALSO PRESENT:

Jeremiah Cruz, DEA TFO

# I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **DEFENSE WITNESS:** | | | | |
| Jeremiah Cruz | 26 | 34 | 37 | |
| **GOVERNMENT WITNESS:** | | | | |
| Jeffrey Palacios | 75 | 83 | 96 | |
| Deborah Epps | 103 | 112 | 131 | |

**EXHIBITS:**

|  | Description | Admitted |
|---|---|---|
| 12 | Application for Search Warrant | 134 |

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

1                    **July 5, 2016; 1:37 p.m.; Hagatna, Guam**

2                                      * * *

3                    THE CLERK:  Criminal Case No. 15-00041, *United*

4    *States of America v. Justin Robert White Cruz;* Hearing on

5    Motions to Suppress.

6                    Counsel, please state your appearances.

7                    MR. LEMONS:  Good afternoon, Your Honor.  For the

8    record, Clyde lemons on behalf of the United States.  Present

9    with me this afternoon is Task Force Officer Jeremiah Cruz.

10                   THE COURT:  Okay.  Good afternoon, Mr. Lemons and

11   Agent Cruz.

12                   MR. GAVRAS:  William Gavras, Your Honor, for the

13   defendant, who's present.

14                   THE COURT:  Good morning or good afternoon,

15   Mr. Gavras and Justin Robert White Cruz.

16                   THE DEFENDANT:  Good -- good afternoon, Your

17   Honor.

18                   THE COURT:  Good afternoon.

19                   THE DEFENDANT:  I would just -- this whole thing

20   that's happening, the pretrial and I'm asking if we can have a

21   continuance.

22                   THE COURT:  Reason?

23                   THE DEFENDANT:  Reason because my attorney, the

24   motions -- I've been having a problem ever since with the

25   motions.  Nobody wants to listen to me.  This is my life.  And

1  what my motions are about is the truth.

2          THE COURT:  There's a lot of motions here.

3  There's a Motion to Suppress all the evidence in the case,

4  Mr. Cruz.

5          THE DEFENDANT:  Yeah, but that's not the motions.

6  The actual motions is the other motions that the federal

7  government knows they made mistakes in this case.  And it's

8  like every time I tell my attorney, started since David Lujan,

9  he denies me.  They tell me there's no merit, but there is a

10  merit.  I feel like they don't want it to be exposed or argued

11  about.  I am I'm asking -- not for another attorney because it

12  doesn't matter which attorney I get, nobody wants to listen to

13  me or take in to consideration what happened, how it was done

14  and the truth.  They always say there's no merit, but the

15  government made a lot of mistakes here that they are trying to

16  hide.  And I want -- my motion is to expose it.

17          THE COURT:  Well, your attorney has filed, and

18  all the other attorneys before him have already filed motions.

19  I'm not going to continue this matter just because you said

20  the attorneys haven't exposed anything.  We haven't even had

21  the motions heard yet, Mr. Cruz.

22          THE DEFENDANT:  I haven't heard it from my

23  attorney since he was appointed.  I only saw him today.  He

24  never once called me since appointed.  This is my life.  He

25  never even once contact me at all.  And I feel it was intended

1    to just roll through and then start the trial.  And nobody is

2    gonna hear what I have to say or the truth.

3                    THE COURT:  Mr. Gavras, you want to respond to --

4                    MR. GAVRAS:  Yes, Your Honor.

5                    THE COURT:  I have no idea what he's saying.

6                    MR. GAVRAS:  Yes, Your Honor.  When -- I guess

7    the last time I was here is when I was appointed.  And I did

8    meet with Justin for quite a while that day.  He didn't tell

9    me he had any particular motions --

10                   THE COURT:  Okay.

11                   MR. GAVRAS:  -- that needed to be filed.  He

12   hasn't called my office.  I didn't think there was any reason

13   to meet.  We're dealing with essentially legal matters.  The

14   facts that go towards these legal matters are not something

15   that he can really help me with.  So I don't know these

16   motions.  I would be interested in knowing, but I don't know

17   what they are.

18                   THE COURT:  All right.  Well, your his attorney.

19   You have met with him.  You have already indicated that to the

20   Court, right?

21                   MR. GAVRAS:  Yes.

22                   THE COURT:  You met with him.  He knows what the

23   motions are that are being filed today?  He knows of them?

24                   THE DEFENDANT:  (Shook head.)

25                   MR. GAVRAS:  I have not told him.  I actually

1   have told him just today.

2          THE DEFENDANT: Just right now.

3          THE COURT: Let him speak, please. He's your

4   lawyer.

5          MR. GAVRAS: In very general terms what they are.

6   I don't find a lot of profit in explaining the legal nature

7   of... of these motions.

8          THE COURT: All right. Okay. Well, we're going

9   to proceed forward. The motions have been filed, Mr. Cruz.

10   This is on behalf of yourself. Your attorney has filed

11   motions to suppress all the evidence in the case. He's asking

12   the Court to suppress all of the -- all the evidence found

13   under all the search warrants. So we're going to proceed

14   forward. And now we'll first of all start with the first

15   issue. And you have an attorney, Mr. Cruz, so you have to

16   speak through your lawyer, Mr. Gavras. Okay, so if you want

17   -- have any questions, you talk to Mr. Gavras.

18          (Pause.)

19          (Defendant consulted attorney.)

20          THE COURT: Okay. Let's begin here.

21          (Pause.)

22          MR. GAVRAS: Your Honor, my client is asking --

23   on behalf of my client, I'd ask for a continuance. The -- my

24   client indicates to me for the first time that there is some

25   evidence out there that I can't swear would be helpful but he

1   seems to think might be helpful.

2           THE COURT:  Well, no.  The Court is going to deny

3   that request.  I mean, we're right here at the time -- we're

4   here at the motion for suppression.  We'll proceed forward

5   with the Motion to Suppress.  If there's any request for

6   additional evidence, you can decide that after you've heard

7   the evidence, but let's go ahead and begin.

8           First of all, the first issue.  I want to track

9   it this way, it's gonna be easier, more logical.  The first

10  issue is whether or not the Court should hold an evidentiary

11  hearing and it also deals with standing.  So let's hear that

12  from Mr. Lemons.

13          MR. LEMONS:  Your Honor, it's pretty much

14  axiomatic that the Fourth Amendment protects people and not

15  places.  And the admission to Motion to Suppress is standing;

16  that is, does the defendant have an interest in the things

17  searched or seized and is that an interest that society is

18  willing to protect.  Well, we have no evidence, no

19  allegations, nothing from the defense that he has standing.

20  And I think the case law is pretty clear.  I don't have the

21  burden of proving standing.  That's -- that's -- that's for

22  the defendant to show.  And once he shows that there's

23  standing, then I think that's when we can move forward.  And

24  so that, in a nutshell, is the government's position.

25          THE COURT:  Yeah, but you have cited -- okay,

1  let's talk about this legal issue of standing.  You have cited

2  to some cases, let me just ask you, and it has to deal with

3  whether he's an addressee or sender, right?

4          MR. LEMONS:  Yes, Your Honor.

5          THE COURT:  Right.  Mr. Lemons, the Ninth Circuit

6  has not ruled on this issue of addressing, have they?

7          MR. LEMONS:  On whether or not that there should

8  be standing?

9          THE COURT:  Right, whether or not an individual

10  has a legitimate privacy expectation to a non-addressee.

11          MR. LEMONS:  Your Honor, I think the state of the

12  law is that a person can have standing.  But again, whether or

13  not they do have standing and I think in the last case that

14  everybody here was involved in, the government conceded off

15  the bat that the defendant had standing for several factual

16  reasons.  But in this case, there's no evidence that this

17  defendant has any interest in this package.

18          THE COURT:  But my question is, has the Ninth

19  Circuit indicated that when an addressee -- a non-addressee

20  has no legitimate expectation of privacy in a package that's

21  not addressed to him and therefore they have no standing to

22  challenge a Fourth Amendment violation.

23          MR. LEMONS:  Well, I -- I kind of think they did,

24  Your Honor, in --

25          THE COURT:  Which case?

1              MR. LEMONS:  *U.S. v. Dorais*, 241 F.3d 1124.  It's

2    a Ninth Circuit case.  And the Ninth Circuit said, the

3    defendant has the burden of demonstrating standing.  Fourth

4    Amendment rights personal.  And the defendant cannot claim a

5    violation of his Fourth Amendment right based solely on the

6    introduction of evidence procured through an illegal search.

7    So I think the Ninth Circuit has --

8              THE COURT:  Do I have *Dorais*?  Yeah, let me get

9    that.

10             (To law clerk.)  I don't have it here, Anne.

11             I was looking at the *Lozano* case where there was

12   a concurring opinion in *Lozano*, where Judge O'Scannlain

13   indicated that -- in the *Lozano* case that Lozano did not have

14   a legitimate expectation of privacy in the mailed package and

15   therefore, he had no Fourth Amendment standing to challenge

16   the admission of evidence in this case.  And he went on to say

17   that... yeah, it's just that the Ninth Circuit hasn't ruled on

18   that.  That's what I'm concerned about.  Other circuits have

19   said that.  You know the case I'm talking about, right?

20             MR. LEMONS:  Yes, I do, Your Honor.

21             THE COURT:  So what year was the case that you're

22   talking about?  I don't...

23             MR. LEMONS:  *Dorais* was 2001.

24             THE COURT:  Okay.  This is a 2010 case, the

25   Lozano case.  This is a concurring opinion.  What -- this

appears to be a little -- this is a lot more closer in time.

More timely, Mr. Lemons.  He says, "Our circuit has not

decided whether an individual has legitimate expectation of

privacy with respect to a package that is not addressed to

him."  Okay.  So --

          MR. LEMONS:  And that's true, Your Honor.  But
--

          THE COURT:  Isn't that what we're talking about

here?  This is a non-addressee.

          MR. LEMONS:  It's a non-addressee, but you still

have to -- whether it's a package, whether -- a package is

nothing but another word for container.

          THE COURT:  Okay, go ahead.

          MR. LEMONS:  And I think what the Ninth Circuit

has said in *Hernandez* in that line of cases is that the

defendant's interest in the package is the timely delivery.

          THE COURT:  Right.

          MR. LEMONS:  Of the package.

          THE COURT:  Right.

          MR. LEMONS:  But to say that because it's mail,

it's outside of what any container is for purposes of the

Fourth Amendment, I don't think that's -- that's quite what

the law is.  It's still a container just like if it was a

briefcase, a suitcase in somebody's house.

          THE COURT:  But this is the same thing, this is a

1   mail package.  *Lozano* was a mail package case just like our

2   case.

3                    MR. LEMONS:  No, I understand, that Your Honor.

4                    THE COURT:  Right.

5                    MR. LEMONS:  And I think that the concurring

6   opinion is correct that there's no case directly on point.

7                    THE COURT:  Well, the Ninth Circuit hasn't ruled

8   on that.

9                    MR. LEMONS:  Well, that's what we're talking

10  about is Ninth Circuit.

11                   THE COURT:  Right.

12                   MR. LEMONS:  Has not directly ruled on that.  But

13  again, a package is still a container and timely delivery is

14  the expectation that a person has in a package.

15                   THE COURT:  Right, but they don't even get to the

16  timely delivery.  They're saying, according to the other

17  circuits and the one that are cited in this concurring

18  opinion, for example, let's see.  "Four other circuits have

19  held...that an individual does not have a legitimate privacy

20  expectation in a package that is not addressed to him."

21  Eleventh Circuit, Fifth Circuit, Seventh Circuit, and the

22  Fourth circuit.  And the Ninth Circuit has not ruled on that.

23  Isn't that really the issue before me?  I have to make that

24  decision.  You're asking me to make a decision, to follow

25  these circuits like O'Scannlain.  The case that you cited, by

 1  the way, is a hotel room.

 2          MR. LEMONS:  That right.

 3          THE COURT:  For standing.  So I want to focus on,

 4  really, on packages.

 5          MR. LEMONS:  But Your Honor, a package is still a

 6  container.

 7          THE COURT:  Right.  I got that.

 8          MR. LEMONS:  And so a person in order to

 9  challenge the search of it, still has to indicate that they

10  have some kind of standing.

11          THE COURT:  Right.

12          MR. LEMONS:  Whether they're the addressee -- if

13  it was -- the name on there had been Justin Cruz, he would

14  still have to show that he had standing.  I would state to the

15  Court it would be very easy for him to do in that

16  circumstance.  But he still has to --

17          THE COURT:  Well, I'll talk to him, I'll ask him

18  where he thinks he has standing.  Let us assume that it --

19  right now it is not -- it has Sullivan, talking about Sullivan

20  1 and Sullivan 2 packages.  And then the Justine Cruise.

21  We'll talk about that a little later, but let's just talk

22  about the Sullivan 1 and Sullivan 2 packages in particular.

23  Those are definitely non-addressee.  There's no indication

24  that he uses those names as AKAs, aliases, right?

25          MR. LEMONS:  That's correct.

1          THE COURT:  So it's not that situation.  I guess

2     I think -- isn't the state of law really that the Ninth

3     Circuit has not actually ruled on this, like the other

4     circuits for a non-addressee?  I mean, that's the way I look

5     at the state of the law for non-addressee mail packages.

6     Especially looking at the most recent case of O'Scannlain.

7          MR. LEMONS:  But Your Honor, that reading of the

8     case says that the person does not have to demonstrate

9     standing or a person has to demonstrate that they have

10    standing to suppress in every case except the case involving a

11    package sent in the mail.  And I don't think that that's what

12    the law is.

13         THE COURT:  I'm sorry, you're saying -- what are

14    you saying this case says?  *Lozano*?

15         MR. LEMONS:  No, I'm saying --

16         THE COURT:  I'm focusing on the *Lozano* case.

17         MR. LEMONS:  The way the Court is reading that

18    case, especially the concurring opinion, is that in any case

19    except when it comes to the mail, defendant has to demonstrate

20    that they have standing.

21         THE COURT:  No, I'm not saying that.  I'm not

22    saying that.  You -- just like it says here, just like in

23    *Lozano*, the government raises standing at trial.  You have

24    raised standing at trial.

25         MR. LEMONS:  Yes.

1          THE COURT:  Just like Lozano did.  Okay.  So I'm

2  just asking you about the case law.  It goes on to say:  "We

3  have held that even if the government does not raise standing

4  in the District Court, so long as the government did not rely

5  on facts contrary to its standing argument...the standing

6  issue is properly before us on appeal."  Okay, go ahead,

7  Mr. Lemons.  I'm not sure what you're trying to say.

8          MR. LEMONS:  Well, Your Honor, what I'm saying is

9  I don't think that that case should be read the way that I

10  understand the Court is reading it.  In other words, you have

11  to have standing to challenge the search of any object except

12  mail.

13          THE COURT:  Okay.

14          MR. LEMONS:  I don't think that that's what the

15  case law says.  I think what the case is saying is that you

16  can have standing in a package, whether you're the addressee

17  or not the addressee.  Okay.  But that doesn't mean because

18  even if you are the addressee, it's not necessarily so that

19  you have standing to challenge the search.  I think it's a low

20  -- it's a low bridge.  It's low-hanging fruit for defendant to

21  prove that they have standing when it's addressed to him but

22  --

23          THE COURT:  You're saying that you want me to ask

24  defense counsel first:  Where is their standing?

25          MR. LEMONS:  Yes.

1          THE COURT:  That's what you're saying.

2          MR. LEMONS:  Yes.

3          THE COURT:  Okay, I will ask him that.  But I

4    wanted to ask you the state of the law.  And I do believe

5    that, based on reading the state of the law, that the Ninth

6    Circuit has not come out and specifically addressed A, B,

7    non-addressee.  But I'm not saying that we won't talk on that

8    issue because I will, I will ask him.

9          MR. LEMONS:  Your Honor, I'm not actually -- I'm

10   not disagreeing with you on the state of the law.  What I'm

11   disagreeing with you is on the interpretation that I

12   understand that you're saying or that you're reading the

13   *Lozano*.

14          THE COURT:  Okay.  All right.  You can be seated

15   for a few minutes.  Mr. Gavras, let's talk about the standing

16   issue.

17          Does your client have standing to challenge a Fourth

18   Amendment violation here?

19          MR. GAVRAS:  Yes.

20          THE COURT:  And how is that?  What's his standing

21   as it relates to the -- let's talk about Sullivan 1 and

22   Sullivan 2 packages.

23          MR. GAVRAS:  Well, I think that -- I'm sorry, did

24   the Court want me to address the *Lozano* and general --

25          THE COURT:  Yeah, both.  Address what he's asked

1   and also what the Court has asked.

2          MR. GAVRAS:  Well, as I understand it, if you

3   look at *Lozano*, I think *Lozano* actually states the circuits

4   are pretty split on that concurring opinion.

5          THE COURT:  I'm sorry?

6          MR. GAVRAS:  The concurring opinion in *Lozano*

7   goes a long way to say that there -- it says on page 1064:

8   "In any event, these Fifth" -- the concurring judge believed

9   that the Fifth Circuit case -- Fifth Circuit should be

10  followed.  And he stated:  In any event, these Fifth Circuit

11  cases represent but one half of a intra- and inter circuit

12  split regarding aliases, particularly criminal aliases."  And

13  so what I think he's saying there is essentially the country

14  is evenly divided on this.

15         And I might point out that, Judge, he does

16  mention the Seventh Circuit.  But in mentioning the Seventh

17  Circuit, it's talking about a concurring opinion in *Pitts*.

18  *Pitts* was actually the case that we cited in our Motion to

19  Suppress.  That talks about standing, why there is standing in

20  using an alias and that type of thing.

21         THE COURT:  Are you saying that this is your

22  client's alias, is that what you're saying?

23         MR. GAVRAS:  Yes.  Well, I'm saying particularly

24  if we look at the opinion in *Pitts* which has to be a, you

25  know, it's almost the gold standard rationale of those

1  circuits that say there is standing.  I mean, I think there's

2  a reference to Ann Landers in there or her sister.

3          And you know, *Pitts* talks a lot about the fact

4  that when people send packages, and to the extent I know this

5  case I have to give credit to Mr. Manley, but you know, it

6  talks to -- just a huge extent about the fact that people

7  oftentimes send packages without using a -- a -- a -- their

8  real name or even a standard alias that they may have used in

9  the past.

10          *Pitts* talks a great deal about the fact the

11  famous people may not want people to know that they're

12  receiving a package.  And I think we could, particularly in

13  the days before the Internet, we can certainly understand why

14  that would be the case.  Even today we can.  And basically,

15  that's the rationale of *Pitts* although they go in to great

16  detail in explaining, much more detail than that in explaining

17  the rationale.  But it's just basically that people have a

18  reasonable expectation of privacy in packages that they

19  receive, even when they're not addressed to them in any way.

20  The fact that, you know, John Doe is put on the package.

21          THE COURT:  But there's nothing -- okay, so what

22  are you saying with regard to these packages as it relates to

23  your client?

24          MR. GAVRAS:  Well --

25          THE COURT:  Is there any type of property

1    interest that he's claiming in these parcels.

2            MR. GAVRAS:  Well, I think the government's

3    evidence is that there is going to be.  That these were his

4    packages.  And you know, when you get into the -- and I don't

5    think the government is going to deny that.

6            THE COURT:  Well, but in the *Pitts* case, like in

7    *Pitts*, he said -- he had an affidavit.  He said I knew of the

8    contents, I had a possessory and proprietary interest in the

9    package, I didn't abandon my interest and then he kept looking

10   at the tracking numbers.  That's not the same as in this case,

11   is it?

12           MR. LEMONS:  Well, we don't have an affidavit to

13   present to the Court.  I think we could scrounge one up for

14   the Court pretty quickly.

15           THE COURT:  I'm sorry?

16           MR. GAVRAS:  I think we could get one to the

17   Court pretty quickly.  But --

18           THE COURT:  What would the affidavit be?  Yeah,

19   what would that be?

20           MR. GAVRAS:  I would have to discuss that briefly

21   with my client, but I don't think that's what's necessary

22   here.  I don't think -- you know, the question is, first of

23   all, I don't think an affidavit is evidence.

24           THE COURT:  Well, the Court can consider

25   affidavits.

1          MR. GAVRAS:  I don't think -- not in a

2     suppression hearing.

3          THE COURT:  In a suppression hearing, the Court

4     can.  Yes, the Court can.

5          MR. GAVRAS:  Maybe I am incorrect about that but.

6          THE COURT:  Yeah.

7          MR. GAVRAS:  But, and maybe it's from the

8     defendant where the Court can --

9          THE COURT:  Yeah, well for sure the defendant.  I

10    mean, yeah the defendant Pitts submitted an affidavit.

11         MR. GAVRAS:  But I don't --

12         THE COURT:  And only for the suppression hearing.

13    It won't be used against him in the case in chief.

14         MR. GAVRAS:  Correct.

15         THE COURT:  Unless he testified in his case and

16    chief and so forth but go ahead.

17         MR. GAVRAS:  And so the question is, you know,

18    one of the questions here is how much pressure, how much does

19    the case law pressure the defendant to get on the stand, or by

20    way of affidavit, to start to present his case prior to trial.

21    Now, I know he's the one that filed the Motion to Suppress,

22    but I don't think, and I think the Court has come across this

23    in the past, let us say the government goes into somebody's

24    house, has a warrant to go inside somebody's house or doesn't

25    have a warrant to go inside somebody's house, does the

1   defendant, under those facts, have to have an affidavit --

2   okay, we come in here and no evidence is presented, okay.

3   Where does that burden lie initially?  I think we can say

4   initially, yes, the defendant has the burden of proof when it

5   comes to standing.  I understand that.  But when it's not

6   seriously argued by the government that they're not gonna put

7   on evidence, that these packages were his, you know that's the

8   whole thrust of these warrants.

9          So the question really is, when you come in to

10  the Court, you get into burdens here.  And in the case of the

11  agents going inside somebody's house, I don't think this Court

12  requires and I don't think the government has ever argued in

13  fact that the person must present an affidavit or get up on

14  the stand and testify that the house was his.  I think there

15  has to be -- and we don't see that in the case law.  We don't

16  see this in the case law.  What we see in the case law is when

17  there's a real question about -- a real question, not a

18  theoretical question, but a real question about were these the

19  defendant's packages, were they intended for him, does he have

20  some interest.  When there is a real question on that, then

21  yes, the defendant would have to come forward and say

22  something.  But when we know that question is just

23  theoretical, does the case law require it and we never see

24  that.

25          If the case law required the defendant to prove

1    standing in all these cases initially, then we would see that

2    being done.  We would have a totally different procedure than

3    what the Court is used to seeing in these cases, where the

4    government comes on first and puts on the evidence because

5    they have the burden as to suppression generally, as to Fourth

6    Amendments generally.  And then the defendant comes on.  So I

7    don't think that -- I don't think that the case law and --

8    puts that kind of pressure on the defendant to testify before

9    trial.  But I don't think that the -- I don't think -- I think

10   -- but -- you know, if the Court wants to start -- and I say

11   this with all due respect.

12              THE COURT:  Go ahead.

13              MR. GAVRAS:  If the Court wants to adopt that

14   procedure now, when we've never gone through that before, when

15   there's real reason to believe that the government's evidence

16   is going to show that these packages were intended for the

17   defendant then, you know, we can start putting on some

18   evidence and I will scrounge -- I will do that today, but it's

19   gonna be a little haphazard.  I'm gonna call the government's

20   witnesses that they have in the courtroom today, but I don't

21   think that that's necessary.

22              THE COURT:  All right.

23              MR. LEMONS:  Well, Your Honor, I think it's

24   pretty clear and the law is pretty clear that the reason that

25   the defendant testifies at a Motion to Suppress or if a

1    defendant files an affidavit, the government is precluded from

2    using that evidence in its case in chief.

3            The only time that the government could use that

4    evidence is if the defendant later took the stand and said

5    something completely different from his or her testimony at

6    the motion hearing.  So if -- that's precisely why the

7    defendant has to prove standing and that's precisely why the

8    Courts have uniformly stated that that evidence is not

9    admissible against a defendant and in the government's case in

10   chief.  It's basically --

11           THE COURT:  Well, you're saying that he lacks

12   standing because he's a non-addressee essentially.  There's no

13   evidence that he has an expectation of privacy as a sender or

14   an addressee.  Is that correct?  I mean, that's the case law.

15   Wait.  That's the case law that you cited.

16           MR. LEMONS:  That's what the -- he does not have

17   -- well, he hasn't demonstrated that he has privacy interest

18   as a sender or an addressee.  I agree with what you said

19   earlier to defense counsel.  In *Pitts*, the defendant filed an

20   affidavit, as you stated, saying that is my property, I have

21   not abandoned my interest in this property.  An then the

22   government -- I mean, the burden shifted.  And so the

23   defendant did establish that he had standing in that case.

24           THE COURT:  Okay --

25           MR. LEMONS:  And that's the defendant's case.

          THE COURT:  Yeah, well, yeah, they talk about the

anonymous -- the argument on anonymity, right?

          MR. LEMONS:  Yes, and Your Honor, I'm not saying

that the defendant can't have a privacy interest in a package

not addressed to him or her.  That's not the law.  Okay.  And

I'm not saying that and I hope the Court doesn't understand me

to be saying that.

          THE COURT:  To be saying what?

          MR. LEMONS:  To be saying that you cannot have

privacy interest in the package because your name isn't on it.

But you have to demonstrate.  If your name is on it, it's

pretty low bar to cross.  If somebody else's name on it, it's

a different story.  But in *Pitts*, they did it.  They filed an

affidavit.

          THE COURT:  All right.  Mr. Gavras, so you do --

you understand that you bear the burden.  The defendant

objecting to search bears the burden of proving a legitimate

expectation of privacy in the area search, in the packages

searched.  So where is that?  If you put that on first and

then he can go forward or not go forward.

          MR. GAVRAS:  Well, then we'll put it on, judge.

          THE COURT:  Okay.

          MR. GAVRAS:  I'm sorry.

          THE COURT:  Well, that's what the law says.  You

bear the burden.

1            MR. GAVRAS:  Then, Your Honor --

2            THE COURT:  Of proving a legitimate expectation.

3   So what is the legitimate expectation of privacy in the

4   packages?  That's it.  And that's a simple question and

5   really, the *Pitts* case, as we both have discussed -- as we've

6   discussed, they do have an affidavit by the defendant.  So you

7   either have an affidavit or you put on the defendant or any

8   other witness.  I don't know if any other witness can talk

9   about the reasonable expectation of privacy other than your

10  own witnesses, but I will leave that to you.

11           MR. GAVRAS:  Thank you.  I will call my first

12  witness if the Court would like --

13           THE COURT:  Okay, go ahead.

14           MR. GAVRAS:  Okay, Jeremiah Cruz.

15           MR. LEMONS:  Your Honor, I'm gonna ask for an

16  offer of proof as to how Mr. Cruz knows what interest the

17  defendant had in this particular package.

18           MR. GAVRAS:  Your Honor --

19           THE COURT:  What's your offer of proof on calling

20  Jeremiah Cruz?

21           MR. GAVRAS:  Well, Your Honor, first I don't

22  think I should be required to present an offer of proof.  But

23  secondly, I think he's gone -- I think he was going to testify

24  that he has knowledge that the package were intended for my

25  client.

```
 1                    THE COURT:  They were intended for your client or

 2       your client has a reasonable expectation of privacy in those

 3       --

 4                    MR. GAVRAS:  Right, that --

 5                    THE COURT:  You have evidence of that?

 6                    MR. GAVRAS:  That he was the recipient.

 7                    THE COURT:  Okay.  That's his offer of proof.

 8       All right.  Wait.  He was the recipient or he was -- has an

 9       expectation of privacy as he was the actual addressee?  Is

10       that what you're saying?

11                    MR. GAVRAS:  One and/or both.

12                    THE COURT:  All right.  Let's see if he can put

13       it on.  Go ahead.  Call him to the stand.

14                    THE CLERK:  Sir, please raise your right hand.

15       You do solemnly swear that the testimony you are about to give

16       in the case now before the Court will be the truth, the whole

17       truth, and nothing but the truth so help you God.

18                    THE WITNESS:  I do.

19                    THE CLERK:  Sir, please be seated.  Please state

20       your full name and spell your last name for the record?

21                    THE WITNESS:  Jeremiah Cruz.  C-R-U-Z.

22                    THE CLERK:  Thank you.

23

24                            DIRECT EXAMINATION

25       BY MR. GAVRAS:
```

*Direct - Cruz*

1      Q.   Okay.  So you're aware of some packages that were

2  seized and in regard to this case?

3      A.   Yes, I am.

4      Q.   At the post office; correct?

5      A.   It was not the post office.

6      Q.   Okay, where was it?  I'm sorry.

7      A.   The packages were delivered to a CMRE, which --

8  commercial mailing.

9      Q.   Oh, okay.  Fine.  Thank you.

10         And those were two packages; correct?

11     A.   Yes.

12     Q.   And do you recall the dates that they were delivered?

13     A.   No, not offhand.

14         THE COURT:  Can we identify them as Sullivan 1

15  and Sullivan 2 package and then Justine Cruise package.

16  There's three different packages.  That would be helpful.

17         MR. LEMONS:  We've identified them in the search

18  warrants, Your Honor.  They're identified as the Sullivan

19  package and the Sullivan 2 package.

20         THE COURT:  That's right.  Okay.  You're right.

21  And then the third one.

22         MR. LEMONS:  The third one is Justine Cruise.

23         THE COURT:  Right.  Okay.  So take out the one.

24  Yeah, thank you for that correction.  Okay.  Go ahead.

25  MR. GAVRAS:  (CONTINUING)

*Direct - Cruz*

1       Q.    Okay.  Are you familiar with the search warrants in

2  this case?

3       A.    Yes.

4       Q.    Okay.  Are you familiar with the designation of

5  packages, as Mr. Lemons has just stated?

6       A.    They being identified as Sullivan and Sullivan 2

7  package?

8       Q.    Right.

9       A.    Yes.

10      Q.    Okay.  You're not familiar with the Justine Cruise

11  package?

12      A.    No, yes, I am.

13      Q.    You are familiar with that one?

14      A.    The Justine?

15      Q.    Right.

16      A.    Yes.

17      Q.    Okay.  And approximately what was the date of the

18  Justine package seizure?

19            MR. LEMONS:  Judge, I'm gonna object because

20  there's been no -- the Justine Cruise package, there's been no

21  objection -- I'm sorry, I withdraw the objection.  I'm sorry.

22  I withdraw the objection.

23            THE COURT:  All right.  Go ahead.

24  BY MR. GAVRAS: (CONTINUING)

25      Q.    Okay.  Could you state the date, approximate date of

*Direct - Cruz*

1    the Justine?

2        A.    I'm not too sure.  I know it was in 2012, late 2012.

3        Q.    It was a little while ago, right?

4        A.    Yes.

5        Q.    Okay.  Thank you.  And then we had the Sullivan and

6    the Sullivan 2 packages; correct?

7        A.    Correct.

8        Q.    And when were they approximately?

9        A.    I believe, 2015.

10       Q.    Okay.

11       A.    Yes.

12       Q.    And do you recall the month?

13       A.    July.

14       Q.    July.  They were both in July; is that right?

15       A.    Correct.

16       Q.    Okay.  And I'm sorry, were they on the same day or

17   different days?

18       A.    Same day.

19       Q.    Okay.  Now, the -- this was in -- these packages were

20   seized and eventually, I guess, either pursuant to or

21   eventually became somehow involved in relationship to an

22   investigation with my client; correct?

23       A.    Yes.

24       Q.    Okay.  And is it the -- and when did you get involved

25   in the case?

*Direct - Cruz*

1    A.    In which -- I'm sorry, which one?

2    Q.    When did you start investigating my client?

3    A.    In 2012.

4    Q.    Okay.  Based upon the Justine -- do you call it the

5    Justine package or the Justine Cruise package?

6    A.    Justine Cruise.

7    Q.    Justine Cruise package.

8          And where was that package, who was it addressed to?

9    A.    It was addressed to Justine Cruise.

10   Q.    And who is that?

11   A.    We don't know.

12   Q.    Okay.  And where was the address to be delivered?

13   A.    I don't recall, but I believe it was, I believe it

14   was Dairy Road, the defendant's address.

15   Q.    The defendant's address, where he lived?

16   A.    I believe so.

17   Q.    Okay.  And?

18         THE COURT:  I'm sorry, where who lived?

19         MR. GAVRAS:  The defendant.

20         THE COURT:  Okay.

21   BY MR. GAVRAS: (CONTINUING)

22   Q.    Correct, sir, the defendant lived there?

23   A.    Yes.  Well, I believe he lived there.  At that time,

24   we didn't know he was living there.

25   Q.    Okay, you stated you believe you know he was living

*Direct - Cruz*

1    there?

2        A.    Yes.  Well, at the time we seized that package.

3        Q.    Yes?

4        A.    We didn't know for sure if that was his --

5        Q.    But had a good idea that was his residence at the

6    time -- soon after you seized package; correct?

7        A.    Yes, because that's the address that when we did our

8    research, that it was listed to him.

9        Q.    Okay.  So you know now.  You may not have known

10   exactly at the time, but you know now that that was his

11   residence; correct?

12       A.    Correct.

13       Q.    And it was addressed there.

14             Was there anyone else living there?

15       A.    I believe so, yes.

16       Q.    Okay.  Who?

17       A.    His family.

18       Q.    Okay, was there a Justine Cruise living there?

19       A.    We couldn't identify a Justine Cruise.

20       Q.    Okay.  And subsequently, who -- and is this

21   essentially the same -- who was the Sullivan package addressed

22   to?

23       A.    It was addressed to a Jane Sullivan.

24       Q.    Okay.  And the Sullivan 2 package?

25       A.    The same name.

1    Q.   Okay.  What address?

2    A.   I don't recall the address.

3    Q.   What was my client's involvement with those packages?

4    A.   I didn't know, at the time, if it was for him.  We --

5  I'm sorry.

6    Q.   Okay.  But you did a follow-up investigation?

7    A.   Yes.

8    Q.   Okay.  And what was my client's involvement with

9  those packages as you have learned from all of your

10 investigation?

11   A.   He picked it up.

12   Q.   He picked up those packages?

13   A.   Yes.

14   Q.   He signed for those packages?

15   A.   I don't recall if he signed for it.

16   Q.   Okay.  And was the Justine package delivered?

17   A.   Yes, it was.

18   Q.   Okay.  Were the Sullivan packages delivered or did he

19 pick those up?

20   A.   They picked 'em up at the CMRE.

21   Q.   And who did?

22   A.   The defendant and his girlfriend.

23   Q.   Okay.  Now, you've done further investigation in this

24 case, right?

25   A.   Yes.

1      Q.   Okay.  And who's -- is it the government's belief,

2   when I say the government, you know, the agents, yours, based

3   upon what you've learned, is it your believe that my client

4   had an interest in those packages or the contents of those

5   packages?

6      A.   Yes, we believed that it was intended for him.

7      Q.   Okay.  In fact, all three of those packages; correct?

8      A.   Yes.

9      Q.   Okay.  So the packages in other words what you're

10  saying, just to make very clear, it's the government's

11  contention that when the packages were sent, they were sent,

12  they were intended for him; correct?

13     A.   That was our understanding it was for him.

14     Q.   Okay.  That's your current understanding?

15     A.   Yes.

16     Q.   Correct?  Okay.

17          And so despite these names on the package and you

18  might refer to 'em as fictitious names or I don't think I'm

19  saying the word right, but nom de guerre or something.  These

20  were his; correct?

21     A.   Well, we didn't know until he picked it up.

22     Q.   Yeah, yeah.  I know, I know.  I understand that.  I'm

23  talking about what you know from now, right now?

24     A.   Well, now I know it was for him.

25          MR. GAVRAS:  Okay.  I don't have any other

1    questions.

2                    THE COURT:  Mr. Lemons.

3

4                         CROSS-EXAMINATION

5    BY MR. LEMONS:

6        Q.    Justine Cruise, that's spelled C-R-U-I-S-E; is that

7    correct?

8        A.    Correct.

9        Q.    And that package was delivered to a cluster box; is

10   that correct?

11       A.    Yes.

12       Q.    Okay.  It wasn't taken to -- it was taken to a

13   cluster box, right?

14       A.    Well, actually, it's addressed to a cluster box, but

15   when we delivered that package on the controlled delivery, we

16   had them pick it up at the post office.

17       Q.    Okay.  And who showed up to pick that package up?

18       A.    A female by the name of Marissa Crisostomo.

19       Q.    Okay.  Justin Cruz didn't show up to pick it up; is

20   that correct?

21       A.    He did not.

22       Q.    Okay.  And let's fast forward it to the Sullivan

23   packages.

24            When those packages were taken out of the stream of

25   mail back in July of 2015, did you know who was supposed to

*Cross - Cruz*

1 pick 'em up?

2    A.    No.

3    Q.    When they were taken back to -- the name of the place

4 was your market, UR Market?

5    A.    Yes.

6    Q.    Now, you videotaped that whole delivery process when

7 they came and picked it up from the UR Market; is that

8 correct?

9    A.    Don't recall video.  I know we took photographs.

10    Q.    Okay.  And who went inside UR Market and picked up

11 the packages?

12    A.    His girlfriend.

13    Q.    And where was Justin Cruz when the girlfriend went in

14 and picked up the packages?

15    A.    He was in the vehicle.

16    Q.    And who came out with the packages?

17    A.    The girlfriend.

18    Q.    And where were the packages, where did she put the

19 packages?

20    A.    She placed them in the car.

21    Q.    Okay.  Now, the defendant was later arrested the next

22 day; is that correct?

23    A.    No, that same day he was arrested.

24    Q.    Same day.

25    A.    (Nodded head.)

1    Q.   You recovered the two Sullivan packages the next day;

2    is that correct or was it the same day?

3    A.   The same evening we executed.

4    Q.   And were they recovered in Justin Cruz's house?

5    A.   No.

6    Q.   Where were they recovered?

7    A.   They were still in the vehicle.

8    Q.   Okay.  Now, is that mailbox registered to Justin

9    Cruz?

10   A.   No.

11   Q.   Was it registered to his girlfriend?

12   A.   No.

13   Q.   Who is it registered to?

14   A.   I don't recall the name, but I believe it's the

15   girlfriend's aunt.

16   Q.   Okay.  So is Justin Cruz's girlfriend's aunt is the

17   person, who the box was registered to?

18   A.   I believe so, yes.

19   Q.   Did you ever see Justin Cruz touch either of the

20   Sullivan packages?

21   A.   No.

22   Q.   Are there any photos of him ever touching those

23   packages?

24   A.   Not that I'm aware of, no.

25   Q.   And, again, they didn't even go inside his house; is

*Cross - Cruz*

1    that correct?

2        A.    No.

3        Q.    And when they came into the post office, did you know

4    that they were gonna be Justin Cruz's?

5        A.    No, we did not.

6        Q.    Okay.

7        A.    We --

8        Q.    You had a hunch that it was meant for him; is that

9    correct?

10       A.    Yes.

11       Q.    And that's based on the investigation, is that a fair

12   statement?

13       A.    Yes.

14              MR. LEMONS:  I have no further questions, Your

15   Honor.

16              THE COURT:  Okay, Mr. Gavras.

17

18                    REDIRECT EXAMINATION

19   BY MR. GAVRAS:

20       Q.    Okay.  Mr. Lemons used the word "hunch."  Now, for

21   the Christine Cruise package --

22              THE COURT:  Justine Cruise.

23              MR. GAVRAS:  I'm sorry, Justine Cruise.

24   BY MR. GAVRAS: (CONTINUING)

25       Q.    In 2012, when you first picked it up, you had what

*Redirect - Cruz*

1    could be called -- when you first were flagged to the package

2    and got to learn what was inside the package, you had a hunch

3    that it was my client's; correct?

4         A.    We believe it could have been his.

5         Q.    It could have been?

6         A.    Because of the similar name.

7         Q.    But subsequent investigation up to and including this

8    very moment, you know that package was intended for my client;

9    correct?

10        A.    Yes.

11        Q.    All right.  Same thing is true for the other two

12   packages; correct, you have more than a hunch, you know they

13   were intended for my client; correct?

14        A.    Yes.

15        Q.    Thank you.

16             THE COURT:  So are you saying that, officer, that

17   the names Sullivan, as noted as the addressee in the Sullivan

18   package and the Sullivan 2 package, appears to be aliases for

19   this defendant?  I mean, that was your information?

20        A.    Well, not an alias.  But we, in my experience, we

21   know that people use fictitious names.

22             THE COURT:  Right.

23        A.    But I've never come across that name as being an

24   alias.

25             THE COURT:  For this defendant?

*Redirect - Cruz*

1      A.    Yes.

2            THE COURT:  But why did you say you felt -- you

3      had a hunch that this was his package?

4      A.    Based on the information that we had gathered prior

5      to the packages being delivered.

6            THE COURT:  Okay.

7            MR. LEMONS:  No further questions.

8            THE COURT:  Okay.  You may step down.

9            Mr. Lemons, on this *Pitts* case, how do you

10     distinguish *Pitts* then?

11           MR. LEMONS:  Distinguish it from?

12           THE COURT:  From the case at hand.  What is --

13     what does *Pitts* say or does *Pitts* say this issue to remain

14     anonymous when sending or receiving a package.  What does

15     *Pitts* say in that circuit?  I guess that's the Seventh

16     Circuit.

17           MR. LEMONS:  I guess what *Pitts* says is that if

18     you use a fictitious name or address, the way I read it

19     practically, is that your ability -- it doesn't mean you don't

20     have standing.  You just have to demonstrate with something

21     extra than if it's delivered to, like in the *Manley* case it

22     was sent to his mailbox.  And it also used his last name.  So

23     there was quite a few indicias there.

24           In this case, you heard TFO Cruz, the defendant

25     didn't even touch the packages, never took them in his house.

1  They were still in the car after they were arrested.  But what

2  *Pitts* says is that you can still have standing in a package,

3  whether or not it's addressed to a fictitious addressee or

4  not.  The defendant just has to demonstrate that.

5           THE COURT:  Right, there has got to be something

6  put forward.

7           MR. LEMONS:  Yes.

8           THE COURT:  Like I think in this -- I think in

9  the *Pitts* case, he said he had an alias.

10          MR. LEMONS:  Correct.  And he said I never gave

11  up any interest in this package and I think that was part of

12  the affidavit that he filed.

13          THE COURT:  Right.  Okay.  Well, it's your case.

14  Your burden, Mr. Gavras.

15          MR. GAVRAS:  Your Honor --

16          THE COURT:  I'm trying to see how *Pitts* really

17  helps you.  Because *Pitts* actually has more evidence.  You

18  know what I'm saying.  It really does.  The *Pitts* case really

19  does have more evidence of an expectation of privacy.

20          MR. GAVRAS:  Well, I think -- well, first if I

21  may, I think perhaps I'm missing the point.  But it seems

22  rather simple to me.  May be two steps involved.  The Supreme

23  Court has ruled that a person has an expectation of status of

24  privacy in their packages, actually sending or receiving them.

25  Here, it was sent to him.  The agent testified it was intended

1    for him.  Now, we know there --

2              THE COURT:  That's what he thinks he said he had

3    a hunch or he believed.  But the question is, what's his

4    reasonable expectation of privacy, your client's reasonable

5    expectation of privacy.

6              MR. GAVRAS:  I don't think that if... okay.  If

7    the agents search a house and then a defendant raises a

8    suppression issue and then the government says, well, the

9    defendant hasn't put on evidence of standing, they have the

10   burden of that and then the defendant -- defense attorney

11   calls the agent to the stand and says, whose house is that?

12   And he says to the defense attorney, well, that's your

13   client's house based upon my investigation.  And in fact, he

14   even said that to the Court.  You know, he knows that there

15   are -- my clients used aliases in the past or different names.

16   He doesn't, apparently according to the agent's testimony, he

17   doesn't stick to any particular name.  And I believe -- you

18   know, at first we had a hunch that it was the defendant's

19   house, your client's house, but then we -- you know, we know

20   in the case here, he said it was intended for him.  I asked

21   him you have more than a hunch.  You knew it was intended for

22   him.  And he said yes.  So if I ask that agent in this

23   hypothetical case, whose house is that, how do you know -- you

24   know, is that my client's house, he says yes, that was your

25   client's house at the time.

```
 1                    THE COURT:  Yeah, but we're not talking about any
 2       houses here, are we?
 3                    MR. GAVRAS:  I understand that.  But we're talk
 4       -- I understand that.
 5                    THE COURT:  Let's talk about the mail.
 6                    MR. GAVRAS:  Under that --
 7                    THE COURT:  That's different, because I mean, you
 8       know, addressing to a house is one thing.  But what about
 9       addressing to a -- this is like a general, what is it -- it's
10       like a... retail store.
11                    MR. GAVRAS:  The UR Market.
12                    THE COURT:  It's a market.
13                    MR. GAVRAS:  Yeah, it's one of these places where
14       you rent a mailbox.
15                    THE COURT:  So it's like a -- okay.  It's like a
16       satellite mail.
17                    AGENT CRUZ:  Private mail.
18                    THE COURT:  Private mail station there at the
19       market.
20                    AGENT CRUZ:  Yes.
21                    THE COURT:  So people can -- and it's handled by
22       the United States Postal Service.  I mean, they run it, right?
23                    AGENT CRUZ:  No, it's a private company, so
24       they --
25                    THE COURT:  Yeah.
```

1          AGENT CRUZ:  It's a private company so it's

2   handled by the owners.

3          THE COURT:  It's handled by the owners, but they

4   work on that in conjunction with the U.S. Postal Service when

5   the mails come in?

6          AGENT CRUZ:  Yes.

7          THE COURT:  Right?  Does it go -- it goes

8   directly to them?  Is that how it goes through the stream of

9   mail if something is mailed in from California?  Does it go

10  directly to the private --

11         AGENT CRUZ:  It goes to the main post office and

12  then delivered to them.

13         THE COURT:  Okay.  All right.

14         MR. GAVRAS:  You know, Your Honor.

15         THE COURT:  Okay.

16         MR. GAVRAS:  If I need to get away from the house

17  example and I think they're both relevant because it goes to

18  what you have a reasonable expectation of privacy.  I'm giving

19  the house example because it's so clear that in that case the

20  defendant wouldn't have to have taken the stand say this was

21  my house.

22          The Supreme Court has said in *Ex parte Jackson*,

23  "Letters and sealed packages of this kind in the mail are as

24  fully guarded from examination and inspection, except as to

25  their outward form and weight, as if they were retained by the

*Redirect - Cruz*

1    parties forwarding them in their own domiciles."  Well, the

2    reason that's important with me and again, I wish I knew

3    exactly what I'm missing here.  We're not in sync here because

4    if the Court has stated, the Supreme Court has stated that a

5    person has a reasonable expectation of privacy in their mail

6    so let's assume it was addressed to my client.

7                    THE COURT:  Well, the question is:  Does he have

8    a reasonable expectation, does your client have a reasonable

9    expectation of privacy in these two --

10                   MR. GAVRAS:  Even Mr. Lemons has conceded that if

11   my client's name was on those packages, he would.

12                   THE COURT:  Well, your client's name is not on

13   the package.

14                   MR. GAVRAS:  I understand, but then we've

15   established two things.

16                   THE COURT:  And your client's address is not on

17   the package; correct?  Is that correct?

18                   MR. GAVRAS:  Yeah, I believe so because it was

19   delivered to his place.

20                   THE COURT:  And there's no evidence --

21                   MR. GAVRAS:  Well, I think maybe the first

22   package it was.  I think the agent testified on that; that

23   Justine Cruise package was.  But --

24                   THE COURT:  He said, what did he testify about

25   Justine Cruise?

1          MR. GAVRAS:  I believe he said, my client's

2    address was on that package.

3          THE COURT:  Oh, right.  That's right.  The, let's

4    see.  Well, where it actually ended up, right?  Okay, there

5    was a tracking number and that's where the -- where it finally

6    ended up going right, isn't that on the Justine Cruise?

7    Because Justine Cruise, there was a PO Box 6263 under Priority

8    Mail.  Dairy Road.

9          AGENT CRUZ:  Yes, Your Honor, that's -- it was

10   going to a cluster box.

11         THE COURT:  Which is what?  What is -- same thing

12   that we're talking about like --

13         AGENT CRUZ:  No, it's actually a standalone box

14   they have in the villages.

15         THE COURT:  Okay, that's right.  I've seen those.

16   So standalone post office box?

17         AGENT CRUZ:  Yes.

18         THE COURT:  That was where it was being

19   delivered.

20         AGENT CRUZ:  That is where it was addressed to.

21         THE COURT:  Right.

22         AGENT CRUZ:  However, when we did the delivery

23   that day, we had them come to the post office.

24         THE COURT:  Oh, I see.  They left a note out and

25   then they --

1                  AGENT CRUZ:  Yes.

2                  THE COURT:  -- went over there.  But the address

3     of the PO Box 636B, Dairy Road, that was addressed to who?

4     Whose address is that?

5                  AGENT CRUZ:  That's the address we believe Justin

6     Cruz's address.

7                  THE COURT:  Justin, the defendant.

8                  AGENT CRUZ:  Yes.

9                  THE COURT:  That's what your information, it was

10    his box?

11                 AGENT CRUZ:  Yes.

12                 THE COURT:  Standalone box?  All right.  Go

13    ahead.

14                 MR. GAVRAS:  So what I'm saying is, if packages

15    are protected and the agents testify that this package was

16    sent by somebody intended for my client, then the logic of

17    that is that my client has standing.  Because if it's intended

18    for you, then you're the recipient.

19                 THE COURT:  Well maybe for the Justine Cruise

20    package, the addressee, that you can say that.  But what about

21    the Sullivan and the Sullivan 2 package?

22                 MR. GAVRAS:  Well, based upon the reasoning of

23    *Pitts*.

24                 THE COURT:  But *Pitts* talks about aliases.

25                 MR. GAVRAS:  Right.

```
1            THE COURT:  And abandonment and so forth.  How is
2   Pitts similar to -- what is it that your client -- how is your
3   client asserting his expectation of privacy in Sullivan 1 and
4   Sullivan 2?
5            MR. GAVRAS:  Look, maybe this is the distinction
6   that where the point the Court has made that I missed, is that
7   let's assume this post office box wasn't his, okay, and, but
8   if I send my wife a letter to her sister's post office box and
9   it's addressed to my wife, my wife has standing for that.
10           Change the facts a little bit, if I call my wife
11  by a different name, but I --on the package, and I send it to
12  her at her sister's address, post office box, she still has
13  standing, if I get up or somebody else gets up and testifies
14  that yes, I intended that package for my wife.  I have seen
15  nothing, nothing in the case law which would say that oh,
16  well, you know, you can only have an expectation of privacy in
17  your mail box.  Nothing has said that.  And the --
18           THE COURT:  Well, it's not your mailbox.  It's
19  your expectation of privacy in the package.
20           MR. GAVRAS:  Exactly.
21           THE COURT:  So the question is:  What -- where is
22  your client's reasonable expectation of privacy in that
23  package?
24           MR. GAVRAS:  It was intended for him.
25           THE COURT:  Well, where is his reasonable
```

*Redirect - Cruz*

1  expectation of privacy?

2          MR. GAVRAS:  I think that makes it -- packages by

3  their very nature, if anything, they go from one person to

4  another.  They're intended for a person.  It's -- that person

5  they're intended for is the recipient, a recipient.  If you go

6  by *Pitts*, a recipient always has a reasonable expectation of

7  privacy in their package.

8          Now, some Courts say you only do if your name is

9  stamped on that package.  But *Pitts* says you always do because

10 you are the recipient.  I mean and I think -- I mean when we

11 think about exactly what post offices are, it's a sender and a

12 receiver.  My client was the receiver.  The agent testified to

13 that.

14         THE COURT:  No, you said your client -- you said

15 your client did not receive it.  Your client was not --

16         MR. GAVRAS:  He was -- it was intended for him.

17         THE COURT:  Well, he thinks it was but...

18         MR. GAVRAS:  Well, you know, I -- to my way of

19 thinking.

20         THE COURT:  You're saying that the prosecution's

21 own witness is essentially saying that that property was your

22 client's property?

23         MR. GAVRAS:  Yes.  That's exactly how I took it.

24 If you intend -- if someone testifies --

25         THE COURT:  And are you saying then that your

```
1   client is also asserting that yes, he had a reasonable
2   expectation of privacy?
3               MR. GAVRAS:  I am asserting that we have shown,
4   through the evidence of the agent, my client had a reasonable
5   expectation of privacy in that package, yes.  Maybe -- I -- I
6   -- you know, could the agent have gone further, perhaps and
7   said he owned the contents of the package?  Somehow -- well,
8   I'm not quite understanding the Court's logic here.
9               THE COURT:  Well, I was -- you know, you cited to
10  Pitts and Pitts talked about aliases.  So the question was,
11  okay, if you're talking about aliases, then is he using
12  Sullivan as his alias and the answer no.  There's no evidence
13  of that according to officer.  He's not or there's no other --
14              MR. GAVRAS:  No, I think the officer's response
15  is that he was -- he was.  I think the officer's response
16  saying I don't know about aliases, in other words, an alias as
17  the police use it, and I think --
18              THE COURT:  Well, I thought he said -- I thought
19  -- I was understanding, maybe that could be corrected, that
20  there was no -- no known understanding that he used the name
21  Sullivan as his alias.
22              MR. GAVRAS:  Yes, that's what he testified to.
23              THE COURT:  Right.  Okay.
24              MR. GAVRAS:  There's not a generalized known or
25  that anybody else knows that he uses that name.  I agree with
```

*Redirect - Cruz*

1    that.  But he did testify that the package was his.  I think

2    as soon as it's determined that a person is a recipient of a

3    package, according to *Pitts* --

4                THE COURT:  But who is the recipient of this

5    package?  It was his girlfriend.

6                MR. GAVRAS:  No, he said -- he did say very

7    specifically that it was intended for my client.

8                THE COURT:  No, but you said the recipient.  Who

9    received this package?  It was the defendant's girlfriend that

10   actually received it and signed it and took it to the car

11   according to the evidence.  Right?

12               MR. GAVRAS:  I think -- I think -- I think that

13   the person -- a package is sent to a person.  If that person

14   is the intended, if it's intended for -- if A sends a package

15   to B and it's intended for B, it doesn't matter if it starts

16   off, if it first gets -- its first stop is C's mailbox; B

17   still has an interest in that package because it's intended

18   for him.  In fact, as it's -- you could make the further

19   argument and there are cases that talk about this where you

20   have dual -- two people can have an interest in a package.

21               THE COURT:  Yeah.

22               MR. GAVRAS:  So if A sends it to B, let's if say

23   A sends it, it's intended for B, but it's going to go through

24   C's mailbox, I think under those circumstances, though I can't

25   swear to it, an argument could be made that both B and C have

1  intended certainly before the point that C gives the package

2  to B, C would have an interest, but all along, B does because

3  he, it is intended for him.

4          THE COURT:  So even if the officer thinks it was

5  intended for him, the question really is -- the question is,

6  does the -- has the defendant shown that he -- I mean, he does

7  bear the burden of proving that he, himself, had a legitimate

8  expectation of privacy in the packages.

9          MR. GAVRAS:  Well, and I would have to say that

10  the preponderance -- by easily by the preponderance of the

11  evidence, the -- we have to take the officer's statement as

12  true because -- that the package was intended for my client.

13          THE COURT:  Yeah, but no, but it goes on to say

14  legitimate expectation of privacy and the -- legitimate

15  expectation of privacy exists when the defendant exhibits a

16  subjective expectation of privacy.  How did he -- how did your

17  client demonstrate a subjective expectation of privacy?

18          MR. GAVRAS:  I'm sorry, where are you reading,

19  Your Honor?

20          THE COURT:  I'm citing to the *Ruth* case.

21          MR. GAVRAS:  I don't think I have that.

22          THE COURT:  That's cited in your *Pitts* case.

23          MR. GAVRAS:  Right.

24          THE COURT:  So look under --

25          MR. GAVRAS:  Let me go to *Pitts*.

*Redirect - Cruz*

1          THE COURT:  *Pitts*.  Under B.  Section B of the...

2    I don't want to spend much more time on this, but try to --

3    see subsection B?

4          MR. GAVRAS:  Yes, Your Honor, I'm there now.

5    Yeah, abandoned property.  Okay.  "A defendant objecting to

6    the search...bears the burden of proving a legitimate

7    expectation of privacy in the area searched." (Reading.)  I

8    think that... (reading).  Right.  I mean, this goes to a whole

9    -- I mean, yeah, this goes to the question of abandonment.

10          THE COURT:  Okay.

11          MR. GAVRAS:  Then we go to the very next

12    sentence.  And then there comes a question of burden.  This --

13    abandonment would have to be a shifting burden for the

14    government.  I mean we've proved that -- I believe we've

15    proved very conclusively that because the package was intended

16    for my client, that under *Pitts*, he has a reasonable

17    expectation of privacy.  And there's no indication anywhere

18    that my client abandoned the property.  In fact, if the

19    government wants to put on an agent to say that, I think it

20    will be pretty easy to show that he didn't abandon the

21    property.

22          THE COURT:  What is it -- so subjectively, I'm

23    just saying what is the evidence that's been presented so far

24    that shows that your client subjectively had an expectation of

25    privacy?  Show it to me in anything that's been presented so

1   far.  Where your client subjectively demonstrated --

2              MR. GAVRAS:  Your Honor, if I may.  If I may.

3              THE COURT:  Okay.

4              MR. GAVRAS:  If a package is sent to me, but I

5   don't know it's sent to me, okay, I still have an expectation

6   of privacy and it is -- the law says that if I'm the intended

7   recipient, I have an expectation of privacy.  There is nothing

8   that my client said to the agents, you know, that package is

9   mine.

10             THE COURT:  Right.

11             MR. GAVRAS:  Okay.  There's no evidence to that.

12  Maybe that he showed up to the post office that day, I don't

13  know.  But I don't think that's the law of expectation of

14  privacy.  I think you get into a mix of subjective and

15  objective.  I mean society, you know, you can't -- ultimately

16  it's an objective test.  Okay.  But if you -- but I mean

17  ultimately it is an objective test.  If the case law is

18  certain about anything, it's an objective test.  However, when

19  it comes to question of abandonment, then yeah, if a person

20  renounces their ownership of something by tossing it in the

21  landfill --

22             THE COURT:  Well, that happened, I mean that

23  happened also -- that was an issue in the *Pitts* case, which

24  you cite to.  But that's not in the case before the Court.

25             MR. GAVRAS:  Yes.  And I would agree.  If a

person says, but even there it's ultimately an objective
standard. I mean, you look to see what the person is
subjectively doing to determine whether or not something is
abandoned. You do look for it. What is in their mind with
regard to this thing they threw out their window. Did they
throw it out because they were in a fight with their spouse,
but they didn't intend to relinquish ownership of it? Or did
they throw it out because, you know, their kid brought home
some marijuana they're throwing it out the window. And
they're disgusted, they don't want it around. Okay. So a
subjective belief does matter a lot when it comes to
abandonment. But it doesn't come -- that subjective belief is
not an issue up until that point and of course we haven't
reached that point. There is no indication that my client
abandoned the packages.

       (Pause.)

       THE COURT: Okay. All right. Mr. -- okay, thank
you. All right, Mr. Lemons.

       MR. LEMONS: Your Honor, I don't know how we got
to abandonment.

       THE COURT: Well, I mean, he cites it. There is
-- they had the whole thing on abandonment in *Pitts*. It's not
relevant to --

       MR. LEMONS: I don't think that's an issue in
this case.

1          THE COURT:  It's not an issue.  But *Pitts* does

2    discuss abandonment.

3          MR. LEMONS:  It does discuss abandonment, but it

4    doesn't apply to this case.  Again=.

5          THE COURT:  Okay.

6          MR. LEMONS:  It's pretty clear.  To have

7    standing, and nobody has said that -- and I haven't argued

8    that because your name and your address isn't on the package,

9    that you don't have standing.  All I said was --

10         THE COURT:  Although those are factors that I can

11   look at, right?

12         MR. LEMONS:  Yes.  And if his name and address

13   would have been on there, he would have a less -- a very low

14   bar to go over to establish standing.  But in this case, he

15   doesn't have a low bar because not only was his name not on

16   it, not only was it not his address, the postal box wasn't

17   even registered to his girlfriend.  He didn't pick up the

18   package.  She did.  And the package never made it in his house

19   where he was arrested.  It was still in the car.  So he has

20   done nothing objectively to demonstrate that he had a

21   reasonable expectation of privacy and that that expectation is

22   one that society is prepared to recognize as reasonable.  It's

23   two-part test.  And in this instance, Your Honor, if he had

24   just done what the defendant did in *Pitts*, filed an affidavit

25   saying these are my packages and I was expecting 'em and I

1　intended to -- I was using a different name for the obvious

2　reasons, we would be in a different position than we're in

3　now.  But he's done nothing other than the agents saying well,

4　it was my hunch based on the investigation, I believe --

5　that's not the defendant exercising subjective actions that

6　the Court can say okay, this looks like it was his package.

7　And I'm making a finding that he has standing.  We haven't

8　gotten to that point yet.

9　　　　　　THE COURT:  All right.  Let's take a five-minute

10　recess on this.  I want to check one more thing.  I'm sorry,

11　the major case that you want to cite to, if I agree with you

12　then we won't have an evidentiary hearing.  What was the major

13　case that you were looking at again was, the one you told me

14　about, *Dorais*?

15　　　　　　MR. LEMONS:  Oh, I was looking at *Dorais* if the

16　Court wants the cite --

17　　　　　　THE COURT:  No, I got *Dorais*.  Yeah.

18　　　　　　MR. LEMONS:  And --

19　　　　　　MR. GAVRAS:  Could I have the cite for it?

20　　　　　　MR. LEMONS:  Again, *Pitts*.  Sure, I can --

21　　　　　　THE COURT:  Yeah, this was -- all right.  Let's

22　take a five-minute recess.  Why don't you look at it.  I got

23　this case too.

24　　　　　　(Recess taken at 2:48 p.m.)

25　　　　　　(Back on the record at 3:36 p.m.)

1          THE COURT:  We are back on the record.  *U.S.A. v.*

2    *Justin Robert White Cruz.*  The Court had an opportunity to

3    review the case by prosecution and then, yes, Mr. Gavras?

4          MR. GAVRAS:  Your Honor, I -- I've discussed

5    whether or not with my client whether or not he is amenable to

6    stating under oath that he had some interest in any of those

7    three packages and I explained to him that those -- if he

8    does, that can't be used against him at trial unless he were

9    to take the witness stand.

10         THE COURT:  Right.  It cannot be used against --

11   anything that he says cannot be used against him unless right,

12   he's gonna be impeached.

13         MR. GAVRAS:  And there is not a chance on God's

14   green earth that he is going to state that he has an interest

15   in any part of those three packages.

16         THE COURT:  Okay.  So he's saying that he does

17   not have any interest in those packages?

18         MR. GAVRAS:  Well, I just want to be very clear,

19   he is stating he is not going to make that statement.

20         THE COURT:  Okay.  Does he have any -- does your

21   client have any evidence to show that he has standing?

22         MR. GAVRAS:  Your Honor --

23         THE COURT:  To challenge these packages?

24         MR. GAVRAS:  Other than the evidence that we've

25   put on, no, ma'am.

1          THE COURT:  And what is the specific evidence

2     that shows that he has a -- that you have established a

3     reasonable expectation of privacy in the packages?

4          MR. GAVRAS:  It is our belief that an intended

5     recipient or person who the package is intended for always has

6     a reasonable expectation of privacy in the package.

7          THE COURT:  I'm sorry, it is your -- can you come

8     up to the podium?  I couldn't hear that.

9          MR. GAVRAS:  Sure.  It is our contention that a

10    person who a package is intended for always has a reasonable

11    expectation of privacy within that package.

12         THE COURT:  Okay, but he's not -- he's not an

13    addressee of this package; is that correct, the Sullivan 1 and

14    Sullivan 2?

15         MR. GAVRAS:  That's correct.

16         THE COURT:  And the Justine Cruise package, he

17    was not the -- there was not the addressee's name -- he is not

18    the addressee or his name is not the addressee?

19         MR. GAVRAS:  Clearly not, Your Honor.

20         THE COURT:  Okay.  And as you know, subjective

21    expectation of privacy is legitimate if it is one that society

22    is prepared to recognize as reasonable, right?  Is that the

23    case law?

24         MR. GAVRAS:  We -- we either interpret or apply

25    that differently than the Court has, but yes, I understand

*Redirect - Cruz*

1    that that is black letter case law.

2              THE COURT:  Mm-hmm.  Okay.  Is there any evidence

3    that shows any subjective expectation of privacy that he's

4    shown?  Is there anything that's been demonstrated in any of

5    the evidence before the Court?

6              MR. GAVRAS:  Again, other than what I've stated,

7    no other evidence.

8              THE COURT:  And what is that, that -- that

9    whoever it was intended for.

10             MR. GAVRAS:  Yes.

11             THE COURT:  Whoever the officer thinks it was

12   intended for.  That's what you're saying.

13             MR. GAVRAS:  It is -- the officer has established

14   without any objection by the prosecution that it was intended

15   for my client.  I don't think it's -- as I've stated and I

16   don't know if the Court is inviting me to do this, I don't

17   have to, but it -- just as if it were my house, the only

18   evidence that has to be put on is that it's my house.  There

19   doesn't have to be a statement by me that I believe I have

20   reasonable expectation of privacy.  I may be very avant-garde

21   and believe that no one should have an expectation of privacy

22   in their house.  Nonetheless, my -- just by putting on

23   evidence by an agent that my house was searched, that would

24   give me a reasonable ex -- that would provide standing.

25             THE COURT:  Well, and what did the officer

*Redirect - Cruz*

1    testify that is similar to that this is your house?

2              MR. GAVRAS:  Well, in a sense -- so far -- he

3    said the package was intended for him.  So we take that as

4    true.  The package was intended for him.  That was established

5    by preponderance of the evidence.  That in and of itself, in

6    our beliefs, is no different than an officer saying this was

7    Mr. Gavras's house that was searched.

8              THE COURT:  All right.

9              MR. GAVRAS:  It's a package that was intended for

10   him, it's my house, I live there.

11             THE COURT:  Yeah, I don't know if it goes that

12   far, but Mr. Lemons, let me hear from you and then we'll go on

13   to the next issue, I think.  I may just hold it under

14   advisement.  But we'll proceed forward.  Go ahead.

15             MR. LEMONS:  Your Honor, what TFO Jeremiah Cruz

16   established is that he had a hunch that this package was

17   intended for Justin Cruz.

18             THE COURT:  Mm-hmm.

19             MR. LEMONS:  But the evidence was even if we go

20   back to the Justine Cruise package, I believe he said that a

21   woman by the name of Crisostomo is the one who actually picked

22   up the package.

23             THE COURT:  Which package?  Be specific.

24             MR. LEMONS:  The Justine Cruise package.  That's

25   not the defendant and it's Justine Cruise.  C-R-U-I-S-E.  And

1  again, that's not a package that is really in question, as far

2  as suppressing evidence, because there's no evidence from that

3  package that we intend to use at trial.

4          THE COURT:  But back to the Justine Cruise

5  package.  This was, as I understand it from the officer, that

6  package was addressed to an address where the defendant name

7  was registered as the mailbox standalone; is that correct?

8          AGENT CRUZ:  Yes, Your Honor.

9          THE COURT:  Yeah.  Okay.  So he does say that as

10 it relates to the Justine Cruise package.

11         MR. LEMONS:  And that was in 2012.

12         THE COURT:  Right.

13         MR. LEMONS:  So now we fast forward all the way

14 to 2015, three years later.  And we have James Sullivan

15 package and James Sullivan 2 package addressed to a postal

16 mailbox going to the defendant's girlfriend's aunt.  And on

17 the --

18         THE COURT:  Going to the defendant's girlfriend's

19 aunt's mailbox?  That's right, right?

20         MR. LEMONS:  That's correct.

21         THE COURT:  Okay.

22         MR. LEMONS:  And even on the day that they did

23 the controlled delivery, the evidence is undisputed, is that

24 the girlfriend picked up packages, the girlfriend put them in

25 the car and the packages weren't even recovered in the

*Redirect - Cruz*

defendant's house.  They were still in the car when they were

recovered.  So this defendant has done nothing to demonstrate

that he had a reasonable expectation of privacy in the

Sullivan packages.

Again, it doesn't matter if it's a fictitious

name or not, you can have a reasonable expectation of privacy.

But you have to demonstrate it.  That's the defendant's burden

and he has not met that in this case.  I'm sure if we offer

evidence that --

THE COURT:  What about his -- what about his

argument that your officer just testified; that, that package

was definitely intended for him, but there was no -- we didn't

get that elaborated upon.

MR. LEMONS:  I don't think that was his

testimony.  He said based on his investigation, he had had a

hunch that it was going to him.  He also said that there was

-- the name James Sullivan was never associated as an alias

with the defendant.  So had he used that, the defendant used

that name as an alias, we might be able to draw a link, but

that wasn't the case.  And I'm sure if we offer that the

officer had a hunch that the defendant committed an offense,

I'm pretty sure the defendant will say, well, that's not

really good enough, I think the Court would agree with that.

And I -- you know, probably throw me out of this courtroom for

presenting that kind of evidence without anything more; that

1  the officer had a hunch that the defendant committed the

2  crime.  And so he has not met his burden to show that he has

3  standing, that he has a reasonable expectation of privacy in

4  those two packages that society is willing to recognize.

5          THE COURT:  Well, you're saying as to Sullivan 1

6  and Sullivan 2?

7          MR. LEMONS:  Yes.

8          THE COURT:  But on the Justine Cruise and we'll

9  get to that later.  Well, you're saying that he might have

10 established standing on Justine Cruise package.

11         MR. LEMONS:  I'm saying that he's got a lower bar

12 to jump over to establish that -- I haven't conceded that he's

13 established that he has standing on the Justine Cruise.  The

14 spelling is C-R-U-I-S-E.  Not C-R-U-Z.  And another individual

15 came to pick up that package, young woman by the name of

16 Crisostomo.

17         THE COURT:  Mm-hmm.  All right.  The second issue

18 that has been brought up, let's hold that -- this particular

19 issue in abeyance for a second.  Do the moving papers

20 establish an evidentiary hearing is required?  In other words,

21 and you've also asked that question, has the defendant raised

22 contested issues of fact.

23         MR. LEMONS:  Correct.

24         THE COURT:  Okay.  So since you raise that, what

25 is your position on that part?

1          MR. LEMONS:  Well, my position is, is until he's

2     established standing, he doesn't.  Now, if the defendant is

3     relying on the first Motion to Suppress, which basically

4     challenged the affidavit itself, I think the cases are pretty

5     clear; that an allegation alone that the warrant is

6     insufficient and the Court -- you have both warrants there,

7     both exhibits, and --

8          THE COURT:  Well, all three warrants.  There's

9     three -- actually four warrants.  But go ahead.

10         MR. LEMONS:  Well.

11         THE COURT:  There's four, but there's three in

12    question.

13         MR. LEMONS:  The two main warrants --

14         THE COURT:  Sullivan 1, yeah, let's identify

15    them.

16         MR. LEMONS:  Sullivan and Sullivan 2.

17         THE COURT:  Okay.

18         MR. LEMONS:  Are the two warrants that I'm

19    referring to.  There's no indication, either by any evidence

20    just Counsel's allegations in the motion, that the agent made

21    any misrepresentations or that the judge issuing the warrants

22    was acting as an advocate for the government as opposed to a

23    neutral and detached magistrate as Judge Perez, we believe,

24    was acting when he issued those two search warrants.

25         THE COURT:  What about his -- the defendant is

1    raising contested issues, he's raising the delay in obtaining

2    the search warrants.  He says you give a timeline, but there's

3    really -- it hasn't really been proved out the whole issue of

4    the delay.  Was it 24 hours, that's not really clear from the

5    paperwork or from the arguments.  And the second issue raised

6    was failure for the postal inspector to have sufficient

7    probable cause because, well, maybe this is a moot issue

8    because of the hidden markers for discovery and --

9              MR. GAVRAS:  The probable cause is -- was

10   contained within the search warrants.  Everything including

11   the certification of the dogs.

12             THE COURT:  Right, at the time that they wrote

13   this, though, I think there was some issues about -- maybe,

14   you know, the timing of the discovery or -- either

15   accessibility to discovery or the actual knowledge of the

16   evidence, whether or not that it showed that the canines were

17   properly certified and so forth.  Right?  I mean, there might

18   have been a timing issue when he raises some of these issues.

19   That's my point.  Right?

20             MR. LEMONS:  I'm not following.

21             MR. GAVRAS:  Your Honor, I believe that may have

22   been raised in my motion.

23             THE COURT:  Well, considering all your motions at

24   once, right?  Yeah.

25             MR. LEMONS:  I'm considering the ones filed both

1  by Mr. Lujan and --

2           THE COURT:  Right.  Correct.

3           MR. LEMONS:  Prior counsel and Mr. Gavras.

4           THE COURT:  Right.  So I mean are some of those

5  issues, do they not entitle him to an evidentiary hearing

6  assuming the Court finds he has standing, which I'm -- I want

7  to discuss that.

8           MR. LEMONS:  Your Honor, after doing research on

9  the dog issue, the defense is entitled to make its case on

10 whether or not the dogs are qualified or not.  I think that's

11 pretty much the holding in *Florida v. Harris*, which is a 2012

12 U.S. Supreme Court case.

13          THE COURT:  Uh-huh.  Therefore?  So you're saying

14 there are some -- does -- basically, the Court is -- has to

15 ask, has he raised any contested issue of fact.  If he has,

16 then he gets an evidentiary hearing assuming that...

17          MR. LEMONS:  Well, I think he can present

18 evidence on the certification of the dogs.  But, again, Your

19 Honor, if you look at the search warrant and let's just

20 assume, even though we put in our search warrant the dog's

21 qualifications because the Court requires prosecutors to put

22 that in there as part of the probable cause finding --

23          THE COURT:  I think that actually helps you and

24 helps the prosecution and the officer when they're trying to

25 establish probable cause.

1           MR. LEMONS:  Oh, I agree a hundred percent.

2           THE COURT:  That the dog is credible.  And

3    reliable.

4           MR. LEMONS:  When I saw his motion, I'm like,

5    well, gee, thankfully the Court makes us put this in here or

6    requires it.  But even if you took that out, Your Honor, I

7    think that if you read the search warrants, the affidavits in

8    support of the search warrants, there is still probable cause

9    there.

10           THE COURT:  Okay.  Yeah, that's -- that's the

11    issue, should the Court hold a hearing on that probable cause.

12           MR. LEMONS:  Correct.

13           THE COURT:  Does he raise anything that -- I

14    guess -- yeah, does he raise any issues that's contested with

15    regard to the affidavit that the Court should then hold a

16    hearing.

17           MR. LEMONS:  I don't believe he has, Your Honor.

18    And it appears as though Mr. Lujan was trying to raise a

19    Franks issue, but I mean, saying that an agent lied, I don't

20    think is really sufficient.

21           THE COURT:  Okay.  And then the issue of the

22    delay, that has not been flushed out though, on how long was

23    this delay and why there was this delay.  I don't think it's

24    very clear from the record.  Do you?

25           MR. LEMONS:  Well, Your Honor, if you look at

1    when the packages were searched and you look at when the

2    search warrants were issued, we searched on day one and they

3    were issued before 9 o'clock the next morning.

4            THE COURT:  Mm-hmm.

5            MR. LEMONS:  And --

6            THE COURT:  Well, does it start from the time

7    that the packages were actually detained?  Because really

8    we're doing an analysis on the detention too, right?

9            MR. LEMONS:  Yes.

10           THE COURT:  So you look at from the detention,

11   the very first time that it comes to the attention of the

12   officer, like oh, okay, look we might have something here, so

13   they start detaining it in order to build their reasonable

14   suspicions and than to go in and try to get probable cause

15   warrant, right?

16           MR. LEMONS:  Yes, Your Honor.

17           THE COURT:  So you look at the time of the

18   detention.  And it's not clear when that detention occurred.

19   It just says some time in the morning, I believe.  I don't

20   recall that.  But, he's raising that issue as well.  Is he

21   not?  The defendant.  When did it occur, how long did it

22   really occur?

23           MR. LEMONS:  Well, he did raise the issue that

24   the detention of the package was unreasonable.

25           THE COURT:  Yeah.  So is that -- that's a

contested issue of fact, right?  Wouldn't you agree?

           MR. LEMONS:  I will agree with your assessment.

           THE COURT:  Well, I mean just -- that's why I'm asking you with regard to the issues.  Are there any other issues that the defense brings up?

           MR. LEMONS:  No, Your Honor.  I don't see any others.  I'm sure --

           THE COURT:  So the Court just has to determine if there's sufficient definiteness, clarity and specificity to conclude that contested issues of fact exist.  And you're saying the only contested issue of fact might just be the delay, the delay in obtaining the search warrants for all packages?

           MR. LEMONS:  Yes.

           THE COURT:  Right?  And no other -- no other issue?

           MR. LEMONS:  No, Your Honor.

           THE COURT:  Okay.  Okay.  So the issue of the hidden markers, that was later -- you guys later gave them the evidence on that, right?

           MR. LEMONS:  I'm sorry, Your Honor?

           THE COURT:  The hidden markers, you know, the -- they had to do the spray on the packaging and they hadn't received that information at the time they filed their motion.

           MR. LEMONS:  Well, actually what defense counsel

1  said is he hadn't seen -- and that wasn't Mr. Gavras, it was

2  Mr. Lujan, said he didn't see markers.  Well, you can only see

3  the markers under black light.

4              THE COURT:  Right.

5              MR. LEMONS:  And he never arranged, called me or

6  the agents.  Say look, I want to --

7              THE COURT:  Okay.

8              MR. LEMONS:  Or I want to do it or I want my

9  investigator to come over.  In fact, we bought the boxes here

10  so -- because I wanted to show the Court if we went to a

11  hearing, that under black light, you could see those markings.

12              THE COURT:  Good.  All right.  Okay, Mr. Gavras.

13  Should the Court hold an evidentiary hearing?

14              MR. GAVRAS:  Well, yes.

15              THE COURT:  What are the contested issues of

16  fact?

17              MR. GAVRAS:  I think if the Court largely -- put

18  its finger on it.

19              THE COURT:  Well, I think some of it has been --

20  is now -- is moot because they've gotten the discovery, right?

21              MR. GAVRAS:  Yes, so far as the request for

22  discovery is concerned.  Your Honor, on the motion that I

23  filed, not the one that Mr. Lujan -- the one I filed, if we go

24  to 2(b) in that first line, says "the delay in obtaining the

25  warrants was reasonable."  I think it's pretty clear from the

1    context, I meant unreasonable.  Just -- I don't think anybody

2    brought it up.

3              MR. LEMONS:  I assumed that.

4              MR. GAVRAS:  Yes.  So far as --

5              THE COURT:  You can change that if you want on

6    the original and by inter-delineation, but go ahead.  You can

7    do that later.

8              MR. GAVRAS:  Okay.

9              THE COURT:  Go ahead.

10             MR. GAVRAS:  So I do think the Court is correct

11   that the unreasonable delay.

12             THE COURT:  That's what you're alleging.

13             MR. GAVRAS:  Right.  The allegation of the

14   unreasonable delay in obtaining the warrant is a contested

15   fact.

16             THE COURT:  Okay, any other contested fact?

17             MR. GAVRAS:  I think that -- so far as what does

18   appear to be Mr. Lujan's contention about a Franks Hearing and

19   any effect that the Court -- the Supreme Court's decision in

20   *Leeuwen* would have, I'll just rest on what Mr. Lujan has

21   stated.

22             THE COURT:  What specifically, though, are you

23   saying with regard to a Franks Hearing?

24             MR. GAVRAS:  Well, in that he's challenging the

25   voracity of the statements made within the warrant.

1          THE COURT:  And what about *Leeuwen*?  You have to

2    be very specific.  I'm sorry, which voracity of which

3    statements in the warrant?

4          MR. GAVRAS:  As Mr. Lemons pointed out, Mr. Lujan

5    apparently challenged the allegations of the agent as to

6    whether or not she lied, I believe, were the words Mr. Lemons

7    used.  And I believe that --

8          THE COURT:  Did Agent Epps lie, that's the

9    question?

10          MR. GAVRAS:  Right.  And I think the court, when

11    discussing it with Mr. Lemons, stated whether or not we have

12    to have a hearing on that.  And I would agree with Mr. Lemons

13    that that is essentially a question that would be a Franks

14    Hearing.  And so then *Leeuwen* would apply as to whether or not

15    -- you know, just what type of -- okay, setting aside the

16    Franks issue, *Leeuwen* would apply in the sense that given what

17    the Magistrate Judge Perez had in front of him, you know, does

18    it meet the standards in *Leeuwen* to issue a warrant.  And that

19    I don't think there needs to be evidence on.  Once you set

20    aside Franks, then you just look to see what the magistrate

21    had in front of him and the affidavit and whether or not that

22    meets the requirements of *Leeuwen*.

23          THE COURT:  All right.

24          MR. GAVRAS:  So that aspect of it would not

25    require.

*Redirect - Cruz*

1            THE COURT:  So we're going to have a separate

2    hearing on Franks.  That's what you're saying?

3            MR. GAVRAS:  That's what Mr. Lujan essentially

4    requested, yes, Your Honor.

5            THE COURT:  All right.  Okay, Mr. Lemons,

6    anything further?

7            MR. LEMONS:  No, Your Honor.

8            THE COURT:  All right.  On the -- see, I think on

9    the issue of standing, I think the prosecution may be right.

10   However, I still -- I want to hold that under advisement just

11   to be sure on another issue.  On the issue of -- since we're

12   here, whether the moving papers establish an evidentiary

13   hearing is warranted on these motions to suppress, the Court

14   will grant that motion.  Assuming there is standing, the Court

15   will find that there is sufficient definiteness, clarity and

16   specificity to enable this Court to conclude that contested

17   issues of fact does exist and that an evidentiary hearing is

18   warranted.

19           So the very first -- the next issue that we have

20   to determine is and let's go right into the reasonable

21   suspicion issue, well, first of all, what was the delay in

22   obtaining the search warrants for the Sullivan and Sullivan 2

23   packages.  And was that delay unreasonable.  That's really the

24   first issue, isn't it?  On Sullivan 2, Mr. --

25           MR. LEMONS:  That's the issue that -- that's the

1  issue that the defendant raised, Your Honor.

2          THE COURT:  Okay.  So why don't we go ahead and

3  proceed with this then.  The hearing on that part.

4          MR. LEMONS:  Well, I'm gonna have to call several

5  witnesses so we can start with Jeffery Palacios.

6          THE COURT:  Okay, is he here?

7          MR. LEMONS:  Yes, they're all in the jury --

8  witness room back there.

9          THE COURT:  So yeah, we'll -- let's do the

10 reasonable suspension, the delay in obtaining the warrants and

11 then the reasonable suspicion whether or not there was such

12 reasonable suspicion to delay and then we can move into the

13 probable cause issue after that.  Okay.

14         MR. LEMONS:  Well, the Court will have to find

15 the delay -- okay, that's fine.

16         THE COURT:  Yeah, we have to find out -- first of

17 all, we have to see if there was a delay, right?

18         MR. LEMONS:  And if the delay was unreasonable.

19         THE COURT:  Let's focus on that first.

20         MR. LEMONS:  Okay.

21         THE COURT:  Okay.  Let's go ahead.

22         THE CLERK:  Sir, please raise your right hand.

23 Do you solemnly swear that the testimony you are about to give

24 in the case now before the Court will be the truth, the whole

25 truth and nothing but the truth so help you God?

*Redirect - Cruz*

```
1              THE WITNESS:  Yes.

2              THE CLERK:  Sir, please be seated.  Please state

3    your full name and spell your last name for the record.

4              THE WITNESS:  Jeffery Palacios, P-A-L-A-C-I-O-S.

5

6                   DIRECT EXAMINATION

7    BY MR. LEMONS:

8         Q.   Where do you work?

9         A.   I work for Guam Customs.

10        Q.   And how long have you been employed at Guam Customs?

11        A.   About 19 years.

12        Q.   And what is your current assignment?

13        A.   I'm assigned to the postal task force as well as the

14   DEA task force.

15             THE COURT:  I'm sorry, how many years did you

16   say?

17        A.   About 19 years.

18             THE COURT:  Okay.  Thank you.

19   BY MR. LEMONS: (CONTINUING)

20        Q.   So you're a task force officer for both DEA and

21   postal inspection services?

22        A.   That's correct.

23        Q.   And how long have you been a task force officer?

24        A.   Postal for about five years.  DEA for about two

25   years.
```

*Direct - Palacios*

1      Q.   Are you familiar with the UR or Your Market in

2 Dededo, Guam?

3      A.   That's correct.

4      Q.   And what is -- well, how do you say it?

5      A.   UR Market.

6      Q.   Okay.  And what is UR Market?

7      A.   It's a grocery store.

8      Q.   And is there anything else located there besides

9 grocery store?

10     A.   That's correct.  It's a --

11     Q.   What is it?

12     A.   CMRA, which is a commercial mail receiving agency

13 that --

14     Q.   Go ahead.

15     A.   Okay.  That typically operates as a private mailbox

16 service.

17          THE COURT:  What is it?  C what?

18     A.   CMRA.

19          THE COURT:  What does that mean?

20     A.   Commercial mail receiving agency.

21          THE COURT:  Okay.  Thank you.  Sorry.

22 BY MR. LEMONS: (CONTINUING)

23     Q.   And are they authorized to handle U.S. mail there?

24     A.   Yes.

25     Q.   Okay.  Now, on July 16th, did you receive a phone

1   call from UR Market?

2       A.    Yes.

3       Q.    And what was the nature of the call?

4       A.    Informing me that there were two packages that

5   arrived for Box 1101.

6       Q.    Okay.  And what did you do after you received the

7   call?

8       A.    I went to the UR Market.

9       Q.    Okay.  And what did you do once you got there?

10      A.    I -- I looked at the packages that were addressed to

11  Box 1101.  And from there, I brought 'em to the DEA office in

12  Hagatna.

13      Q.    Now, what time did you receive that call?

14      A.    I probably received the call around 1 o'clock in the

15  afternoon.

16      Q.    And about what time did you arrive at UR Market?

17      A.    Some time around 2, 2:30, maybe 3.  I'm...

18      Q.    Okay.  And you went straight back to your office?

19      A.    That's correct.

20      Q.    And where is your office located?

21      A.    It's at the DEA office in Hagatna.

22      Q.    And who were the two packages you picked up addressed

23  to?

24      A.    Addressed to um... I remember the last name Sullivan.

25      Q.    Is there anything that would refresh your

1  recollection?

2      A.   Yes, the affidavit, the report.

3      Q.   How about the package itself?

4      A.   The package itself, yes.

5      Q.   I'm gonna show you what has been marked.

6               MR. LEMONS:  Your Honor, I filed these exhibits

7  with the Court.

8               THE COURT:  Okay.

9               MR. LEMONS:  As Government's Exhibit No. 4.

10              THE COURT:  You have, Carmen, the exhibit?  You

11 filed it separately?

12              MR. LEMONS:  Yes, Your Honor, I filed an exhibit

13 list.

14              THE COURT:  Okay.

15              MR. LEMONS:  On June 21st.  It'd be Document 130.

16              THE COURT:  Okay.  So Exhibit No. 4?

17              MR. LEMONS:  Yes, Your Honor.  Can we turn the

18 ELMO on?

19              THE COURT:  Carmen, you want to turn that on?

20              THE CLERK:  Yes, ma'am.

21              THE COURT:  She has to turn it on.

22              (Pause.)

23              (Discussion with clerk and judge.)

24              THE COURT:  Sorry, they're trying to -- Carmen

25 says they might have switched something off on the laptop.

*Direct - Palacios*

```
 1                 So you're looking at Exhibit 4?

 2                 MR. LEMONS:  Yes, Your Honor.

 3                 THE COURT:  All right.  There it is.  All right.

 4   Thank you.

 5                 Go ahead, Exhibit 4.

 6                 MR. LEMONS:  May I, Your Honor.

 7                 THE COURT:  You may.  Exhibit 4, right?

 8                 MR. LEMONS:  Yes, Your Honor.

 9   BY MR. LEMONS: (CONTINUING)

10       Q.   Do you recognize Exhibit No. 4?

11       A.   Yes.

12       Q.   And what do you recognize Exhibit No. 4 as?

13       A.   The James Sullivan package.

14       Q.   Okay.  And is that how the label and Customs slip

15   appear to you on the day you picked up that particular package

16   from UR Market?

17       A.   Yes.

18       Q.   Okay.  Now, I'm gonna draw your attention to USPS

19   tracking number.  What are the last two digits on Exhibit 4?

20       A.   I believe that's five one.

21       Q.   Okay.  And the tracking number is so that a person

22   can track their package?

23       A.   That's correct.

24       Q.   Okay.

25                 THE COURT:  Are you moving off of the Exhibit 4
```

*Direct - Palacios*

1  right now?

2          MR. LEMONS:  Yes, Your Honor.

3          THE COURT:  Let me just ask the agent, officer a

4  question.  So it's addressed to who then on this package?

5      A.  James Sullivan.

6          THE COURT:  And this address PMB 1101, what does

7  PMB stand for?

8      A.  I believe, private mailbox.

9          THE COURT:  Oh, okay, private mailbox.  That is

10 what it is.  And whose mailbox is this?

11     A.  That -- the mailbox was or is registered to Annette

12 Blas.

13         THE COURT:  And who is she?

14     A.  I believe Annette Blas is a relative of Martina

15 Guanzon, who is the girlfriend of Mr. Justin Cruz.

16         THE COURT:  Okay.  Thank you.  Thank you.

17 BY MR. LEMONS: (CONTINUING)

18     Q.  And you picked up a second package; is that correct?

19     A.  That's correct.

20     Q.  And do you recall who that was addressed to?

21     A.  Yes, it was addressed to James Sullivan.

22     Q.  Gonna show you Government's Exhibit No. 15.

23         Do you recognize Government's 15?

24     A.  Yes.

25     Q.  And what do you recognize that as?

*Direct - Palacios*

1       A.   To be the second James Sullivan package.

2       Q.   Okay.  It was one of the two packages; correct?

3       A.   That's correct.

4       Q.   Okay.  Now, there's a different tracking number on

5  that.

6            Can you read the second two digits on that tracking

7  number?

8       A.   I believe that's either 1-8 or 1-6.

9       Q.   Okay.  And so it was a separate package from the

10  first one?

11      A.   That's correct.

12      Q.   And does that Customs sheet in Government's 15 and

13  the label and tracking number, do they appear to be in same

14  condition as they were when you first saw the packages?

15      A.   Yes.

16      Q.   So what did you do with the packages once you got

17  back to the DEA office?

18      A.   I turned them over to Postal Inspector Richard

19  Kaufman.

20      Q.   Okay.  And do you know what happened to the packages

21  next?

22      A.   Yes, right after that, then the packages were brought

23  to Barrigada post office to conduct a K9 run.

24      Q.   Okay.  And were you present when the K9s --

25      A.   Yes.

Q.    What time did the K9s arrive there at the post

office?

A.    Around 4 o'clock in the afternoon.

Q.    Do you recall what time they were called or do you

know?

A.    No, I --

Q.    Okay.  Now, you said the dogs were called.

Do you recall what time they arrived at the post

office?

A.    Yes, they arrived around 4, 4 to 5.

Q.    Between 4 and 5 o'clock?

A.    That's correct.

Q.    All right.  And when they got there, do you know if

they immediately brought 'em and then had them sniff the

packages or was there a process?

A.    I don't recall that day, but I do recall that -- I do

recall that the K9 did run the two Sullivan packages and that

the -- from what the K9 handlers told me and Richard Kaufman,

that the K9s alerted to both packages.

Q.    Do you recall about what time that was?

A.    I believe, one of the packages -- one of the K9 dogs

alerted to it around 4:30 and then the second package and was

about 5 o'clock.

Q.    Okay.  Now, was that the end of your involvement with

that package that day?

1    A.    That day, yes.

2    Q.    Okay, did you open the package that day?

3    A.    No.

4    Q.    And why is that?

5    A.    We did not have a warrant to open up the package.

6    Q.    Okay.

7          MR. LEMONS:  I have no further questions of TFO

8    Palacios at this time.

9          THE COURT:  Okay.  Mr. Gavras.

10

11                    CROSS-EXAMINATION

12   BY MR. GAVRAS:

13          MR. LEMONS:  And Your Honor, we're just going on

14   the issue of the reasonableness of the delay.  Is that --

15          THE COURT:  Right.

16          MR. LEMONS:  Okay.

17          THE COURT:  Right.

18          MR. LEMONS:  Then I have no further questions.

19   MR. GAVRAS: (CONTINUING)

20   Q.    So you -- sir, you received a call from the UR

21   Market; is that correct?

22   A.    That's correct.

23   Q.    Why did they call you?

24   A.    Because I'm a task force officer with the postal

25   service, postal inspection service.

1    Q.   I understand, but why did they call you, I mean I

2    don't call you because you're a task force officer.  Why did

3    they call you, on that day, at that time?  Do you know?

4    A.   Yes, the clerks are familiar with me.  The clerks

5    know that I'm -- I work for the postal inspection service as a

6    task force officer and the clerks know to call me if we -- if

7    we have a watch on a particular box.

8    Q.   Okay.  So you had a watch on this particular box?

9    A.   That's correct.

10   Q.   And you were -- you had instructed these people to

11   call you if a package came in?

12   A.   That's correct.

13   Q.   Okay, when did you instruct them to this?

14   A.   I don't recall.

15   Q.   Was it prior to July 16th?

16   A.   Yes.

17   Q.   Was it -- I'm not asking the exact date and time, but

18   was it a few days ahead time, a week ahead --

19        MR. LEMONS:  Your Honor, I'm going to object as

20   to the relevancy of whether or not the delay in getting a

21   search warrant for these packages were reasonable or

22   unreasonable.

23        MR. GAVRAS:  Your Honor, it's based -- all of it

24   is based upon timing.  All of it.  So I want to know the

25   chronology of events.  Depending upon how he answers this, and

*Cross - Palacios*

```
 1   some subsequent questions, could establish that there was a

 2   long delay.

 3              THE COURT:  All right.  Overruled.  Go ahead.

 4              MR. LEMONS:  Well, may I respond?

 5              THE COURT:  Go ahead.

 6              MR. LEMONS:  Your Honor, he testified that he

 7   picked up the packages when he was called that day and he went

 8   there at 1 o'clock.  What happened weeks ago or months ago is

 9   irrelevant when the packages arrived on the date that he

10   picked 'em up.

11              THE COURT:  All right.

12              MR. GAVRAS:  Your Honor, if I may -- if you need

13   a response?

14              THE COURT:  Overruled.  Go ahead.

15   BY MR. GAVRAS: (CONTINUING)

16       Q.   Okay.  So, sir, you told him how many --

17   approximately how many days prior to alert you?

18       A.   I can't recall.

19       Q.   Was it more than one day?

20       A.   Definitely more than one day.

21       Q.   So it was before July 15th?

22       A.   I believe so.

23       Q.   Okay.  So how do you know -- can you tell by looking

24   at the exhibits when the packages arrived at the UR Market?

25       A.   Can I see the package?  Or...
```

*Cross - Palacios*

1          MR. GAVRAS:  (To Mr. Lemons) Exhibit 4 and

2    Exhibit 15.

3    BY MR. GAVRAS: (CONTINUING)

4        Q.   Sir, I'm handing you what's been marked as Exhibit 4.

5    Saw this just a few moments ago.  Can you tell when that

6    package was received by the UR Market?

7        A.   No.  I cannot tell when that package was received

8    from the UR Market.

9        Q.   Okay.  Is there -- and this is Government's

10   Exhibit 15.

11          Does it show you when the package was received by UR

12   Market?

13       A.   Not on the package itself, no.

14       Q.   Okay.  So you don't know when the package was -- you

15   have no personal knowledge as to when that package was

16   received by the UR Market; is that correct?

17       A.   I do based -- because the clerk called me that the

18   package arrived that day.

19       Q.   Okay.  I'm not asking you as to --

20       A.   But that's --

21       Q.   Do you have personal knowledge as to when that

22   package arrived?

23          MR. LEMONS:  Your Honor, let him answer the

24   question.

25   BY MR. GAVRAS: (CONTINUING)

1      Q.   Okay.  Answer the question.  I'm simply saying --

2      A.   Yes.

3      Q.   -- do you have personal knowledge, yourself, as to

4  when that package arrived?

5      A.   The time the clerk called me and told me that that

6  the package arrived is when I knew.

7           THE COURT:  Wait, wait.  Let him finish,

8  Mr. Gavras.  Go ahead.

9      A.   -- is when I believe the package arrived based on the

10  clerk.

11  BY MR. GAVRAS: (CONTINUING)

12      Q.   The only basis you have is based as to when the

13  package arrived is when the clerk told you?

14      A.   No, there's other -- the package has a tracking

15  number.

16      Q.   Okay?

17      A.   And it should be scanned arrived at, you know, on a

18  certain date.  And based on that, yes.  You can...

19      Q.   No, did you -- did you look into the records that

20  that scanning device would give to determine when the package

21  arrived?

22      A.   Not me personally.

23      Q.   Okay.  So the only knowledge you have as to when

24  that, you yourself has, as to when that package arrived is

25  based upon what somebody else, that is the clerk at the store,

1  told you; is that correct?

2      A.    That's correct.

3      Q.    Okay.  And what was the name of that clerk?

4      A.    Chona Aguilar.

5      Q.    Okay.  Have you worked with Ms. Aguilar before?

6      A.    Yes.

7      Q.    Now, you instruct Ms. Aguilar to hold the packages

8  for you; is that correct?

9      A.    Yes.

10     Q.    Okay.  And she has done this in the past for the

11 government?

12     A.    Yes.

13     Q.    Okay.  Now, and she does this in conjunction with you

14 in your investigation of drug crimes?

15     A.    Yes, that's correct.

16     Q.    Okay.  Have you ever known her not to follow your

17 instructions?

18     A.    No.

19     Q.    How long has she been working for the government?

20     A.    I don't know.

21     Q.    You don't know?

22     A.    I don't know.

23     Q.    Well, how long had she been working, that you know

24 of, for the government?

25     A.    At least, more than a year.

*Cross - Palacios*

1    Q.   More than a year, before July 16, 2015; correct?

2    A.   Yes.

3    Q.   Because you were familiar with her; correct?

4    A.   Yes.

5    Q.   Okay.  So let's assume -- do you know what happen --

6    do you know the UR Market's protocol so far as what to do with

7    a package when it comes into their facility?  And I say the UR

8    Market, I mean the CMRA at the UR Market.  Do you know if they

9    put it immediately into the person's box unless you ask them

10   to do otherwise?

11   A.   I don't know personally, but that -- that's the

12   common practice.

13   Q.   Okay.  Now, do they -- you received this -- you

14   received a call from her on that day, but you have no

15   knowledge -- you testified that she said it arrived that day,

16   but she didn't tell you what time it arrived, did she?

17   A.   No.

18   Q.   Okay.  So it could have came in that morning; is that

19   correct?

20   A.   That's correct.

21   Q.   But she knew, based upon your instructions, to hold

22   that package for you, right?

23   A.   That's correct.

24   Q.   Well, agent, why didn't you tell Ms. Aguilar to call

25   you as soon as the package came in?

*Cross - Palacios*

1      A.   I may have not told her those exact words, but she

2  knows to give me a call as soon as the packages arrive.

3      Q.   How does she know that?  And the reason I ask is

4  because you just got through telling me you don't know when

5  the package arrived?

6      A.   That's correct.  I do not know when the package

7  arrived, but her instructions are to give me a call once a

8  package arrived.

9      Q.   Okay.  And then you received a call approximately --

10 you said approximately 1 o'clock in the afternoon; correct?

11     A.   That's correct.

12     Q.   And it arrived and then you arrived one to two hours

13 later; is that right?

14     A.   That's correct.

15     Q.   Okay.  Now, it's about a 30-minute drive from Agana

16 to the UR Market; isn't that correct?

17     A.   Depending on the time of the day and the conditions

18 during that day.

19     Q.   Okay.  Well, Agana is where the courthouse is and I

20 used to live up in that area and by 1 o'clock in the afternoon

21 we're done, pretty much done with lunch, aren't we, so far as

22 traffic is concerned?

23     A.   That's possible.

24     Q.   Okay.  And so it's generally about a 30-minute drive

25 in non-rush hour traffic from Agana to the UR Market?

*Cross - Palacios*

```
1       A.   Could be 30 to an hour, 30 to 45 minutes.  I don't
2  know.
3       Q.   You don't know?
4       A.   (No response.)
5       Q.   Okay, if you don't know.  So you arrived
6  approximately -- do you remember why -- okay, you arrived an
7  hour to two hours later; correct?
8       A.   About, yes.
9       Q.   What accounted for that delay of up to two hours
10 later after you received this phone call?
11      A.   I don't know that day.  I can't recall.
12      Q.   You could have been doing other things; is that
13 right?
14      A.   That's possible.
15      Q.   And then how long -- now, when you go in there, what
16 did you do once you were there?
17      A.   At the UR Market?
18      Q.   Right.
19      A.   I looked at the packages.  Then I contacted Postal
20 Inspector Ricard Kaufman.
21      Q.   Okay.  You contacted him from the UR Market?
22      A.   That's correct.
23      Q.   Okay.  And that Richard Kaufman is the individual,
24 who you're going to end up turning those packages over to at
25 Barrigada; correct?
```

*Cross - Palacios*

1     A.   At Hagatna, the DEA office.

2     Q.   Oh, and then he takes 'em over to the Barrigada post

3   office?  Is that correct?

4     A.   That's correct.

5     Q.   Okay.

6     A.   Inspector Kaufman and myself.

7     Q.   Oh, and you, okay.  So you called him.

8          And what did you tell him when you were at the UR

9   Market, what did you tell Richard Kaufman?

10    A.   I don't recall the exact words, but I informed him

11  that we have two suspect packages and from there, he -- he

12  told me to bring 'em over to the office.

13    Q.   Okay.  Why did you go over to the DEA office instead

14  of going straight to the Barrigada post office with the K9s

15  being there?

16    A.   Because that's where our office is located at.

17    Q.   Okay.  But how long did you stay at your office with

18  the packages?  At the DEA office?

19    A.   Um, it -- I can't recall.

20    Q.   Okay, maybe I can just make it a little -- I'm

21  wondering why you didn't go straight to the Barrigada post

22  office and meet him there where the K9s would be because that

23  would have been faster, wouldn't it?  Than going back to the

24  DEA office in Agana then driving to Barrigada?

25    A.   I can't answer that.  You're gonna have to ask

*Cross - Palacios*

1   Mr. Kaufman.

2       Q.   Okay.  But you do agree with me that it would have

3   been faster?  If we're interested in getting the packages to

4   the Barrigada post office as fast as possible, would you drive

5   directly from the UR Market to the Barrigada post office

6   rather than going kind of a circuitous route by going from UR

7   Market to the DEA office in Agana and then doubling back,

8   essentially, to the Barrigada post office; correct?

9       A.   The Barrigada post office is closer to the UR Market.

10      Q.   Than is the Agana DEA office?

11      A.   That's correct.

12      Q.   Yes, and that's a much better way of saying it than I

13  did.

14           Now, he instructed you -- how long did you stay with

15  him at the DEA office?

16      A.   I don't recall.  It wasn't -- it couldn't have been

17  long.  But I don't recall exact time.

18      Q.   Okay.  Do you remember what you and he discussed at

19  the DEA office?

20      A.   Not exactly but I know that I did make arrangements

21  for K9 -- to conduct a K9 run at the Barrigada post office.

22      Q.   Okay.  Did you -- were you aware when you -- when you

23  received that initial call from the UR Market at 1 o'clock,

24  were you aware there was a pretty good chance that you were

25  going to have the dogs sniff those packages to see if they'd

*Cross - Palacios*

1    alert on 'em?

2       A.    Not when I received the call.

3       Q.    Okay.  When you got -- then when you got the

4    packages, at the UR Market, is that the time that you were

5    aware that you would have the K9s sniff the packages?

6       A.    More than likely, yes.

7       Q.    Okay.  So then you called -- I have here if my notes

8    are correct, you brought the packages to the Barrigada post

9    office and you arrived there at 4 to 5:00 in the afternoon;

10   correct?

11      A.    Yes, around that time.

12      Q.    Okay.  And who would have brought the dogs there,

13   that would have been Guam Customs?

14      A.    That's correct.

15      Q.    So then one dog ended up alerting at 4:30 and the

16   other at 5 o'clock, is that -- I believe was your testimony?

17      A.    About that time, yes.

18      Q.    Why -- were you present to watch the dogs and the

19   packages?

20      A.    Yes.

21      Q.    Okay.  And so you didn't -- you testified you didn't

22   open the packages because you didn't have a warrant at that

23   time; correct?

24      A.    That's correct.

25      Q.    Okay, when was the warrant eventually gotten?

1    A.   The next day.

2    Q.   At what time?

3    A.   At about 8:30, 9 in the morning.

4    Q.   Now, the UR Market is open pretty late in the

5    evening; isn't that correct?

6    A.   That's correct.

7    Q.   Okay.  In fact, I think it probably stays open, what,

8    till about 10?

9    A.   I believe so.

10   Q.   Okay.  And the -- and of course they make those CRMA

11   post office boxes available up until the time they closed, is

12   that correct, in other words available for the customers to

13   get their mail out?

14   A.   You know what, the mailboxes are -- the customers

15   have access to the mailboxes, but the office I believe -- I

16   believe there's a certain time that they close.  I'm not too

17   sure if they close the same time as the grocery store closes.

18   Q.   You don't know about when the employees of the UR

19   Market still have access to the boxes; is that right?

20   A.   No, I don't.

21   Q.   Okay.  But you do know that the customers of the

22   boxes have access to the boxes until the UR Market closes?

23   A.   That's correct.

24   Q.   Okay.

25   A.   Or I'm sorry, I believe -- I believe they have access

*Cross - Palacios*

1  to the boxes itself 24 hours.  I'm not too sure if it's

2  locked, you know, the entrance to the boxes.

3      Q.   Okay.  Well, thank you.  Let me ask you.  When you

4  say they have access to their boxes, so if I had a box -- say

5  I was the person with this box that the packages were intended

6  to go in, pretend that was my box.

7      A.   All right.

8      Q.   I had a couple boxes there, might as well.  I'd be

9  able to go into any of those boxes 24 hours a day; is that

10 right?

11     A.   That's what I'm saying.  I do not know if the access

12 is closed during a certain time or if it's open 24 hours.

13     Q.   Oh, okay.  But you do know that it's at least open

14 until UR Market closes, which I think we've established is 9

15 or 10 o'clock?

16     A.   That's correct.

17     Q.   Okay.

18          MR. GAVRAS:  I don't have any other questions,

19 judge.  Thank you.

20          THE COURT:  Mr. Lemons, anything further?

21

22                    REDIRECT EXAMINATION

23 BY MR. LEMONS:

24     Q.   So TFO Palacios, you saw the boxes; correct?

25     A.   That's correct.

1     Q.   Would they fit into one of the mailboxes at --

2     A.   The packages will not fit into the boxes.

3     Q.   I'm going to show you two more exhibits.  I want to

4  show you Government's 6.  That's a blowup of the priority mail

5  label.

6          Can you tell us the last two digits on that one?

7     A.   5-1.

8     Q.   Okay.  And is there an expected delivery day on

9  there?

10    A.   That's correct.

11    Q.   What's that date?

12    A.   June -- or July 15th, 2015.

13    Q.   Show you Government's 17.

14         Can you tell us the last two digits on that label?

15    A.   1-6.

16    Q.   And is there an expected delivery date?

17    A.   Yes.  July 15, 2015.

18    Q.   Now, you didn't write the search warrant; is that

19  correct?

20    A.   That's correct, I did not.

21    Q.   Were you there when the search warrant was written?

22    A.   When the search warrant was written?  I'm not sure.

23    Q.   Okay.  Were you there when -- who wrote the search

24  warrant?

25    A.   I believe it was Inspector Deborah Epps.

*Redirect - Palacios*

```
 1      Q.   Okay.  And were you there when Inspector Epps was
 2  inspecting the package?
 3      A.   Yes.
 4      Q.   Okay.  And do you know what she was looking for?
 5      A.   Yes.
 6      Q.   What was she looking for?
 7      A.   She was looking for drugs.
 8      Q.   No, I mean -- do you know what she was looking for,
 9  if anything, on the package itself?
10      A.   Oh, on the package itself?
11      Q.   Yes.
12      A.   Yes.
13      Q.   And what was that?
14      A.   She was looking for the place of origin, which the
15  package was mailed from California.
16      Q.   Okay.  And why is that important?
17      A.   That California is a -- one of the source states.
18      Q.   Source states?
19      A.   For Guam.
20      Q.   For Guam for what?
21      A.   For methamphetamine.
22      Q.   What else was she looking for?
23      A.   She was looking for work clothes, work boots, which
24  would have been declared on the Customs form.
25      Q.   Okay.
```

*Redirect - Palacios*

1          MR. LEMONS:  May I approach the witness?

2          THE COURT:  Yup.

3   BY MR. LEMONS: (CONTINUING)

4      Q.   Okay.  I'm gonna show you Government's 4 again.

5           And what's on that Customs declaration sheet?

6      A.   Items declared:  Wrangler work boots, one; Wrangler

7   work shirts, three, I believe; and Wrangler work pants, I

8   believe, two?

9      Q.   I'm gonna show you 15 again.

10          And what's on that Customs sheet?

11     A.   What's declared as Wrangler work boots, Wrangler work

12  shirts, and Wrangler work pants.

13     Q.   And why was she looking for those items on the

14  Customs sheet?  If you know?

15     A.   We had -- Inspector Epps had information from a

16  confidential informant.

17     Q.   Okay.  And was she looking for anything else on the

18  package if you know?

19     A.   Yes.

20     Q.   And what was that?

21     A.   That'll be markings on the package itself that the

22  only way you'll be able to see it is if you put a fluorescent

23  light up against it, in a dark room.

24     Q.   A fluorescent light or black light?

25     A.   Or a black light, yeah.

1      Q.   And were you present when she did that?

2      A.   No, I wasn't.

3      Q.   So, okay, you weren't present for that.

4      A.   No, I wasn't.

5      Q.   Did you leave the office and come back or what?

6      A.   (No response.)

7      Q.   Did you -- were you gone from the office?

8      A.   I can't recall.

9      Q.   Okay.

10     A.   Yeah.

11     Q.   And so the packages were being examined for certain

12   things as far as you know?

13     A.   Yes, that's correct.

14     Q.   And you were not the one that was writing the search

15   warrant that day?

16     A.   No.

17     Q.   Okay.  And so is it better, from your perspective,

18   that the person writing the search warrant do as much as they

19   can in the investigation?

20     A.   Yes.

21     Q.   Okay.  Now, defense counsel asked you why didn't you

22   take 'em to Barrigada because the K9s were there.

23          Are Guam Customs dogs stationed at the Barrigada post

24   office?

25     A.   No.

```
1       Q.   Do you know where they house those dogs?

2       A.   Yes.

3       Q.   Okay.  And it's not at the post office?

4       A.   No, it's not.

5       Q.   And how many times have you, since you've been a task

6  force officer with DEA and postal, have you called Guam

7  Customs dog's dog handlers, drug detection dog handlers, to

8  bring their dogs out?

9       A.   Numerous times.

10      Q.   And do they always show up five minutes after you

11 call?

12      A.   No.

13      Q.   Do they show up ten minutes after you call?

14      A.   No.

15      Q.   They have other responsibilities, is that a fair

16 statement?

17      A.   Yes.

18      Q.   But they did show up the same day that you called?

19      A.   That's correct.

20           MR. LEMONS:  Nothing further.

21           THE COURT:  All right.  What was the day that you

22 -- what day and what year was the day that you received the

23 call from UR Market?

24      A.   That was July 16, 2015.

25           THE COURT:  Oh, okay.  July 16, 2015.  And okay.
```

1   July 16th.  All right.  Thank you.  All right.  That's it?

2                   MR. LEMONS:  Your Honor, I think I need to

3   correct.

4                   THE COURT:  You want to -- you have another

5   question, yup, go ahead.

6                   MR. LEMONS:  No, I think in response to your

7   question he said he was called on July 16th.

8                   THE COURT:  That's what he said, yeah.

9   BY MR. LEMONS: (CONTINUING)

10      Q.   What day did you pick up the packages?

11      A.   The same day I was called.

12      Q.   Okay.  And what day was that?

13      A.   I believe, that was July 16th.

14      Q.   Okay.  Are you absolutely sure?

15                  MR. GAVRAS:  Objection.

16      A.   Yes.

17                  MR. LEMONS:  Okay.

18                  THE COURT:  Okay.  All right.  You may step down.

19                  THE WITNESS:  Thank you, Your Honor.

20                  THE COURT:  Okay.  Next witness?  Is there

21  anything else on the detention?  I guess, well, is there

22  anything else that you have any -- with regard to the evidence

23  on the detention?

24                  MR. LEMONS:  Yes, Your Honor.

25                  THE COURT:  Okay, go ahead.

1                    MR. LEMONS:  I call Postal Inspector Epps.

2                    THE COURT:  Okay, Epps to the stand.

3                    THE CLERK:  Please raise your right hand.  Do you

4    solemnly swear that the testimony you are about to give in the

5    case now before the Court will be the truth, the whole truth

6    and nothing but the truth so help you God?

7                    THE WITNESS:  I do.

8                    THE CLERK:  Thank you, please be seated.  Please

9    state your full name and spell your last name for the record.

10                   THE WITNESS:  Deborah Lee Epps.  The E-P-P-S.

11                   THE CLERK:  Thank you.

12                   THE COURT:  You may proceed.

13

14                        DIRECT EXAMINATION

15   BY MR. LEMONS:

16       Q.    Where do you work?

17       A.    At the U.S. Postal Inspection Service.

18       Q.    And how long have you been a postal inspector?

19       A.    13 years.

20       Q.    Now, on July 16th, did you write two search warrants?

21       A.    I did.

22       Q.    Okay.  And what did you write those search warrants

23   for?

24       A.    On?  What did I write them on?

25       Q.    Yes.

*Direct - Epps*

1     A.   That we received two packages in the mail.  And I

2  wrote those search warrants on those.

3     Q.   And you signed the affidavit?

4     A.   I did.

5     Q.   And that affidavit was under oath?

6     A.   Yes.

7          MR. LEMONS:  May I approach the witness, Your

8  Honor?

9          THE COURT:  You may.

10 BY MR. LEMONS: (CONTINUING)

11    Q.   I'm gonna show you what's been marked as Government's

12 Exhibit 1 consisting of eight pages.

13    A.   Okay.

14    Q.   Do you recognize Government's Exhibit 1?

15    A.   Yes, this is the affidavit that I wrote.

16    Q.   Okay.  And does your signature appear on the first

17 page?

18    A.   It does.

19    Q.   Okay.  And on there, is there a time on there?

20    A.   Yes.

21    Q.   Okay.  And what does the time on there?

22    A.   8:50 a.m.

23    Q.   Okay.  And what does that time designate?

24    A.   That's the time that I swore out the warrant in front

25 of the judge.

*Direct - Epps*

1    Q.    Okay.  And that was July 17th?

2    A.    Yes.

3    Q.    And I'm gonna draw your attention to pages -- the

4    affidavit itself, pages one through eight?

5    A.    Okay.

6    Q.    Is that your affidavit?

7    A.    Yes.

8    Q.    Okay.  And for which package is that for?

9    A.    This is the second Sullivan package, Sullivan 2.

10   Q.    That's Sullivan two package?

11   A.    Yes.

12   Q.    And is the easiest way to determine the Sullivan 1

13   from the Sullivan 2 by the tracking number?

14   A.    Yes.

15   Q.    Okay.  And where does the tracking number appear on

16   that one?

17   A.    It's on the last page, on the attachment A.  And then

18   it's also on page 4 under purpose of affidavit.

19   Q.    Okay.  Did you come into contact with the Sullivan 2

20   package?

21   A.    Yes.

22   Q.    And where was that at?

23   A.    That was at the Guam resident office in Agana.

24   Q.    That's at the DEA office?

25   A.    Yes.

1    Q.   Okay.  And does postal have -- postal inspectors have

2    an office there?

3    A.   We do.

4    Q.   Okay.  And is that where you wrote the affidavit for

5    Sullivan 2 package?

6    A.   Yes.

7    Q.   Now, what did you do with the Sullivan 2 package

8    based on information that you had?

9    A.   So when I got it, I ran databases to verify the

10   information on the outside of the package.

11   Q.   Okay.  Tell us about the databases.

12   A.   Okay, the databases are basically law enforcement

13   databases where I can go in and verify the accuracy of

14   information, for example, the sender's information, the

15   address and whether the address matches the sender's name.  I

16   can do the same thing with the addressee, the recipient.

17   Q.   Did you do that for the Sullivan 2 package?

18   A.   I did.

19   Q.   And what did your search indicate?

20   A.   The addresses themselves were legitimate, but neither

21   the sender nor the recipient was connected to the addresses on

22   the package.

23   Q.   Okay.  What did you do after that?

24   A.   I believe, after that I -- what did I do, I looked at

25   the Customs form.

1     Q.   Okay?

2     A.   To see --

3     Q.   Why did you look at the Customs form?

4     A.   Again, it's just to verify the information in the

5 package to see what they're claiming is inside the package,

6 whether there are mistakes on the Customs form with regard to

7 the address and whether it matches what's on the package.  The

8 weight of it, when they mailed it, things like that.

9     Q.   And did you have any other information about the

10 contents of that package?

11    A.   We did.  We had a CI, who was telling us the drugs

12 when they came in were being hidden inside work boots in

13 packages.

14    Q.   All right.  And did they tell you anything else about

15 the contents of the package?

16    A.   Um, just that from what I remember, it was clothing

17 and work boots would be in the packages that contained the

18 drugs and then there would be some markings that would

19 indicate that they were drug packages.

20    Q.   Okay.  Now, you verified that there were some work

21 boots in the package?

22    A.   Yes.

23    Q.   How did you do that?

24    A.   Well, it was on the Customs form.

25    Q.   Okay.

1    A.   That there were work boots in the box.

2    Q.   All right.  And you testified about -- you said there

3  was something about some markings?

4    A.   Mm-hmm.

5    Q.   What kind of markings?

6    A.   Yeah, we were told that the box would be marked with

7  a pen that you could only see under a black light.

8    Q.   Okay.  And did you place the Sullivan 2 package under

9  black light?

10   A.   Yes.

11   Q.   And what was the result?

12   A.   We could see markings in each of the four corners.

13  Just a dot with what looked like a marker, but you could only

14  see it under the black light.

15   Q.   Okay.  And did you do anything else other than --

16   A.   Yeah, we submitted it to the K9 dog.

17   Q.   Were you present for that?

18   A.   I was not.

19   Q.   All right.  Who arranged that, do you recall?

20   A.   If I'm not mistaken, it was our Task Force Officer

21  Jeff Palacios.

22   Q.   Okay.  So you weren't present for that; is that

23  correct?

24   A.   I was not.

25   Q.   Now, why didn't you get the search warrant until

1  July 17th signed?

2     A.   Because when we retrieved the packages and did all of

3  the database research and things like that, it was late.  It

4  would have been after the judges had gone home for the

5  evening.  It would have been after the U.S. attorney's office

6  had closed for the evening so we waited until the next morning

7  to get it signed.

8     Q.   And were the district court judges on Guam, at that

9  time?

10    A.   They were not.  They were all off island from what I

11  remember.

12    Q.   Okay.  Now, I'm gonna show you what's been marked as

13  Government's Exhibit 12, pages 1 through 8.

14            MR. LEMONS:  May I approach the witness, Your

15  Honor?

16            THE COURT:  You may.

17            MR. LEMONS:  Well, let me show -- (showed defense

18  counsel.)

19  BY MR. LEMONS: (CONTINUING)

20    Q.   Do you recognize Government's Exhibit 12?

21    A.   I do, this is the application for the search warrant

22  for the first Sullivan package.

23    Q.   Okay.  So and that one is just simply the Sullivan

24  package in the warrant?

25    A.   Correct.

*Direct - Epps*

1     Q.   And, again, how did you distinguish that search

2  warrant from the Sullivan 2 search warrant?

3     A.   From the tracking number.

4     Q.   And does the tracking number appear in there like it

5  did in the Sullivan 2 package?

6     A.   It does.

7     Q.   Did you go through the same process with the Sullivan

8  package as you did with the Sullivan 2 package?

9     A.   I did.

10     Q.   Okay.  And when was that search warrant obtained?

11  Does it state on the face of the application?

12     A.   Yes.  The same date, July 17th.

13     Q.   Okay.  And what time did you get that one?

14     A.   8:54 a.m.

15     Q.   All right.  And so you had to do the examination of

16  two packages?

17     A.   Yes.

18     Q.   Now, is it important to you as a postal inspector to

19  determine whether or not you have probable cause to search a

20  warrant -- as fast as possible?

21     A.   It is.

22     Q.   And why is that?

23     A.   There are several reasons, the primary reason is that

24  the quicker we can get through the process, the less suspicion

25  we can arouse -- arise with the suspects.  So if we can get

1 through the process quickly and get it back out there, it

2 lessens the chances of the suspects finding out that we had it

3 at all.

4    Q.   Okay.

5    A.   If that makes sense.

6    Q.   So --

7    A.   The longer we hold on to it, the more suspicious it

8 looks.

9    Q.   You don't want to arouse suspicion in the person

10 that's --

11    A.   Exactly.

12    Q.   Is there any other reason?

13    A.   Yes, there are some regulations and rules that we

14 follow as postal inspectors regarding the postal service.  So

15 that if the package is negative, we want to get it to the

16 customer as quickly as we can.  We don't want to delay the

17 mail.

18    Q.   So had that package not had any contraband in it,

19 you'd want it to get about to where it's going as quickly as

20 possible, is that --

21    A.   Exactly.

22    Q.   Okay.  Now, again, you weren't present for the dog

23 sniff of the Sullivan package?

24    A.   I was not.

25    Q.   Okay.

1          MR. LEMONS:  I have no further questions.

2          THE COURT:  Okay, Mr. Gavras.

3

4                    CROSS-EXAMINATION

5  BY MR. GAVRAS:

6      Q.   You talked with Mr. Lemons about probable cause is

7  important.

8      A.   Mm-hmm.

9      Q.   In determining as quickly as you can and getting a

10  warrant done as quickly as you can.

11          You're also aware of the term reasonable suspicion;

12  correct?

13      A.   Yes, I am.

14      Q.   And at what point did you -- did you or any -- in

15  your opinion, that you or any of your agents have reasonable

16  suspicion as to either of these packages contained narcotics

17  or anything illegal?

18      A.   I -- for me?

19      Q.   Yes.

20      A.   Reasonable suspicion comes in when, one, we have a CI

21  telling us that there are drugs coming in to the suspect's

22  name.  And then when we see packages that we know the person

23  we believe to be his girlfriend is checking the mail there,

24  and then when we get the package and we look at it and the

25  names are fake on the outside of the package.  And then we

*Cross - Epps*

1  have, you know, I mean that's -- that's reasonable suspicion

2  and then we get to our probable cause with our dog sniff.

3      Q.    So it kind of builds?

4      A.    It does.

5      Q.    Okay.  And at some point reasonable suspicion is

6  established; is that correct?

7      A.    Yes, and probable cause as well.

8      Q.    Okay.  Right.  Reasonable suspicion would come first?

9      A.    Yes.

10     Q.    And then probable cause would come later?

11     A.    Correct.

12     Q.    And at what time did reasonable suspicion kick in?

13     A.    I mean, I don't really know how to answer that

14 question.

15     Q.    Well, reasonable suspicion as you know, I mean

16 because it is your profession, allows you to hold on to

17 something for a while; correct?

18     A.    Mm-hmm.  Right.

19     Q.    Okay.  And you wouldn't hold on to something and stop

20 the mail flow without reasonable suspicion; correct?

21     A.    Right.

22     Q.    Okay.  So in this case, when was reasonable suspicion

23 established?

24     A.    The day that we picked the package up.

25     Q.    Okay.  When that day in -- I know you don't know all

1    the times.

2         A.    Yeah, I don't because I --

3         Q.    -- relationship -- did it happen once you saw the

4    package?

5         A.    I wasn't the first one to see the package.  The first

6    one to see the package would have been our TFO Jeff Palacios.

7         Q.    So at some point, he may have been able to establish

8    reasonable suspicion?

9         A.    I would -- yes, he would have established reasonable

10   suspicion and then he would have brought it to us to verify

11   that.

12        Q.    And then it would have built after that?

13        A.    Right.

14        Q.    Okay.  But prior to Agent Palacios having the

15   package, there wouldn't be reasonable suspension; correct?

16        A.    No, I don't -- I don't know that that's necessarily

17   true.

18        Q.    Tell me why.

19        A.    Because we already had a CI telling us that there was

20   a package coming in.  We had someone, who wasn't authorized to

21   receive or accept mail or have mail sent to that box, checking

22   that box.  The mailbox, the PMB.  We had somebody who wasn't

23   authorized to pick that mail up or, as far as we knew on the

24   form, authorized to receive or pick up mail there, actually

25   checking the mail there and picking up mail there.  And then

*Cross - Epps*

1    --

2        Q.   So you -- I'll let you back to that line of thought,

3    but so you all were monitoring the box?

4        A.   Yes.

5        Q.   Okay.  Go ahead.

6        A.   Yes, we were monitoring the box and then so that is

7    enough for us to create the reasonable suspicion that the

8    drugs were probably coming into that box at some point.

9        Q.   Okay.  So let's talk about those factors.

10        A.   Okay.

11        Q.   Okay.  You had a confidential informant?

12        A.   Yes.

13        Q.   Okay.

14        A.   I did not.  He wasn't my informant or she, I don't --

15        Q.   When I say you --

16        A.   We, as a group, had a confidential informant.

17        Q.   Confidential informant.  You had someone going into

18    the box?

19        A.   Mm-hmm.

20        Q.   Who wasn't authorized?

21        A.   Right.

22        Q.   Okay.  We'll talk about that.

23        A.   Okay.

24        Q.   What that means.  And was there something else?

25        A.   I don't know.  You tell me.

1        Q.   Before Agent Palacios got a hold of the package --

2        A.   Right.  So we had the CI telling us and then people

3   checking the mail.

4        Q.   Okay.  We had CI, we have people monitoring the box?

5        A.   Mm-hmm.

6        Q.   And noticing that people who aren't authorized --

7        A.   Mm-hmm.

8        Q.   -- are going --

9        A.   Checking the mail.

10       Q.   Are going to --

11       A.   Mm-hmm.

12       Q.   Is there a third reason?

13       A.   I don't remember.  I don't think.  Just we had

14  information that were gonna to be drugs coming in.

15       Q.   That was the confidential informant?

16       A.   Right.

17       Q.   Okay.  So you had these two reasons for reasonable

18  suspicion prior to Agent Palacios, right?

19       A.   Right.

20       Q.   Okay.  Now, when you say --

21            THE COURT:  When you say -- what are you asking

22  her with regard to reasonable suspicion?

23            MR. GAVRAS:  I was asking her what her basis for

24  reasonable suspicion was prior to agent --

25            THE COURT:  Reasonable suspicion what, to detain

1    the package, right?

2                    MR. GAVRAS:  Yes.

3                    THE COURT:  Isn't that the issue?

4                    MR. GAVRAS:  Yes, I'm sorry.  I believe, I

5    started reasonable suspicion to determine if there were drugs

6    or anything illegal within the package is what I asked her.

7                    THE COURT:  All right.  Go ahead.

8                    MR. GAVRAS:  Okay.

9    BY MR. GAVRAS: (CONTINUING)

10       Q.   So when you say whether or not someone is authorized

11   to go into the box, what does that mean?

12       A.   For the postal service that means there's a form that

13   the box owner fills out and it has the box owner's information

14   and then there's a section that she fills out or he fills out

15   that says who else is authorized to receive mail there.  And

16   that's what I mean by that.  So with the form that we have,

17   the application that we have on file for that box number, she

18   didn't authorize anyone else to receive mail there or to pick

19   up mail for her at that location.  So that's what we mean by

20   that.

21       Q.   Are those post office boxes there, are they with keys

22   or combinations or how did that work?

23       A.   I believe it's a key at that particular one.

24       Q.   Okay.  So if someone is not authorized to pick up, if

25   they're not on the form that you mentioned, but yet they have

1  the key, would you arrest somebody for going into a box if

2  under those circumstances?

3  　　　　　　MR. LEMONS:  Objection, Your Honor, there's no

4  evidence that there was a box opened with a key.  There's no

5  evidence that the box -- in fact, the evidence is the boxes

6  could not fit in the postal box.

7  　　　　　　MR. GAVRAS:  Your Honor, that's not what I'm

8  getting at.  I'm getting at the question of -- she states that

9  it's an indicia of reasonable suspicion if somebody who's

10  apparently been given the key is going to the box yet they're

11  not on the list of people that are authorized.  And if it's --

12  if -- I'm gathering that's because it's against the law as

13  opposed to being completely innocuous behavior, which wouldn't

14  necessarily give rise to reasonable suspicion.

15  　　　　　　THE COURT:  All right.  Overruled.  Go ahead.

16  BY MR. GAVRAS: (CONTINUING)

17  　　Q.   So, ma'am, would you arrest somebody if they had the

18  key to any box, but yet weren't on the list of authorized

19  people to enter that box?

20  　　A.   No.

21  　　Q.   No.  And because that's done quite a bit, isn't it?

22  　　A.   I'm sorry?

23  　　Q.   People often give their keys to people that they

24  don't list as on that form that you mentioned?

25  　　A.   Yes.

1      Q.    Isn't that correct?

2      A.    Yes.

3      Q.    Okay.  Now, you've indicated that you had been

4  watching this box, I say to you, I mean collectively again?

5      A.    Okay.

6      Q.    Watching this box for a while, at least long enough

7  to know that people were going to that box that had the key,

8  but weren't on the list; correct?

9      A.    Mm-hmm.

10     Q.    So how long had you been watching that -- had the

11  government been watching that box, prior to --

12     A.    I don't know the answer to that question.  You'd have

13  to ask our TFO Jeff Palacios.  I don't know when he started

14  that watch.

15     Q.    Was it as long as a week?

16     A.    I don't know.

17     Q.    You have no idea whether it was a day or anything?

18     A.    I was not the case agent on that case and I do not

19  know when they started that watch.

20     Q.    How do you know they started a watch?

21     A.    Because I was told by the -- by the TFO and the case

22  agent that they had a watch on the box prior to those boxes

23  coming in.

24     Q.    And when were you told this?

25     A.    I'm sorry, it was like a year ago.  I don't remember.

1     Q.   Was it before or after the seizure of the packages?

2     A.   It was before.

3     Q.   Okay.  So it was before the seizure of the package?

4     A.   Mm-hmm.

5     Q.   Okay.  But you don't know how long before?

6     A.   No.

7     Q.   Okay.  Now, why would there have been a watch on the

8 box?

9     A.   We were told and again this has to do with the

10 informant and the information that was given to the TFO, but

11 from what I understand, we were told that Justin Cruz's

12 girlfriend was checking the mail there and because Justin Cruz

13 was our target of this investigation, we wanted to know what

14 Justin Cruz's girlfriend was looking for when she was checking

15 that box.  So we put a watch on that box in the event that the

16 drug packages were coming into that mailbox to that CMRA.  We

17 knew that information had a time and so we were watching that

18 box to see if the drug packages came in there for him and it

19 was his girlfriend picking them up.

20     Q.   Okay.  So you put a watch on the box to see who might

21 go to the box, is that --

22     A.   No, we already had information that she was checking

23 the mail there.

24     Q.   Okay.  And that was from the confidential informant?

25     A.   Right.

Q.   Did you determine also that the girlfriend was
related to the person, who was the customer of the box?

A.   I don't know that we were able -- ever able to
establish a relationship between the box holder and Justin
Cruz's girlfriend.  I don't know that we ever figured out who
she was specifically.

Q.   Okay.  Now, this confidential informant, were there
other parcels of mail coming to that box?

A.   I don't know.

Q.   You don't know?

A.   (Shook head.)

Q.   Okay.  And was this confidential informant somebody
that the government had used previously?

A.   I don't know that either because I don't know who it
is.

Q.   Okay.  So you have no idea how reliable the person
was?

A.   I haven't had any contact with the confidential
informant.  That's not -- he was not my source.

Q.   Okay.  Now, why would the government have had a
person who doesn't work for the government, one of these
employees at the UR Market, seize the packages?

A.   I'm sorry?

Q.   Okay.  There are employees at the UR Market; correct?

A.   Yes.

1    Q.   And I'm just wondering, why would the government have

2  an employee of UR Market seize the package, hold on to the

3  package and then call the agents?

4    A.   Because we authorized her to hold the package until

5  we got there.

6    Q.   Okay.  Now, I understand that there are barcodes on

7  these packages; is that right?

8    A.   You're talking about the tracking number?

9    Q.   Yeah, tracking numbers?

10   A.   Okay.

11   Q.   And I guess next to the tracking number, there's a

12  bar thing?

13   A.   Okay.

14   Q.   And that's the thing that scanned; is that right?

15   A.   Yes.

16   Q.   Okay.  Now, did you ever scan that to see about or

17  did you ever access the information so far as the -- that

18  would have been inputted as a result of that barcode?  Using

19  that barcode?

20   A.   The tracking information?

21   Q.   Right, the tracking information.

22   A.   I don't know whether I did or someone else did.

23   Q.   Okay.  Now, that package was scheduled to arrive

24  according to the information on the package on July 15th.

25        Did it, in fact, arrive on July 15th?

1      A.   I have to check the tracking information.  I don't

2 know for sure.

3      Q.   Okay.  Do you have that information with you?

4      A.   I don't have it in front of me, no.

5      Q.   Would you expect it to arrive on the expected

6 delivery date?

7      A.   No.

8      Q.   You wouldn't?

9      A.   Not here.

10      Q.   Really?

11      A.   Absolutely not.  No.  I have priority mail packages

12 that I can track that I can tell you -- the postal service

13 will not guarantee priority or Express Mail to Guam because of

14 the track it has to take.  Sometimes it ends up in Narita,

15 Japan and it can sit in Narita for days before it actually

16 gets here.  So no, I would not look at that expected delivery

17 date and expect it to actually be on Guam and have delivered

18 to the customer by that day date.

19      Q.   Well, sometimes we get packages late.

20      A.   A lot times of times we get packages late, yeah.

21      Q.   And sometimes we're surprise when we get them early,

22 right?

23      A.   Rarely.

24           MR. LEMONS:  I'm gonna object.  Is there a

25 question here or?

1          THE COURT:  Overruled.  Go ahead.

2    BY MR. GAVRAS: (CONTINUING)

3          Q.    Okay.

4          A.    But I would say that tracking date, the delivery date

5    is definitely not something you could rely on.

6          Q.    Okay.  And do you have any knowledge as to when the

7    package arrived?

8          A.    I believe, it came in on the 16th actually.

9          Q.    And what gives you that basis?

10         A.    Because we -- I believe that that's the day that we

11   seized it and brought it to the office.  I can't remember for

12   sure whether that was the date that UR Market -- I'm not

13   actually positive.  It may have come in that day and we picked

14   it up the next day.  I don't know.  Again it was a year ago.

15   I would really have to look the tracking information to verify

16   that.

17         Q.    So it's possible that it may come in one day, but you

18   picked it up the following day; is that correct?

19         A.    Yes, depending on where it is in the delivery status.

20   If it comes in, for example, they change the route.  So when

21   it came in from United, and it was picked up at the airport,

22   it may have not been delivered to the post office until like

23   2 o'clock in the morning of that.

24              So it would have come in on the 16th for example in

25   the evening, but it wouldn't actually reach the post office

1    until the morning of the 17th.  Do you know what I mean, from

2    processing.  So I'm just not sure.

3        Q.   It actually -- I believe it was taken by your agents

4    from the UR Market on the 16th?

5        A.   Okay.

6        Q.   So it's possible that it could have arrived on the

7    15th?

8        A.   Um, again it's possible.  I would really have to look

9    at the tracking numbers.  I don't know.

10       Q.   Or even the 14th?

11       A.   No, not the 14th.

12       Q.   Why not the 14th?

13       A.   Because the post office has deadlines for when

14   they're allowed to process mail.  So if it comes in, that day

15   again, like at 2 o'clock in the morning by the end of that day

16   all the mail will have been processed and gone out.  At least

17   the First Class Priority, things like it, would all have been

18   processed out.

19       Q.   Okay.  Well, apparently there's a relationship

20   between the government and one of the ladies at the UR Market

21   post office --

22       A.   Okay.

23       Q.   -- named Aguilar and she was the one that seized

24   package originally.

25       A.   Okay.

1    Q.   Is she trained?

2    A.   I don't know what she has for training.

3    Q.   You don't know?

4    A.   I don't know her.

5    Q.   You don't know whether or not she's told to contact

6    the government as expeditiously as possible?

7    A.   For what?

8    Q.   Once she seizes a package?

9    A.   If there's a watch on the package, then she is told

10   to contact one of us.

11   Q.   How do you know?

12   A.   When the package comes in.

13   Q.   How do you know that?

14   A.   Because that's what we always do.

15   Q.   Okay.  She's told that?

16   A.   Yes.

17   Q.   But what assurance do you have that she'll do that?

18   A.   I don't.

19   Q.   Okay.  Now, you -- approximately what time on

20   July 16th did you get involved in the --

21   A.   I have no idea.

22   Q.   Was it before or after the dogs were called in?

23   A.   I don't -- it would have been before the dogs were

24   called.

25   Q.   Okay.  Did you go to the post office where the

*Cross - Epps*

1  package was taken for the dogs to sniff?

2      A.    No.

3      Q.    The packages?

4      A.    I didn't.

5      Q.    But you would have been called in prior to that time?

6      A.    Yes, because if I'm not mistaken the way that the

7  events occurred was that TFO Palacios retrieved the package

8  and brought it to Agana for us to look at the DEA grow.  And

9  then once we confirmed that it was something that definitely

10 needed further investigation, he and my partner, Inspector

11 Kaufman, took it up to Barrigada to be run by the dogs.

12     Q.    Okay.  And then after the dogs alerted on the

13 package, about what time was that, do you know?

14     A.    I don't know.

15     Q.    Okay.  Then what was your next interaction with this

16 investigation?

17     A.    If they would have brought them back down and I don't

18 remember where Inspector Kaufman was or what he was doing at

19 that point, but he asked me to write the warrants.

20     Q.    He asked you to write the warrants?

21     A.    That's correct.

22     Q.    About what time was that?

23     A.    Again, I don't remember.  It was, like, a year ago

24 and we've done so many since then.  I don't remember.

25     Q.    Would it have been before nine o'clock?

*Cross - Epps*

1    A.    At night or in the morning?

2    Q.    At night.

3    A.    Yes.

4    Q.    Okay.  Would it have been before 5 o'clock?

5    A.    Maybe.

6    Q.    Okay.  What time do you usually go home?

7    A.    It depends on what we're doing.  I've had nights

8  where I didn't get home until two o'clock in morning.  It just

9  depends on what we're doing.

10    Q.    Of course.  But in this case you recall, it would

11  have probably been before nine o'clock?

12    A.    It would have been in the evening, but yes, before

13  nine o'clock.

14    Q.    Some time in the evening?

15    A.    Yes.

16    Q.    So you swore up the warrant and what time did you

17  finish that?

18    A.    Next morning.

19    Q.    When I say swear up the warrant, I guess, preparing

20  the warrant to take to the judge.

21          When did you finish that activity of preparing?

22    A.    Again, it would have been some time in the evening

23  and it would have been late enough that we couldn't get to a

24  judge that night.

25    Q.    Okay.  And I believe, I didn't quite hear, but there

1  was something about judges being on -- not vacation, but being

2  off island?

3       A.   Right.  The District Court judges were all

4  unavailable for whatever reason.  I don't remember if they are

5  were off island or they were in a conference.  I don't

6  remember.  I just remember the District Court judges were not

7  available.

8       Q.   You remember they weren't available for that evening?

9       A.   For that, I want to say for that week, but I don't

10 really remember.

11      Q.   Okay.  And I'm just wondering why didn't you take the

12 warrant application to a judge the evening that you filled it

13 out?

14      A.   Because they wouldn't have been available.  It was

15 too late.  The Courts would have been closed and we have that

16 relationship with the District Court judges where we can

17 actually call them and say look, we've got this emergency

18 warrant, we need to come in and have it signed.  I don't

19 believe that we had that same relationship with the Superior

20 Court judges.  And so we, as a team and including the U.S.

21 attorney, decided to wait until the following morning when the

22 judge would be available.

23      Q.   Okay.  Was that Mr. Lemons?

24      A.   Yes.

25      Q.   What -- and had there been District Court judges,

1    either Judge Gatewood or Judge Manibusan, had they been

2    available, had they not been off island, would you have taken

3    your application to them that evening instead of waiting --

4                MR. LEMONS:  Objection, Your Honor, speculation.

5    He wasn't available.

6                THE COURT:  Overruled.  She already talked about

7    it.  Go ahead.  Overruled.  She said would she have done it.

8        A.   I mean the option wasn't available; it's a

9    possibility.  We've done it before.  But -- you know, as a

10   team.  I don't -- and I don't remember why or whether we would

11   have done that, whether there was a discussion about taking it

12   to the judge and judges weren't available.  I don't know.  It

13   was, again, a year ago.  There are occasions when we do that.

14   But there are also occasions, just as many if not more, where

15   we wait till the following morning when the judge is

16   available.

17       Q.   You said you're not sure whether or not.  I think you

18   said you're not sure, I don't know, whether or not you have

19   the same type of access to Superior Court judges, that is our

20   local judges, in the evenings, that you do with the District

21   Court judges?

22       A.   Right.  For a federal warrant.

23       Q.   You're not sure?

24       A.   I don't know whether we have that kind of...

25       Q.   You just don't know?

1     A.    It wouldn't have been my call.

2     Q.    Okay.  Did you inquire into that evening?

3     A.    I don't remember.  I know that I sent the warrants to

4  AUSA Lemons and, again, it's not my call whether we go see a

5  judge that night or the next morning.  That can be up to the

6  U.S. Attorney's office.

7     Q.    Do you know what time the UR Market opens for

8  business?

9     A.    No, don't.

10    Q.    Okay.  I don't have any --

11          MR. GAVRAS:  No other questions.

12          THE COURT:  Mr. Lemons.

13

14                    REDIRECT EXAMINATION

15  BY MR. LEMONS:

16    Q.    Do you remember going to the Superior Court to get

17  the search warrants signed?

18    A.    I do.

19    Q.    Okay.  And it was you; correct?

20    A.    Yes.

21    Q.    And did I go?

22    A.    Yes.

23    Q.    And did anybody from this courthouse go?

24    A.    Not that I remember, no.  I don't remember.  Oh, yes.

25    Q.    Who was that?

1      A.   Was it Walter?  I can't remember if it was Walter or

2    Judith.  It was one of them.  I don't remember.

3      Q.   Okay.

4      A.   Yeah.

5      Q.   Did they record the proceedings?

6      A.   Yes.

7      Q.   So it wasn't just you and me that had to be there

8    with the judge, it was also somebody --

9      A.   Right, it never is, yeah.

10     Q.   From the District Court?

11     A.   Right.

12     Q.   And so you submitted the warrant to the U.S.

13   Attorney's office?

14     A.   I did.

15     Q.   And it was that evening?

16     A.   Right.

17     Q.   And you appeared before the judge, right away or the

18   next day?

19     A.   The next morning, right.

20     Q.   Okay.  You recall how long we had to wait outside

21   before --

22     A.   I remember sitting out in the hallway on a very hard

23   bench for a while because he was doing something else.

24               MR. LEMONS:  Okay, I have no further questions.

25               THE COURT:  All right.  Okay, you may step down.

1   Okay.  All right.  How many more witnesses do you have Mr. --

2              MR. LEMONS:  We're only dealing with the delay.

3              THE COURT:  Right.

4              MR. LEMONS:  I probably should call one of the

5   dog handlers.

6              THE COURT:  Okay.  That shouldn't take long,

7   right?

8              MR. LEMONS:  Won't take me long.

9              THE COURT:  Well no, I mean you got the

10  certification.  The question is -- all right.  That's fine.

11             MR. LEMONS:  Pardon me.

12             THE COURT:  Go head and call them.

13             MR. LEMONS:  We're just --

14             THE COURT:  I just want to see how many more

15  witnesses because we can finish this up tomorrow morning.

16             MR. LEMONS:  Well, I just want to call the one

17  dog handler to explain how they got there, I think it goes to

18  the issue of the delay.

19             THE COURT:  Okay.  The time and everything, when

20  they got there and what the results were?

21             MR. LEMONS:  Yes, Your Honor.

22             THE COURT:  Pretty much.  But is that -- then

23  what else do you have after that?

24             MR. LEMONS:  Well, on this subject I have no

25  other witnesses, but if we're --

1          THE COURT:  But this -- but she already
2     established, would you agree, the probable cause as well?
3     Based on the affidavit.
4          MR. LEMONS:  Yes, Your Honor.
5          THE COURT:  So you don't have any other evidence
6     on probable cause, do you?
7          MR. LEMONS:  Well, there's gonna be the dog
8     sniffs.
9          THE COURT:  Okay.  I mean, that's coming in right
10    now.
11         MR. LEMONS:  Well, if you look at the warrants,
12    at this time, Your Honor, I'm gonna ask to move exhibits 1 --
13    the whole Exhibit 1 through 8 into evidence.  That's the --
14         THE COURT:  I'm sorry, Exhibits 1?  Exhibit 1?
15         MR. LEMONS:  Yes, Your Honor.  That's the
16    Sullivan 2 search warrant.
17         THE COURT:  Okay, you want that admitted.
18         MR. LEMONS:  I'm gonna ask the Court to admit 12
19    through 12-8, which is the Sullivan 2 search warrant.
20         THE COURT:  Okay.  Those are admitted.  All
21    right.
22    (Exhibit 12 to 12-8 admitted)
23         MR. LEMONS:  I'm going ask the Court to admit
24    Government's Exhibit 4 and 15, which are the Customs -- photo
25    of the Customs form, the priority label form and the name of

1  the sender and the recipient.

2          THE COURT:  Okay.

3          MR. LEMONS:  And then Government's Exhibit 15,

4  which would be for the Sullivan package.  Ending in the digit

5  16.  Then I'm going to move into evidence Government 6, which

6  is a blowup of the label with the tracking number where you

7  can see the numbers much clearer.

8          THE COURT:  Okay.  These are the ones that have

9  already been admitted.  Have already been marked and

10 identified, right?

11         MR. LEMONS:  Yes.  Then finally Government's

12 Exhibit 17, which would be for -- 6 would be for the Sullivan

13 2 package and 17 would be for the Sullivan package.

14         THE COURT:  Right.

15         MR. GAVRAS:  Your Honor, maybe I.

16         THE COURT:  Yeah?

17         MR. GAVRAS:  You were asking about witnesses.

18         THE COURT:  Yeah.

19         MR. GAVRAS:  If it's possible, I would like to

20 recall Jeremiah Cruz just briefly.

21         THE COURT:  All right.  All right.  But I am just

22 trying to figure out our schedule.  It's 5:21 now.  We can

23 finish this tomorrow morning, though.

24         MR. LEMONS:  That's fine.

25         THE COURT:  If you want to finish Jeremiah Cruz

```
1    and you only have one question with him?  One or two

2    questions.

3              MR. GAVRAS:  It could take three minutes, but

4    yes.

5              THE COURT:  Why don't we recall Jeremiah Cruz up

6    real quick.  Then we'll finish this tomorrow morning.  How is

7    that, Counsels?

8              MR. GAVRAS:  Your Honor, if we're --

9              THE COURT:  Are you all pretty much done --

10             MR. LEMONS:  Here's the position that I think I'm

11   in.  And you can correct me if I'm wrong.  If we're only

12   dealing with the delay, the only reason I'm calling the dog

13   handler is to testify what time he got the call and why he

14   arrived at the post office at the time he did.  That's the

15   only reason because we're going to establish times.

16             THE COURT:  All right.  All right.

17             MR. LEMONS:  So I -- but if we're going to go

18   into more then I need all of them here tomorrow.

19             THE COURT:  I'm sorry, you're go to go into, like

20   on probable cause?  Is that what you're talking about?

21   Probable cause -- issue of -- I think you've already -- well

22   go ahead.  The factors contained in the affidavit.

23             MR. LEMONS:  Right.

24             THE COURT:  That the court can only consider

25   would be the -- just the four corners of the affidavit, right?
```

1          MR. LEMONS:  Exactly.

2          THE COURT:  To determine if there's sufficient

3    probable cause for the magistrate judge to have issued the

4    warrant; correct?

5          MR. LEMONS:  Correct.

6          THE COURT:  So do you have any further evidence

7    on that?

8          MR. LEMONS:  No, the only reason the dog handler

9    would be here; not to establish probable cause.

10          THE COURT:  Right.

11          MR. LEMONS:  But the time.

12          THE COURT:  Right.  Because they talked about how

13    they built up -- why there was a delay in detaining the

14    package.  Right?  And also probably ascertaining whether there

15    was reasonable suspicion that the package contained

16    contraband, is that --

17          MR. LEMONS:  Correct.

18          THE COURT:  Okay.  So that's what you're gonna do

19    there.

20          MR. LEMONS:  And that's all I'm gonna do with the

21    two dog handlers because there was -- they used different dogs

22    on the two packages.

23          THE COURT:  Okay.  So you want to do that right

24    now or you want to do that tomorrow morning?

25          MR. LEMONS:  I'd rather do it tomorrow morning.

*Redirect - Epps*

 1                  THE COURT:  Okay.

 2                  MR. LEMONS:  And I think they would appreciate it

 3       too.

 4                  THE COURT:  Okay.  Why don't we do it tomorrow

 5       morning then.

 6                  MR. LEMONS:  Okay.

 7                  THE COURT:  My -- what time, Carmen, can we do

 8       it?  Nine o' clock?  9:00 a.m. and we can finish.

 9                  MR. LEMONS:  That's fine.

10                  THE COURT:  So that's all you're gonna call those

11       two.  Anything else?  Then we have to discuss the Justine

12       Cruise issue.

13                  MR. LEMONS:  Well --

14                  THE COURT:  Because if that's not -- if there's

15       nothing on Justine Cruise warrant, there's nothing to

16       suppress.

17                  MR. LEMONS:  If I need to call a witness --

18       dealing with, you know, things don't always go as you plan, my

19       case agent was gonna be one to testify on that, so he'll be

20       here.

21                  THE COURT:  Okay.

22                  MR. LEMONS:  So I don't think it's gonna be an

23       issue, but just in case it is, he's gonna be here, he can

24       testify.

25                  THE COURT:  Okay.  Is that it then?  So is that

```
1    all we have then?

2               MR. GAVRAS:  Sure.

3               THE COURT:  That's all you have as far as

4    evidence, Mr. Lemons, as far as remaining evidence?

5               MR. LEMONS:  Yes, Your Honor.

6               THE COURT:  Okay.  So doesn't sound like we have

7    much left.  Then we just have arguments tomorrow.  Yes,

8    Mr. Gavras?

9               MR. GAVRAS:  If we just ask Mr. Lemons to have

10   Mr. Jeremiah Cruz brought in.

11              THE COURT:  Is he still here?  Or Palacios?  Oh,

12   Cruz.  Jeremiah Cruz.

13              MR. GAVRAS:  Oh, I'm sorry.

14              THE COURT:  Did you want Cruz or Palacios?

15              MR. LEMONS:  He's my case agent.  He's under oath

16   already.

17              THE COURT:  Did you want Cruz or Palacios?

18              MR. GAVRAS:  I guess Palacios.  I apologize.

19   Yeah.

20              THE COURT:  Cruz -- you want --

21              MR. GAVRAS:  Yeah, I'm sorry.

22              THE COURT:  Palacios still here?

23              MR. LEMONS:  I don't know.

24              THE COURT:  Why don't you check.  Just check real

25   quick.
```

1          (Pause.)

2          AGENT CRUZ:  No, Your Honor, he's not.

3          THE COURT:  Well, bring him back tomorrow morning

4    then.

5          AGENT CRUZ:  Yes.

6          THE COURT:  Bring him back at nine o'clock.  All

7    right, Counsels.  If there's nothing further, then we'll be

8    able to finish this tomorrow then.  Okay.  All right.

9    Anything further, Mr. Gavras?

10         MR. GAVRAS:  (Shook head.)

11         THE COURT:  Your client will have his dinner,

12   right?  They'll have his dinner or do they have his dinner

13   here?  Do they have his dinner here or he'll have it when he

14   gets to facility?

15         MR. GAVRAS:  When he gets there.

16         THE COURT:  When he gets there.  All right.

17   Thank you, Mr. Gavras.

18         MR. GAVRAS:  Thank you, judge.

19         THE COURT:  Mr. Lemons.  That's it.  I'll see you

20   tomorrow morning.

21         MR. LEMONS:  Okay.  So Jeremiah Cruz can testify

22   tomorrow if necessary?

23         THE COURT:  Oh, yeah.  Yeah.  He could -- that's

24   what you want him to testify regarding the Justine Cruise

25   issue.

1          MR. LEMONS:  I was thinking for him.  He wants --

2     Mr. Gavras wants.

3               THE COURT:  Palacios.

4               MR. LEMONS:  Palacios.

5               THE COURT:  Right.  All right.  Thank you.

6               (Proceedings concluded at 5:26 p.m.)

7          ----------------------------------------

8               CERTIFICATE OF OFFICIAL REPORTER

9     CITY OF HAGATNA            )
                                 )  ss.
10    TERRITORY OF GUAM          )

11

12          I, Veronica F. Reilly, Official Court Reporter for

13    the United States District Court of Guam, do hereby certify

14    the foregoing pages, 1 to 141, to be a true and correct

15    transcript, to the best of my ability, of the proceedings held

16    in the above-entitled matter.

17          Dated this 29th day of July, 2017.

18

19                         /s/Veronica F. Reilly
                           Veronica F. Reilly
20

21

22

23

24

25

*Redirect - Epps*