IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA,  ) Court of Appeals No. 17-10138
                            )
            Plaintiff,  ) District Court No. 15-00041-01
                            )
      vs.             )
                            )
JUSTIN WHITE CRUZ,        )
                            )
            Defendant.  )

TRIAL TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD,
CHIEF JUDGE
OCTOBER 17, 2016; 9:22 A.M.
HAGATNA, GUAM

**Jury Trial - Day 9**

**Motions for Judgment of Acquittal, Closing Arguments and**

**Closing Jury Instructions**

Proceedings recorded *mechanical stenography*, transcript produced by computer.

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

APPEARANCES


Appearing on behalf of plaintiff:


**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: CLYDE LEMONS, JR., AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, GU 96910
(671) 472-7332


Appearing on behalf of defendant:


**LAW OFFICE OF WILLIAM L. GAVRAS**
**BY: WILLIAM L. GAVRAS, ESQ.**
101 Salisbury Street
Dededo, GU 96929
(671) 632-4357


ALSO PRESENT:

Jeremiah Cruz, DEA TFO

Jennifer Mafnas, USA legal assistant

I N D E X

|                                           | Page   |
|-------------------------------------------|--------|
| Motion for Judgment of Acquittal **denied** | 25, 41 |
| Defense rests                             | 53     |
| Closing argument by the government        | 54     |
| Closing argument by defense               | 71     |

Veronica F. Reilly, CSR No. 2004
Federal Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

1          **October 17, 2016; 9:22 a.m.; Hagatna, Guam**

2                              * * *

3          THE CLERK:  Criminal Case No. 15-00041, *United*

4  *States of America v. Justin Robert White Cruz;* Jury Trial, Day

5  9, Motions for Judgment of Acquittal and Closing Arguments and

6  Closing Jury Instructions.

7          Counsel, please state your appearances.

8          MR. LEMONS:  Good morning, Your Honor.  For the

9  record, Clyde Lemons, on behalf of United States.

10          THE COURT:  Good morning.

11          MR. LEMONS:  With me this morning will be Task

12  Force Officer Jeremiah Cruz and my legal assistant, Jennifer

13  Mafnas.

14          THE COURT:  Okay.

15          MR. LEMONS:  To make sure I don't ruin the

16  PowerPoint.

17          THE COURT:  Very good.  Thank goodness.  I always

18  tell you gentlemen, practice practice, so you look -- you

19  don't look disorganized.  But good morning.

20          MR. GAVRAS:  Good morning, Your Honor.  William

21  Gavras for the defendant, who's present.

22          THE COURT:  Okay, good morning, Mr. Gavras and

23  Mr. Cruz.  Okay, we're ready to proceed, Counsel?  We're

24  outside the presence -- whoa.  If you break it, you gotta pay

25  for it.  I always tell you guys that.  It costs like -- how

1  much does it cost, Vergel?

2            IT STAFF:  $400.

3            THE COURT:  How much?  I thought it was $4,000.

4            (Laughing.)

5            (Mr. Gavras blew into microphone.)

6            MR. LEMONS:  Nice try.

7            (Laughing.)

8            THE COURT:  Is it really 400?  Well, we'll find

9  out.  I think it's closer to 4,000.  All these silk-stocking

10 lawyers that come into my courtroom.

11           MR. LEMONS:  I'm a public servant.

12           THE COURT:  That's true.  You're a public servant

13 that makes a lot of money.  I know the salary scales, dude.

14           MR. GAVRAS:  I'm a whipping boy.

15           THE COURT:  And that you are.  All right.

16 Several things.  I'm sure you have a copy.  Verdict form; is

17 that correct?

18           MR. GAVRAS:  Yes.

19           MR. LEMONS:  Yes, Your Honor.

20           THE COURT:  Okay.  So we'll get to that in a

21 minute.  Let's see.  Last we left off, I think we should

22 finish the jury instructions first, before we go into the

23 Motion for Judgment of Acquittal because we're still working

24 at the instructions.

25           MR. GAVRAS:  Your Honor, depending on how the

```
 1   Motion for Judgment of Acquittal turns out, it could affect

 2   the jury instructions.

 3              THE COURT:  So do you want to go forward on the

 4   judgment of acquittal.

 5              MR. GAVRAS:  I actually would.

 6              THE COURT:  Okay, very well.  Let's go.  Go

 7   ahead.  You could come up to the podium and make your motion.

 8   We are outside the presence of the jury.  This is Motion for

 9   Judgment of Acquittal at the close of the prosecution's case

10   and then you can make -- probably the same one if you put on

11   no evidence; is that correct?

12              MR. GAVRAS:  Yes.

13              THE COURT:  Okay.  Proceed.  Under Rule 29,

14   proceed.

15              MR. GAVRAS:  Well, the first issue I'd like to

16   bring up is actually harkens back to the -- to the chemist's

17   testimony.

18              THE COURT:  Zhivago?

19              MR. GAVRAS:  Dr. Zhivago.

20              THE COURT:  Was he a doctor?

21              MR. GAVRAS:  Mr. Zhivago.

22              THE COURT:  Yes, don't promote him.

23              MR. GAVRAS:  Um.

24              THE COURT:  Zhivago.

25              MR. GAVRAS:  You may recall, Your Honor, that you
```

1  originally sustained my objection to his testifying as to the

2  amount of the substance and weight, the quality --

3              THE COURT:  Right.

4              MR. GAVRAS:  The quality and what the substance

5  was.

6              THE COURT:  Correct.

7              MR. GAVRAS:  And then he went on to present

8  further evidence.

9              THE COURT:  You mean, was he further qualified?

10             MR. GAVRAS:  Yeah, further foundational evidence

11  as to qualification.

12             THE COURT:  Yes --

13             MR. GAVRAS:  Calibration.

14             THE COURT:  Okay.

15             MR. GAVRAS:  Calibration.

16             THE COURT:  Oh, right, right.

17             MR. GAVRAS:  If I said qualification, I meant

18  calibration.

19             THE COURT:  All right.

20             MR. GAVRAS:  As to calibration.  However, it's my

21  memory that he never put on any additional evidence as to the

22  calibration of the machine that weighs the drugs.  That was

23  essentially a scale of some sort.

24             THE COURT:  Right.  He -- you mean, he didn't --

25  he himself did not do the calibration, somebody else did it

1  or?

2           MR. GAVRAS:  That's right.

3           THE COURT:  Is that what you're saying?

4           MR. GAVRAS:  He only did the calibration as to

5  the -- I forget.  The HRC or -- it was.

6           THE COURT:  What HRC, what is that?

7           MR. GAVRAS:  I'd have to -- he only did the

8  calibration as to one of the devices that tests for what kind

9  of substance it is.

10          THE COURT:  Okay.

11          MR. GAVRAS:  And then I remember Mr. Lemons, when

12 he came back on to provide further foundational testimony,

13 asked Mr. Zhivago, as to that machine alone.

14          THE COURT:  Right, I do recall.

15          MR. GAVRAS:  Within a scientific degree of

16 certainty established and he said yes, I came back -- but it

17 wouldn't be DEA standards, but the Court went ahead and let

18 that in.

19          THE COURT:  Right.

20          MR. GAVRAS:  But the one thing he -- and he

21 talked about those -- I think there were three instruments.

22          THE COURT:  Mm-hmm.

23          MR. GAVRAS:  That did the -- what type of

24 substance it is -- substance it is and the purity of the

25 substance, but he never gave any more testimony as to the

1 scales.  It was forgotten.  It had not -- it was not addressed

2 after that.

3           THE COURT:  I'm sorry, so are you saying that the

4 prosecutor didn't get any foundational -- in his case in

5 chief, any foundational questions regarding the calibration of

6 the scale?

7           MR. GAVRAS:  Of the weighing device, yes.

8           THE COURT:  Which is the scale.

9           MR. GAVRAS:  I believe it was a scale of some

10 sort.

11          THE COURT:  Maybe you're right.  I'll go back and

12 look at that.  But maybe Mr. Lemons can refresh my memory

13 better.

14          MR. GAVRAS:  Sure.

15          THE COURT:  And of course Veronica will know.

16          MR. GAVRAS:  (Laughing.)

17          THE COURT:  She'll find it for us, but go ahead.

18          MR. GAVRAS:  So that would apply to Count 1.

19          THE COURT:  Count 1.  Okay.  Let me look at Count

20 1 -- superseding indictment.  Okay, this is 50 or more grams

21 of methamphetamine.  So is the prosecutor required to just

22 show that it was 50 or more grams and the not the specific

23 number; correct?

24          MR. GAVRAS:  Yes.

25          THE COURT:  Right.  So you're saying

1  notwithstanding, there's just no evidence of a calibration,

2  period?

3            MR. GAVRAS:  That's right.

4            THE COURT:  Or a -- okay.

5            MR. GAVRAS:  Insufficient evidence, calibration

6  of the scales.

7            THE COURT:  At all?

8            MR. GAVRAS:  I believe there was none.  But it

9  was insufficient.  I think --

10           THE COURT:  You mean, he talked about all the

11  other measuring tools with the exception of the scale?

12           MR. GAVRAS:  Yes.

13           THE COURT:  That's your position?

14           MR. GAVRAS:  That's my position and I think if

15  the Court goes back to the point of the transcript where you

16  sustain my objection and then see what additionally was done.

17           THE COURT:  Right.

18           MR. GAVRAS:  And if that was enough for the

19  Court.  And I'm saying that if anything else was done, it

20  wasn't sufficient.  I don't believe anything else --

21           THE COURT:  So you're basically saying -- so for

22  purposes of that element on Count 1, the 50 or more grams in

23  terms of the weight.

24           MR. GAVRAS:  Right.

25           THE COURT:  The Court should dismiss it for

1  insufficient evidence, Motion for Judgment of Acquittal at the

2  closing of the prosecutor's case because the evidence is

3  insufficient to sustain the conviction?

4             MR. GAVRAS:  Yes, certainly as to in excess of 50

5  grams.

6             THE COURT:  So basically, it's actually Count 1

7  and Count 2.

8             MR. GAVRAS:  Yes.

9             THE COURT:  And what about Count 3?  You have

10  Count 3.

11             MR. GAVRAS:  Count 3.

12             THE COURT:  Count 4?

13             MR. GAVRAS:  Count 4.

14             THE COURT:  Count 4.  One, two, three and four.

15  Wow.  Would it really wipe out all of that?

16             MR. GAVRAS:  Well, I will argue --

17             THE COURT:  That's a huge windfall for your

18  client, isn't it?  Well, I shouldn't say windfall.  That's not

19  right.  But I mean, it's a victory for your client.

20             MR. GAVRAS:  Emotionally, it would be a windfall,

21  yes.

22             THE COURT:  But I shouldn't said that, that's not

23  really proper.  But basically, you're saying if the

24  prosecution failed to do that, then all of those four counts

25  will go out the door.

1          MR. GAVRAS:  Yes, and if I may argue in the

2     alternative on that?

3          THE COURT:  Right.  Go ahead.

4          MR. GAVRAS:  That even if those counts themselves

5     will not go out the door in total, they'd certainly go out --

6     and which is my primary argument.  My secondary argument would

7     be --

8          THE COURT:  I'm sorry, Count 1 and Count 2 --

9     you're right, Count 3 is not for this defendant.  I'm looking

10    at the superseding indictment that hasn't been --

11         MR. GAVRAS:  That's for Peter --

12         THE COURT:  Count 1, Justin Cruz, No. 1.  Count

13    2, Justin Cruz.  Never mind No. 3.  Count 4, Justin Cruz.

14         MR. GAVRAS:  Right.

15         THE COURT:  So Count 1, 2, and 4?

16         MR. GAVRAS:  Right.  And so my secondary argument

17    would be that no reasonable jury could make a finding that it

18    was 50 grams or more.

19         THE COURT:  Okay.  Let me hear from the

20    prosecutor on that particular part of the motion.

21         MR. GAVRAS:  Sure.

22         THE COURT:  If he doesn't know the answer

23    clearly, then I want to get Ms. Veronica here.  Ms. Reilly.

24    Yeah, I wanted to see if Ms. Reilly, Veronica, can pull that

25    up.  But you probably can answer this.  Go ahead.

```
 1              MR. LEMONS:  Your Honor, I believe that --

 2              THE COURT:  Yes?  Very good argument, though.

 3              MR. LEMONS:  -- Mr. Zhivago testified that the

 4    scales are tested using a known reliable weight.

 5              THE COURT:  Can you get into the mic, please.

 6    Are you on?

 7              MR. LEMONS:  Testing.

 8              THE COURT:  There we go.  Zhivago.  What witness

 9    number was he?

10              MR. LEMONS:  Four, five, or six.

11              THE COURT:  He's not six, he's not five.  What?

12    Six.  Let me go to six.  No, that was Grey.  Bishop.

13              MR. LEMONS:  He was before Bishop.

14              THE COURT:  Oh, okay.  Bishop.  Maybe he was.

15    Seven -- maybe I got the numbers wrong here.  Zhivago.

16    Cross-exam.  Grey.  Sergeant Grey -- hold on a second.

17    Zhivago.  I got it.  Tell me what's the deal.

18              MR. LEMONS:  I believe his testimony was that the

19    scales are tested using a known reliable weight.  So --

20              THE COURT:  And you're pretty sure of that.

21              MR. LEMONS:  Yes, Your Honor.

22              THE COURT:  Hold on.  Hold on.  Give me a minute

23    to look at my notes.  And then if not, I'm going to have --

24    gross weight -- drugs -- I usually have good notes, but if I'm

25    starting to -- weight -- weight --  that was when Mr. Gavras
```

1   made his objection.  Then he talked about gas chromatograph

2   mass spectrometer monthly.  All machines are calibrated

3   monthly.  So they have gas chromatograph -- gas chromatograph

4   mass spectrometer, color test, composite, infrared,

5   confirmatory technique, GC.  So these are the machines they

6   looked at.  Identity, purity, weight.  I'm looking at the

7   weight stuff.  Okay, you know what, I can't -- I'm gonna have

8   to have Veronica -- let me have her go back and look for that

9   -- that before -- and then you can make -- I'll have you

10  argue, but I want her to find that.  So you're basically

11  saying that as it relates to the scales.  I think I recall --

12  I think Mr. Gavras is correct on all the other machines, but I

13  can't honestly recall the scales.  So let's take a ten-minute

14  recess.  I'll have Veronica look for it.  Then we'll come

15  back.  You can make your argument.

16          MR. GAVRAS:  We can make further argument?

17          THE COURT:  Yeah, yeah.  Let's do this one step

18  at a time because this is critical.  This is critical.  Wow.

19  Ten minutes.

20          (Recess taken at 9:35 a.m.)

21          (Back on the record at 10:22 a.m.)

22          THE COURT:  We're back on the record.  *USA v.*

23  *Cruz*.  All Counsels are present.  I'm sorry for that delay.  I

24  was meeting with Judge Manglona.  Plus also, we got a copy of

25  the transcript.  Did you all listen to it or review it or no?

1    Oh, I thought you were doing that while I was in my chamber.

2    Okay, I guess not.  We'll have my court reporter read the

3    transcript or the -- transcript.

4              THE COURT:  We'll stop there.  You're talking

5    about the balance, the weight, right?

6              MR. GAVRAS:  Yes, Your Honor.

7              THE COURT:  Not the infrared.  Go ahead and

8    proceed, Mr. Lemons, with your argument.  Well, let me just

9    stop.  Let me stop.

10             So based on that, do you now withdraw your

11   argument on that?

12             MR. GAVRAS:  No, Your Honor.  Because --

13             THE COURT:  Oh, okay.

14             MR. GAVRAS:  Because subsequent to that, you

15   actually sustained my objection.  Oh, let's keep going then.

16             (Whereupon the reporter read back requested

17   portion.)

18             THE COURT:  Objection, yes, that's fine.  All

19   right.  So -- and in between all of that, there were

20   additional foundational questions.  So your objection is what

21   then?

22             MR. GAVRAS:  My objection is that there was

23   actually no additional evidence with regard to the

24   calibration.

25             THE COURT:  Oh, let's go back to -- well -- let's

1    see if there's any additional evidence on the calibration

2    part.

3                    (Whereupon the reporter read back requested

4    portion.)

5                    MR. LEMONS:  Your Honor, I'd direct this Court to

6    *US v. Lemus*, 815.

7                    THE COURT:  Wait.  Did you all give me this

8    before?  Probably not.  What is it?

9                    MR. LEMONS:  No, we didn't.

10                   THE COURT:  Right, I got it.  *US v.*, what?

11                   MR. LEMONS:  *Lemus*.  L-E-M-U-S.

12                   THE COURT:  Is that on?  Is that mic on?

13                   THE CLERK:  Yes, all the mics are on.

14                   THE COURT:  Maybe my ears are off.  Go ahead.

15                   MR. LEMONS:  815 F.3d 583.

16                   THE COURT:  815 F.3d 583.  Go ahead.

17                   MR. LEMONS:  2016, Ninth Circuit case.

18                   THE COURT:  Okay, go ahead.

19                   MR. LEMONS:  Where the Ninth Circuit has stated

20   that they have upheld convictions requiring proof of at least

21   50 grams in absence of the drugs themselves.  Your Honor, in

22   this --

23                   THE COURT:  In absence of the drugs themselves?

24                   MR. LEMONS:  Correct.

25                   THE COURT:  You got the drugs.

1          MR. LEMONS:  In this case, we actually have the

2    drugs.  And there's nothing in the law that says we cannot

3    prove weight circumstantially if you want to throw out the

4    weight of the drugs that the DEA lab obtained in this case.

5          THE COURT:  Are you saying that -- okay, what is

6    the -- where is the elements of Count 1, what instruction

7    number is that?

8          MR. LEMONS:  Well, Your Honor -- specific finding

9    that the drugs involved weighed --

10          THE COURT:  You have to make a specific finding

11   that a determination as to the amount of 50 grams or more must

12   be unanimous.

13          MR. LEMONS:  Correct.  Or five grams or less than

14   five grams.

15          THE COURT:  Right.  So you have to make that --

16   so that's true.  So what was your question?  What's your

17   point?

18          MR. LEMONS:  So Your Honor, we can prove it's

19   circumstantial.  We have --

20          THE COURT:  Can you put -- can you put on your

21   mic there.  Is your mic on?

22          MR. LEMONS:  It was -- well, she gave me a

23   different one and I'm not sure if I'm working this thing right

24   or not.  Oh, it was off?

25          THE COURT:  Yes.  See, I knew it wasn't my

1  hearing.  Go ahead.

2          MR. LEMONS:  Your Honor, the jury can determine

3  for themselves.  Let's see, we have the two exhibits from the

4  Sullivan packages.

5          THE COURT:  Which exhibit what?

6          MR. LEMONS:  35 and 36.  The jury can determine

7  for themselves whether or not this weighs more than 50 grams,

8  less than --

9          THE COURT:  I think the jury can tell what's 50

10  pounds, but I don't know about 50 grams.  Seriously, I

11  wouldn't know what 50 grams weighs.

12          MR. LEMONS:  Well Your Honor, if you recall,

13  there was testimony that a gram is the size of a packet of

14  Sweet'N Low sugar.

15          THE COURT:  Yeah.  That's right.

16          MR. LEMONS:  There was also testimony that there

17  are from both -- from both Gregorio Cruz, from Special Agent

18  Kirk Williams, that there are 28 grams in one ounce and that

19  --

20          THE COURT:  Yeah, that's right.  One ounce is

21  28 grams, that's right.

22          MR. LEMONS:  And that there's a thousand grams in

23  a kilo and a kilo is 2.2 pounds.  I think that's been

24  testified.

25          THE COURT:  So circumstantially, they can put it

```
1   all together, that's what you're saying?  That's a good

2   argument, Mr. Lemons.  Okay, yes --

3               MR. LEMONS:  And so the Court in *Lemus* as the

4   Ninth Circuit said, they've upheld convictions requiring proof

5   of at least 50 grams in absence of the drugs themselves.  But

6   we got the drugs here.

7               THE COURT:  Okay, got it.  That's a good

8   argument.  Mr. Gavras?

9               MR. LEMONS:  And I'd also cite to the case *US v.*

10  *Yashi*.  Unpublished opinion.

11              THE COURT:  How do you spell Yashi?

12              MR. LEMONS:  Y-A-S-H-I, 2013 Westlaw, 588, 178.

13              THE COURT:  2013 Westlaw what?

14              MR. LEMONS:  588, 178.

15              THE COURT:  Okay.

16              MR. LEMONS:  And in that case, the Court held

17  that you can even prove the identity of a drug without

18  scientific testing.  So --

19              THE COURT:  So -- so --

20              MR. LEMONS:  I believe we've proved

21  circumstantially -- if the court wants to throw out the weight

22  because of based on the DEA analysis, the jury can still make

23  a determination for itself.

24              THE COURT:  And you say that's a reasonable

25  inference, jury can conclude?
```

1          MR. LEMONS:  Correct.

2          THE COURT:  All right.  Yes, go ahead,

3  Mr. Gavras.  Go for it, Mr. Gavras.  I think he makes a very

4  good argument.

5          MR. GAVRAS:  Well, I think really what he --

6  okay, let's take it kind of parcel a little bit.  This idea of

7  there's 28 grams in an ounce, there are 16 ounces in a pound,

8  there's 2.2 pounds in a kilo.  I mean -- the Court can take

9  judicial notice of that.

10          THE COURT:  Well, that was testified to in trial.

11  He's correct.

12          MR. GAVRAS:  But I'm just saying though, the

13  Court could also take -- I mean, I even questioned him about

14  that.  The Court could take judicial --

15          THE COURT:  I'm sorry, you even questioned about

16  what?

17          MR. GAVRAS:  Those incremental larger amounts,

18  how much is --

19          THE COURT:  You didn't believe that?

20          MR. GAVRAS:  No, I was just trying to -- I don't

21  know what I was doing, but I did in my own questioning I went

22  through the conversion.

23          THE COURT:  Okay, go ahead.  He makes a good

24  argument.

25          MR. GAVRAS:  But that proves nothing by itself.

```
 1              THE COURT:  Well, of course.  Nothing is by
 2   itself.  That's why he is saying look at the totality of the
 3   circumstances.
 4              MR. GAVRAS:  Well, he said circumstantial
 5   evidence is what he said.
 6              THE COURT:  Right, he said look at the --
 7              MR. GAVRAS:  Okay.
 8              THE COURT:  If the Court accepts Zhivago or the
 9   Court -- he says throw out Zhivago, Mr. Zhivago, and use the
10   circumstantial evidence.
11              MR. GAVRAS:  Okay.
12              THE COURT:  Good argument.
13              MR. GAVRAS:  But what is the circumstantial
14   evidence?  He's saying eyeball it, ladies and gentlemen.
15              THE COURT:  He's saying what?
16              MR. GAVRAS:  Eyeball it.  He's saying.
17              THE COURT:  Eyeball it?
18              MR. GAVRAS:  That's what he's saying.  He's
19   saying the jury can look at it, eyeball it, and I suppose
20   weigh it themselves in their hands.  Now, that's the only
21   evidence he's pointing to.
22              THE COURT:  Weigh it themselves in their hands?
23              MR. GAVRAS:  Yes, that's -- there's nothing else
24   he is saying.  When you get down to what the government is
25   saying, he's saying the jury can look at the drugs and try to
```

1     estimate on their own, that's why I used the term eyeball it.

2              THE COURT: Yea, can't they do that any way?

3     They can do that, can't they?

4              MR. GAVRAS: That is not circumstantial evidence.

5     Circumstantial evidence is -- that would be direct evidence.

6              THE COURT: Can the jury reasonably infer based

7     on the testimony presented, as Mr. Lemons has argued, that if

8     this is so many pounds, therefore, this must be --

9              MR. GAVRAS: No, because --

10              THE COURT: -- so many pounds.

11              MR. GAVRAS: No, there is no evidence as to that

12     because once you get rid of Zhivago, there is no evidence of

13     pounds or kilos. So what he's asking the jury to do, the only

14     thing he's asking the jury to do is -- and the only

15     circumstantial evidence and it's not circumstantial evidence,

16     it's direct evidence, but it fails by having them look at it.

17     It's like me saying, Your Honor, look at this substance I have

18     between my fingers. Okay. You decide how much it weighs.

19     That's not circumstantial evidence. That's direct evidence.

20     But you're not qualified to do that. You can't do it. You

21     know how many substances the difference between substance

22     there are particles in the universe called quasars. Actually,

23     they're bodies.

24              THE COURT: They're called what?

25              MR. GAVRAS: Celestial bodies in the universe.

1            THE COURT:  What are they called?

2            MR. GAVRAS:  Quasars.  And that much of it would

3    weigh more than the Earth.

4            THE COURT:  You say "that much," what are you

5    demonstrating?

6            MR. GAVRAS:  I'm holding up a centimeter between

7    my two fingers.

8            THE COURT:  Okay.

9            MR. GAVRAS:  Would weigh the equivalent of this

10   Earth.  Now, we're asking the jury to make estimations.  We're

11   not asking the jury to figure out circumstantial evidence.

12   We're asking the jury to make estimations.  If the Court feels

13   comfortable with that, I don't think it is.

14           THE COURT:  Okay.  Anything further?

15           MR. GAVRAS:  But I don't think it's

16   circumstantial evidence.  I think it's direct evidence.

17           THE COURT:  All right.  Anything further?  I can

18   make my ruling.

19           MR. GAVRAS:  Nothing.

20           THE COURT:  Rule 29 of the Federal Rules of

21   Criminal Procedure provides that a defendant may move for

22   Judgment of Acquittal if the evidence is insufficient to

23   sustain a conviction.  After the prosecutor closes his

24   evidence, the Court on the defendant's motion must enter a

25   judgment of acquittal of any offense for which the evidence is

1  insufficient to sustain a conviction.  And if the Court denies

2  a Motion for a Judgment of Acquittal at the close of the

3  prosecutor's case, the defendant may offer evidence without

4  having reserved the right to do so.

5            So what the Court is going to do here is say that

6  -- well, let me see.  The standard for Motion of a Judgment of

7  Acquittal is the same regardless of when the motion is made.

8  I'm -- under Federal Rules of Criminal Procedure 29(a), the

9  evidence is insufficient to sustain a conviction if after

10  reviewing the evidence in the light most favorable" to the

11  prosecutor, no rational trier of fact could find the essential

12  elements of the crime beyond a reasonable doubt.  Because the

13  government and that's citing *Jackson v. Virginia*, 443 U.S.

14  307, 319 (1979) -- because the prosecutor does not need to

15  rebut all reasonable interpretations of the evidence, that

16  would establish the defendant's innocence or rule out every

17  hypothesis except that of guilt beyond a reasonable doubt at

18  the first step of *Jackson*, a reviewing Court may not ask

19  whether a finder of fact could have construed the evidence

20  produced at trial to support acquittal.  Only after we've

21  construed all the evidence at trial in favor of the

22  prosecution, do they take the second step to determine whether

23  the evidence at trial, including any evidence of innocence,

24  could allow any rational trier of fact to find the essential

25  elements of the crime beyond a reasonable doubt.

1          So the Court is -- has heard from Mr. Gavras and

2     he's saying that the prosecutor has failed to establish that

3     the balance or the scale was properly calibrated, there's

4     insufficient evidence, there's no direct evidence and the

5     Court should not allow circumstantial evidence to be inferred

6     by the jury or to allow the jury to direct -- to directly on

7     their own...

8          (Pause.)  Figure out how to weigh this in the

9     deliberation room.  Is that what you're saying?

10          MR. GAVRAS:  I'm saying that it is direct

11     evidence, but it's -- it would be speculative on the part of

12     the jury.

13          THE COURT:  All right.  So I think that based on

14     the Count 1, Count 2, Count 4, where the prosecutor has to

15     prove 50 grams or more of methamphetamine hydrochloride

16     unanimously, the prosecution has already -- has done that

17     through the testimony of Mr. Zhivago.  He did testify that the

18     machines, the balance or scale or whatever you might call it

19     were properly calibrated every month and even if the Court

20     were to throw out Mr. Zhivago's testimony like Mr. Lemons has

21     argued, the jury can reasonably infer based on all the other

22     evidence of the weight from the Sullivan 1 and Sullivan 2

23     packages that there has been more than 50 grams of

24     methamphetamine hydrochloride element met in those three

25     counts.  So the Motion for Judgment of Acquittal, based on

1    that ground, is denied.  Next argument?

2                MR. GAVRAS:  Yes.  Your Honor, I believe I may

3    have made reference to this yesterday.  I know I told

4    Mr. Lemons this.  I also sent the Court some case law last

5    night with regard to this and I sent it to Mr. Lemons as well.

6                THE COURT:  I got it.  Was it like 10 o'clock

7    last night, 11 o'clock midnight?

8                MR. GAVRAS:  It was late, Your Honor.

9                THE COURT:  We got it.  We worked on it.  Go

10   ahead.

11               MR. GAVRAS:  But Mr. Lemons did indicate that he

12   had already -- he had the cases on Saturday actually.

13               THE COURT:  Okay, good.  Make your argument.

14               MR. GAVRAS:  I would just move to dismiss Count

15   1.  I think that's the conspiracy count, let me double-check.

16   On the basis that the evidence, first of all, Mr. Peter Santos

17   testified he couldn't remember at all when he went over to my

18   client's residence.

19               THE COURT:  I'm sorry, Count 1?

20               MR. GAVRAS:  Right.  Conspiracy.

21               THE COURT:  I'm sorry, so we got the first one,

22   the Motion for Judgment of Acquittal on the first grounds is

23   denied.  The second ground is -- what was the second ground

24   now?

25               MR. GAVRAS:  Insufficient evidence of the

1   conspiracy, that the -- Peter Santos testified that he didn't

2   even remember when he went -- he had known my client for

3   20 years, doesn't even remember when he went over to his house

4   two times to pick up drugs.  That's what he testified to.

5   He's not even sure really on cross -- that was on direct.  On

6   cross, it was -- well, actually on direct it was twice.  And

7   then on cross, I asked him when, he said he couldn't remember.

8   And then he even -- doesn't even know if it was twice.

9           THE COURT:  This is Peter Santos.

10          MR. GAVRAS:  That was Peter Santos and then for

11  Gregorio Cruz, Gregorio testified that it was -- he bought

12  drugs from my client.  And the cases I cited particularly -- I

13  think the case --

14          THE COURT:  Is this a buyer-seller relationship

15  issue?  Seller-buyer relationship issue with Gregorio Cruz?

16          MR. GAVRAS:  Yes.  It was only a buyer-seller and

17  as the Ninth Circuit pointed out, the Supreme Court pretty

18  recently stated the buyer-seller is not an exception to the

19  conspiracy.  In other words, you actually have to prove the

20  conspiracy.  I mean, that's really apology I suppose, but it's

21  nonetheless very important.  And when you look at the language

22  of, and if I could just quote some of the language from

23  *Loveland*, which is the Ninth Circuit's -- which is the more

24  recent of the two cases that I gave you, it goes on to say

25  that "we explained that when deciding if there is sufficient

1    evidence of an agreement, we look to evidence of a prolonged

2    and actively pursued course of sales coupled with the seller's

3    knowledge *and*" -- they actually italicize this -- "*and a*

4    *shared stake* in the buyer's illegal venture."  And they

5    italicize that.  That is on page 560.  And I think that's very

6    important.  *And a shared stake* in the buyer's -- there's no

7    indication that my client has had a shared stake.  And it goes

8    on.  "Unlike *Lennick* --"

9                 THE COURT:  Let me ask you this, do you want the

10   -- let's assume I denied it, the dismissal of Count 1, do you

11   want an instruction on buyer-seller rule?

12                MR. GAVRAS:  No.

13                THE COURT:  Oh, you don't?

14                MR. GAVRAS:  No.

15                THE COURT:  Even if you're arguing for --

16                MR. GAVRAS:  I'm not arguing for a buyer.  I'm

17   saying that --

18                THE COURT:  You don't have to have it.  That's

19   fine.

20                MR. GAVRAS:  Yeah, I don't.

21                THE COURT:  The case law, I thought, said that

22   the other conspiracy language --

23                MR. GAVRAS:  I'm entitled to it.

24                THE COURT:  You are entitled to it, but you don't

25   want to.

1          MR. GAVRAS:  I don't want it.  I'm not going to

2    sit here and argue, ladies and gentlemen, acquit my client

3    because he was dealing dope, he wasn't in a conspiracy.

4          THE COURT:  Okay.

5          MR. GAVRAS:  Okay.  And so it goes on.  "Unlike

6    *Lennick*, which involved small amounts of marijuana, *Ramirez*

7    involved repeated sales of escalating marijuana."  But then

8    the next sentence is critical, so because I think that's what

9    Mr. Lemons is gonna say, that this is escalating amounts to

10   larger amounts.  But look what the Ninth Circuit --

11         THE COURT:  What page are you on or what note,

12   headnote?

13         MR. GAVRAS:  Same page I quoted last time.  560.

14         THE COURT:  Go ahead.

15         MR. GAVRAS:  And then I'm toward the end of 560.

16   But the very -- "but we held that even repeated sales and

17   large qualities could not sustain a conspiracy conviction, in

18   the absence of evidence of involvement of Ramirez, in the

19   buyers' drug sales."  So you know, you can look -- there has

20   to be involvement in that.  It's not just that it's large

21   amounts and the Ninth Circuit went to great lengths, it put --

22   things in italicize, the first thing I said in italics and

23   then it started the -- that sentence I just read with the word

24   "but," as a way to emphasize it.

25         THE COURT:  I'm trying to find, what -- is this

1  on *Loveland*?  Are you looking at *Loveland*?

2             MR. GAVRAS:  Yes, Your Honor.

3             THE COURT:  I'm sorry.  I was looking at *Moe*.

4             MR. GAVRAS:  I'm sorry.  It's towards the end of

5  page 560 on *Loveland*.

6             THE COURT:  Five six zero?

7             MR. GAVRAS:  Yes.

8             THE COURT:  Let me just pull this.

9             MR. GAVRAS:  It's the paragraph that begins with

10  the words "We explained."

11             THE COURT:  I got it.  Five six zero.  Go ahead.

12             MR. GAVRAS:  And you'll see the italicized

13  portion in the first sentence.  Then you see the second

14  sentence, which talks about escalating amounts.  The third

15  sentence qualifies that, strongly, which begins with the word

16  "But."  "But we held that even repeated sales and large

17  quantities could not sustain a conspiracy conviction."  Then

18  we go to the next sentence, which it just gives some facts.

19  "*Ramirez* was a stronger case for government than this one.

20  Ramirez's buyer collected money from the government undercover

21  agent while Ramirez was nearby."  Okay.  So Ramirez -- this

22  guy had a buyer.  Ramirez was the defendant, he had a buyer

23  and the buyer ran off and collected money from an undercover

24  agent.  Ramirez was nearby and the buyer brought it

25  immediately to Ramirez.  Ramirez exchanged the methamphetamine

immediately.  So the buyer comes back with money from the

undercover agent.  Ramirez is nearby and they do the exchange.

That looks like they're somewhat involved.  They could all --

Ramirez in that case could actually see what his buyer is

doing to get the money to him.  He's running off to the

undercover agent, grabs money, comes back and they do the

exchange of money for drugs.  "Ramirez exchanged the

methamphetamine immediately, which the go-between," that's his

buyer, "immediately ran and delivered to the undercover

agent."  I mean, it looks like Ramirez in that case knows

exactly what's going on in the other guy's business in his

buyer's business and is dependant upon it.  "In three out of

the four sales proved, the undercover agent and Ramirez were

in site of each other.  Nevertheless, we held that there was

insufficient evidence of conspiracy between Ramirez and the

go-between."  Then if we go down to headnote 5, okay.  "Though

courts once called the 'buyer-seller rule' a 'narrow

exception' to a conspiracy, a particularly thoughtful Supreme

Court of Connecticut decision, *State v. Allan*, notes that the

buyer-seller relationship is a failure of proof of conspiracy,

not an exception to conspiracy."  Again, I think that's just a

tautology in my mind.  But, they, the Ninth Circuit seemed to

think it was important.  "As we held in *Lennick* and reiterated

in *Moe*, 'conspiracy requires proof of an agreement, to commit

a crime other than the crime that consists of the sale

1  itself.'"  Okay.  And then we go on.  I don't have just as my

2  last quotation, if we go town headnote 789.  "Of course, like

3  any element, the agreement may be proved by direct or

4  circumstantial evidence.  And the agreement can be explicit or

5  tacit."  And then in a very short, somewhat dramatic sentence,

6  "But the agreement has to be there."  There is no such

7  agreement between my client and Gregorio Cruz.  It was always

8  an exchange for money.  At worst, he testified -- this is the

9  worst thing he testified to, that it's -- that's not addressed

10  in this case, they smoked meth together.  So what?  And then

11  the other thing my client said to him, allegedly, said oh,

12  yeah, look, if you don't want to buy from me anymore, maybe

13  you should buy from somebody else.  But if anything, that

14  emphasizes the fact he's buying from him.

15          THE COURT:  Okay.  All right.  Thank you.

16  Mr. Lemons.

17          MR. LEMONS:  Your Honor, I'd ask the Court to go

18  to the *Moe* decision.

19          THE COURT:  Okay, got it.  Go ahead.

20          MR. LEMONS:  The reason that I ask the Court to

21  look at the *Moe* decision is because the *Moe* decision involved

22  a case where the defendant, Moe, was not fronted drugs and the

23  drugs weren't on consignment.  And what the Ninth Circuit did

24  is it looked at ten factors and it basically said the court,

25  meaning you, has to do a -- I don't know what they meant by

1    this, but a holistic approach and that if the case is close,

2    then the Court should consider giving the buyer-seller

3    instruction.  And those factors, that the Court said to look

4    at included, whether the drugs were sold on credit or

5    consignment.  In *Moe*, they weren't.

6            So the other factors that they had to look at

7    was:  The quantity of drugs involved; the level of trust

8    demonstrated between buyer and seller, and using codes as one

9    indication of that trust; the length of time during which

10   sales were ongoing; whether the transactions were

11   standardized; whether they advised each other on the conduct

12   of other's business -- of the other's business; whether the

13   buyer assisted the seller by looking for customers; and

14   whether the parties agreed to warn each other of potential

15   threats from competitors or law enforcement.

16           And so in this case, Your Honor, what you have,

17   according to Greg Cruz, he wasn't just a casual buyer.  He met

18   the defendant in the latter part of 2013.  He started off

19   buying three to five grams at a time, I believe he said.  And

20   then business got better, he stepped up to two -- to ten

21   grams.  And then eventually to ounce levels.  And the only

22   reason he stopped buying from the defendant is because he was

23   arrested in June of 2015.  June 8th, to be exact, for the

24   offense that he's pled to in this case.  And then the price

25   went down, because if you'll recall, he said he was buying it

1     between four and $600 a gram from the defendant.

2            And then when he stepped up to an ounce level, he

3     started purchasing ounces for $10,000.  And that comes out to

4     approximately $357 a gram.  A substantial discount of $600 a

5     gram.  And so these are some of the factors the Ninth Circuit

6     has said the Court should look at it.  And then the trust

7     element.  Well, what did Gregorio Cruz tell you.  Defendant

8     gave him a pair of work boots.  He found two ball -- two

9     spheres of ice in the boots.  He called them the next day,

10    which was father's day I believe he testified and said I got

11    something that belongs to you.  He only told him about the one

12    sphere.  And the defendant basically called him an honest man.

13    I guess, obviously, he didn't know there were two spheres of

14    ice in the boots.  And he gave him an ounce as a reward.  And

15    then as part of a show of trust, of kind of putting his arm

16    around Gregorio Cruz and saying I'm gonna teach you a few

17    things and he showed him how to get drugs from off island

18    through the mail without getting caught.  So he showed him the

19    -- told him about how he has the boxes marked so he would know

20    if law enforcement had tampered with 'em and that the markings

21    would only be visible under a black light.  He also told him

22    how to wrap the drugs and put lotion on it and so he was

23    helping this guy out because this relationship started in 2013

24    and ended in June of 2015.  And as Mr. Cruz said or Gregorio

25    Cruz said, he was buying from the defendant every week.

1   That's a long time -- long-term relationship.  And so those

2   are the factors that the Ninth Circuit looked at in

3   determining that there was -- that a reasonable jury could

4   find elements of conspiracy, but it also cautioned the

5   district court that a proper instruction should be given.  And

6   *Loveland*, the 2016 case, basically affirmed and reiterated

7   what the -- what they had held in the *Moe* case.

8            THE COURT:  Okay.  Thank you.

9            MR. LEMONS:  Now --

10           MR. GAVRAS:  Just -- I apologize.

11           THE COURT:  Were you done?

12           MR. LEMONS:  No, that was just as to Mr. Cruz.

13           THE COURT:  What about -- now we gotta go into

14  Peter Santos.

15           MR. GAVRAS:  May I interject here?  May be

16  helpful.

17           MR. LEMONS:  Well, he did both --

18           THE COURT:  No, no, let him finish.  Yeah, go

19  ahead.  Finish, Mr. Lemons.

20           MR. LEMONS:  So Your Honor, Peter Santos said

21  that he worked -- he sold drugs for the defendant -- I believe

22  it was cousin, Jacob Cruz.  And that he had been over there

23  many times only on two occasions to purchase drugs.  But I

24  would submit that he showed up, on the day that the defendant

25  got a load of drugs in, with a scale and $2,200.  And

1  according to the testimony, what he said when the law

2  enforcement stopped him, did Justin tell you.  Now, they did a

3  search of the truck and this so-called dog collar he came to

4  drop off, I didn't hear any evidence about them finding a drug

5  collar.

6          THE COURT:  A dog collar.

7          MR. LEMONS:  A dog collar.

8          THE COURT:  You said, a drug collar.

9          MR. LEMONS:  Oh, I meant a dog collar.

10          THE COURT:  Or it could be your accent.

11          MR. LEMONS:  Could be.

12          THE COURT:  Could be.

13          MR. LEMONS:  What they found was money, marijuana

14  and a digital scale that is commonly used to weigh drugs.  But

15  here's where the story gets more interesting and that goes to

16  Exhibit 47.  And ordinarily, you can't bring in the acts to

17  cover up a conspiracy unless there are charges in the charging

18  instrument that go specifically to that.  And in this case, we

19  have two charges and what shows that there's a relationship

20  there is Exhibit 47.  And that's -- I believe Officer Angoco

21  referred to this as a kite, which is basically prison slang

22  for note.  And so what do we have?  Peter told you he wrote

23  the part in blue.  "Bro, I need ten before Monday, my hearing

24  date."  And he told you, he was a little anxious because Shane

25  Black, the son of my colleague, Fred Black, was his lawyer and

he wasn't feeling too comfortable about that.  And Shane Black
was appointed.  "So my hearing is at 3:00 p.m.  I told you
what they want me to do and I won't do that so long as I get
me a new lawyer.  Let me know ASAP."  And so the response and
the reason Peter said that this was -- he believed that this
was from Justin Cruz is because the defendant asked him the
exact same thing when they were in lockup, but his response in
lockup earlier was, "forget it," only he used a different
word.  And so Justin Cruz writes back, "I told Jake to give
you, because I don't have anything.  They took everything, but
can you take the rap and say everything is yours?  And I'll
take care of you and your son."  Well, Your Honor, that, at
least in my mind, shows a relationship, a meeting of the minds
between the defendants and so I believe you can find that
there's a conspiracy and the cover up because it's charged in
that instrument between these two defendants.

        THE COURT:  Okay, thank you.

        MR. GAVRAS:  Yeah, I won't take too long, Your
Honor.  I think, in some ways, we may have wasted a little of
the Court's time talking about Gregorio Cruz and I apologize
for that because Count 1 doesn't allege conspiracy between my
client and Gregorio Cruz.

        THE COURT:  Right.  So don't worry about that.

        MR. LEMONS:  It does say two -- people known and
unknown to the grand jury.

1          MR. GAVRAS:  Okay, well then -- then we have -- I

2    mean I don't know --

3          THE COURT:  But you're not really pushing that on

4    Count 1.  You're arguing really just Robert and Peter, right?

5    Are you going to also argue on Gregorio on this charge as

6    well?

7          MR. LEMONS:  I certainly am.

8          THE COURT:  Okay.

9          MR. GAVRAS:  Okay.  Then we'll go back to

10   Gregorio.  Your Honor, first of all, the government asked you

11   to concentrate on *Moe*.  *Moe* came before *Loveland*.  *Loveland*

12   discussed *Moe*.  I think and also *Loveland* talks about the

13   Connecticut Supreme Court case, which in *Loveland* the court

14   mind influenced it.  And so what we have here is quantity is

15   not enough.  Look at *Ramirez*.  The case, *Ramirez*, that's

16   discussed in *Loveland*.  And talk about the trust there where

17   they're right next to each other.  The defendant, his buyer

18   and then the undercover agent.  If anything, they're working

19   together there, closely.  But because as the Ninth Circuit

20   said in *Loveland*, there has to be evidence of an agreement.

21   It says you can have all these nice things.  All these things

22   that could indicate that yeah, it could be part of the

23   conspiracy or it could be part of a buyer-seller relationship.

24   But in the end, whenever the Ninth Circuit said these things,

25   it always said but you must have evidence of an agreement and

1   it's not enough just to have quantity.

2          Now, so far as truth -- trust is concerned, there

3   was a lot of trust going on in *Ramirez*.  I mean, if we had the

4   *Ramirez* case, Mr. Lemons would be arguing what; that well,

5   *Ramirez* -- three out of the four sales in *Ramirez* -- *Ramirez*

6   -- three out of four sales by the undercover -- by the buyer

7   to the undercover agent, Ramirez was there.  That's a lot of

8   trust.  But that wasn't enough.  Work boots, well, you know, a

9   gift when you get a coupon at Macy's, it's not a -- because

10  you bought some stuff, it's not -- you're not in business with

11  Macy's.  Also, trust, the -- Gregorio Cruz was dishonest to my

12  client because he kept one of the balls of meth.  He gave him

13  a reward?  Is giving a reward now evidence of a conspiracy?

14  In any sense?  Somebody does something nice to you and you

15  give something back, I don't think so.

16         And again, the closest I think that the

17  government comes to saying there was conspiracy is when my

18  client said hey, why don't you consider buying something from

19  other people.  You know, and this is one way you can do it.

20  But that's no different than going to one store and then

21  saying, well you know, another store has a shirt like this you

22  might like.  I'm sure that's happened to people and this is

23  how you get to the store.  And I've had that happen -- these

24  -- especially in light of *Loveland*, this is not evidence of a

25  conspiracy.  This is just evidence that they had a

1    relationship.  But the relationship isn't enough.

2              Now, we get to Santos.  Peter Santos.  Let's look

3    at what Peter Santos testified to at trial.  He testified that

4    he was bringing a dog leash.  Okay, maybe the government

5    doesn't believe that.  I mean, a dog collar.  Maybe the

6    government doesn't believe it, but let's see what the

7    government does believe.  Let's look at the plea agreement.

8    Exhibit 48.  And this is extraordinarily telling.  And this is

9    -- and I want to emphasize something here, the government has

10   stated that it did not know -- did not have an opportunity to

11   interview Peter Santos before he pled guilty.  But -- so maybe

12   they're gonna argue that they were misled.  That was a long

13   time ago.  They -- the government has subsequently entered

14   evidence into this case, which says that it was -- that Peter

15   Santos's relationship with my client was a buyer-seller

16   relationship.  Definitive evidence as to that and that is in

17   Government's Exhibit 48 wherein the government stated that on

18   July 17th, my -- that Peter Santos drove to his co-defendant's

19   residence with the intent to purchase methamphetamine.  And

20   that was used as the factual basis for what?  Not as a factual

21   basis for conviction for conspiracy.  But for attempted

22   possession with intent to distribute.  That is enormously

23   significant for a number of different reasons.  Because this

24   is evidence that the government presented to the jury in this

25   case and the only other evidence is what Peter Santos

```
1   testified to about the dog collar.  I don't think this is

2   close.

3              THE COURT:  All right.  I'm going to -- I'm going

4   to deny the motion for judgment of acquittal, but I'm going to

5   write it out over lunch hour and then I'll announce why.  But

6   I'm going deny it on the arguments -- the Court is

7   incorporating by reference a lot of the arguments made by the

8   prosecutor.  But let me just articulate it better because I

9   got those cases late and I need to make sure that I understand

10  -- I did see the ten factors that you mentioned, Mr. Lemons,

11  and I got your -- so I got both of your cases, your case last

12  night, Mr. Gavras.  So --

13             MR. LEMONS:  Your Honor.

14             THE COURT:  We're gonna go ahead and take a lunch

15  recess.  I'm going to call the jurors and let them go to lunch

16  and then we'll come back.  Yes?

17             MR. LEMONS:  I will just ask you, in *Moe*, to pay

18  attention to -- close attention to the footnotes because I

19  think they're really important in this case.

20             THE COURT:  I will.

21             MR. GAVRAS:  Your Honor, I also need to rest my

22  case and then just reassert, by reference, my prior arguments.

23             THE COURT:  I will.  We'll do that -- you want to

24  rest your case in front of the jury?

25             MR. GAVRAS:  No -- no.
```

1        THE COURT:  Well, I think you should.  Because --

2   just formally, you should.

3        MR. GAVRAS:  Well, if you think it's required.

4        THE COURT:  Yeah, I do.

5        MR. GAVRAS:  Okay.

6        THE COURT:  So why don't we do that after lunch,

7   though.

8        MR. GAVRAS:  Okay.

9        THE COURT:  We'll just make it real smooth.

10  Everything will be real smooth.  Now, I want -- and then I'll

11  talk to you about the verdict forms.  I need you guys to pull

12  up the verdict form real quickly and then look at the

13  indictment.  So you guys have a copy of the -- you gentlemen

14  have a copy of the verdict form.  If you look to Count 4.

15  Look at the indictment, look at the verdict form.

16        MR. LEMONS:  Count 4 of the indictment or the

17  jury instructions or both?

18        THE COURT:  No, look at the verdict form and then

19  the indictment.

20        MR. LEMONS:  Okay.

21        THE COURT:  Make sure I got this.  Count 4.  Oh,

22  I'm sorry.  Look at the -- let's go to Count 4 in the

23  indictment.  Look at the indictment in the caption.  Count 4

24  is -- which one is count -- Count 1.  Count 4 is possession

25  with intent to distribute methamphetamine hydrochloride.  It

1    cites to -- in the -- caption 846, but the body of the

2    indictment doesn't cite to it.

3                    MR. LEMONS:  Of Count 4?

4                    THE COURT:  Look at Count 4.  Look at the caption

5    of Count 4, which is the third one.  Superseding indictment

6    Count 4 on page one of seven.  Then look at Count 4 on page

7    three.  So you guys cite to 846, but there is no 846 there.

8    It should just be 841 for attempted conspiracy.

9                    MR. LEMONS:  Your Honor, there is no 846 in the

10   body of the indictment.

11                   THE COURT:  But you put it in the caption.

12                   MR. GAVRAS:  Oh, up top?

13                   THE COURT:  Yeah, the caption.

14                   MR. GAVRAS:  Oh, see.

15                   THE COURT:  Cover page.  Cover page.  You guys

16   need to do some scrub-a-dub-dubs.  So the caption is

17   incorrect.  Just an FYI.  Remember, I don't just have my eyes

18   looking at this, I have others in my Court.  So the caption

19   has 846.  The body of the indictment doesn't have 846.  Do you

20   see what I'm saying?

21                   MR. LEMONS:  You're correct, Your Honor.

22                   THE COURT:  Right.  So I -- so Count 4 only has

23   841(a)(1).  That's one thing.  Just FYI.  Then also Count 5 in

24   the indictment, let's look at Count 5.  Tampering of a witness

25   by corrupt persuasion.  Count 5, let's look at Count 5 of the

1    indictment.  Okay.  You have -- you cite in Count 5,

2    1512(b)(1) and (j); correct?

3                MR. LEMONS:  Yes.

4                THE COURT:  Okay.  The Court does not include (j)

5    because that refers to punishment.  So you guys put that in

6    there, but it's not -- anyway.

7                MR. LEMONS:  Yes --

8                THE COURT:  We don't put that in the verdict

9    form.  That's all.  That's --

10                MR. LEMONS:  Oh, it shouldn't be in the verdict

11   form.

12                THE COURT:  No, it's not.  That's what I'm

13   saying.  So I just want you to note that.  All right.  Those

14   are the only comments I want to make as to the verdict forms.

15   Is there anything else on the verdict forms?  Counsels, please

16   review it.  Let me know and then I'll call in the jury.

17   Diane, why don't you get the jury ready.  One minute.  And

18   then I'll come back and I'll -- 11:30, 12:30, 1:30, 2 --

19   we'll start at 2 o'clock.

20                MR. LEMONS:  Okay.

21                THE COURT:  Because I have a meeting.

22                MR. LEMONS:  Can we leave...

23                THE COURT:  I'll let them go to lunch and then

24   I'll get the verdict forms done.  Then I'll just make my

25   ruling on the Judgment of Acquittal more formally after lunch.

1   And then we'll call in the jury.  Call 'em in now.  Anything
2   else on the verdict forms?  Yes.
3               MR. GAVRAS:  Well, it's actually not on the
4   verdict form.  It's on something for the jury, though.
5               THE COURT:  But on the verdict forms, is there
6   anything else?
7               MR. GAVRAS:  I don't see anything.
8               MR. LEMONS:  No, Your Honor.
9               THE COURT:  Okay.  Yes, Mr. Gavras?
10              MR. GAVRAS:  Your Honor, I'm not sure if you
11  ruled whether or not Dr. -- the calibration was sufficient for
12  Mr. Zhivago to testify as to weight.  I believe you did.
13              THE COURT:  Yes, I did.
14              MR. GAVRAS:  Okay, thank you.
15              THE COURT:  I did allow that.  And I'll make --
16  yeah, I think that there was -- I think Mr. -- I think there
17  was sufficient foundation laid.
18              MR. GAVRAS:  Okay.  Just for the record, that had
19  you not ruled that way, I would have asked -- so my remedy
20  would have been for you to ask the jury to disregard
21  Mr. Zhivago's testimony as to weight.
22              THE COURT:  That's fine.  And anyway, by the way,
23  the jury already is going to get an instruction that they can
24  either accept all of it, none of it or some of his testimony.
25  So I think that you're already gonna get that instruction

1  anyway.  So call the jury.  So tell them to come back at 2 and

2  then we'll proceed forward with closing and I'll start

3  deliberating today.

4          MR. GAVRAS:  You think we have to wait till 2,

5  Your Honor?

6          THE COURT:  I do because I have a meeting.

7          (Jury in at 11:29 a.m.)

8          THE COURT:  All right.  Thank you for your

9  patience, ladies and gentlemen.  Sorry to keep you waiting for

10  an hour and a half, but always in a trial it's never perfect.

11  These counselors were still working even -- what time did we

12  get that?  Karen, what time was that?  Midnight?  10 o'clock

13  last night?  10:00 p.m.  10:00 p.m., they were still sending

14  me some case law.  Sometimes things come up and they -- you

15  know they -- oh, this came up.  So we were still working on

16  the jury instructions past midnight last night and even this

17  morning.  They were here this morning and we were working on

18  it at, was it 9:15?

19          MR. GAVRAS:  Yes.

20          THE COURT:  They've been here since 9:15 and so

21  we just finally completed everything, but it's time for lunch.

22  So what we're gonna do is, I'm gonna let you go.  You have you

23  to go to lunch right now on your own because we haven't

24  started deliberation.  I thought we would have already started

25  deliberation.  But I'm going to admonish you to please keep an

```
1   open mind.  Do not form or express an opinion on this case
2   until it's submitted to you.  And then when you come back from
3   lunch, we'll have the closing arguments and then the jury
4   instructions and then you'll begin deliberation.  So I
5   apologize, but so you all have a good lunch.  It's 11:30 p.m.,
6   I mean a.m., feels like p.m. because we've been working late
7   last night.  So it's 11:30 a.m.  And I'm going to ask you to
8   be here by 1:45.  We're gonna take a long lunch.  Sorry about
9   that.  I hope that's okay with you.  Maybe if you have, you
10  know, significant other, you might want to take 'em to a nice
11  lunch or something.  Or a friend or you know you might --
12  maybe Macy's has a sale, they had a sale --
13            (Laughing.)
14            THE COURT:  They had a sale this weekend.  I
15  don't know if they still continue the sale today, but I will
16  see all of you at 1:45 and we'll begin at 2 o'clock.  Keep an
17  open mind, don't speak to anyone connected with this trial.
18  It's not yet over.  Leave your notebooks there.  Have a warm
19  lunch.  I think it's raining out.  Please rise for the jury.
20  Okay, Counsels, I'll see all of you at 1:45.  I'll see all of
21  you at 1:45 and then I'll over that last part of the ruling
22  and then we'll start with the jury at 2.
23            (Jury out at 11:31 a.m.)
24            THE COURT:  We're outside the presence of the
25  jury.  Anything further, Counsels?  Mr. Cruz has his lunch
```

1  here today, right?

2              DEPUTY GRIFFITH:  Yes.

3              THE COURT:  All right.  Thank you guys.  I'll see

4  all of you.

5              (Recess taken at 11:32 a.m.)

6              (Back on the record at 2:12 p.m.)

7              THE COURT:  *USA v. Cruz*.  Sorry about that delay

8  again.  I was with Judge Manglona, who's here from off island

9  and we had a meeting and we had to take care of some stuff.

10  All right.  Before the lunch break, the Court denied the

11  defendant's Motion for Judgment of Acquittal.  And I would

12  like to go over the reasons for that denial before we get into

13  closing arguments and jury instructions.

14              Defendant presented two arguments.  First, there

15  was insufficient evidence on the calibration of the scale.

16  Therefore, there was insufficient evidence as to the weight of

17  the methamphetamine hydrochloride.  And second argument, that

18  there's no evidence as to the conspiracy and Count 1 with

19  defendant providing the Court the following two cases:

20  *Loveland* and *Moe*.  I think the Court has sufficiently stated

21  its reasons for the defendant's first argument, so the Court

22  will focus on the defendant's second argument.  The Court

23  finds that after reviewing the evidence in light most

24  favorable to the government, that there is sufficient evidence

25  for a rational trier of fact to find that there is an

1   existence of a conspiracy beyond a reasonable doubt.

2          In *Moe*, the Court considered the following

3   factors:  Whether the drugs were sold on credit or on

4   consignment; the frequency of sales; the quantity of drugs

5   involved, the level of trust demonstrated between buyer and

6   seller, including the use of codes; the length of time during

7   which sales were ongoing; whether the transactions were

8   standardized; whether the parties advised each other on the

9   conduct of the other's business; whether the buyer assisted

10  the seller by looking for other customers; and whether the

11  parties agreed to warn each other of potential threats from

12  competitors or law enforcement.  The Court had also considered

13  the discussions made in *Loveland*, which this Court also note

14  that it cited to the *Moe* case.  M-O-E.  Evidence was presented

15  that there was a relationship between the defendant and

16  Gregory Cruz, a relationship that is more than just a buyer

17  and seller.  It appears that there was an element of trust in

18  their relationship.  And having been dealing for close to two

19  years during the latter part of 2013 until June of 2015, the

20  quantity of drugs in this case is also significant.

21          The Court recognizes that a large quantity alone

22  does not establish a conspiracy.  However, taking that and

23  coupled with other evidence, such as a defendant showing

24  Gregory Cruz how to "package" the drugs, in an attempt to

25  conceal it from law enforcement officers or how to mark the

1   package as to determine if it was tampered with, these are

2   sufficient evidence to show that there was actually an

3   agreement to commit a crime and not merely just a buyer-seller

4   relationship.

5          This Court also bases its decision on the

6   testimony given by Peter Santos and the conversation that

7   ensued or an offer as to one taking care of the other or one

8   taking the rap for the other.  For the reasons stated herein

9   and based on what is on the record, the Court finds that

10  viewing the light -- viewing the evidence in the light most

11  favorable to the prosecution, the Court hereby denies the

12  defendant's Motion for Judgment of Acquittal.  And this is at

13  the close of the People's case.  At this time, are you going

14  to rest then Mr. --

15          MR. GAVRAS:  Yes, Your Honor.

16          THE COURT:  So you can rest properly in front of

17  the jury because I'm going to ask you and then if you say I

18  make the same objection at the close of the evidence, I'll

19  make the same ruling.  How is that?  And then we'll be ready

20  to proceed to closing.  You ready for that?

21          MR. LEMONS:  Yes, Your Honor.

22          THE COURT:  Okay.  You may -- we'll call in the

23  jury.  How long is your closing, about?

24          MR. LEMONS:  Hour and 20 minutes.

25          THE COURT:  Okay.  Very well.  We'll -- we're

1    gonna go till 5 today.

2                    MR. LEMONS:  Okay.

3                    THE COURT:  All right.  And I'll slow down.

4    Everybody -- I'm sorry -- I was just -- you know...

5                    (Discussion with law clerk.)

6                    THE COURT:  Oh, okay, okay there's a -- hold on

7    one second, Diana.  There's another instruction that I have to

8    give.  Thank you, Karen, for reminding me.  I just want to be

9    sure too, before we go on, Mr. Gavras, you've indicated that

10   you do not want the instruction on the buyer-seller rule; is

11   that correct?

12                   MR. GAVRAS:  That is correct.

13                   THE COURT:  I was looking at the language from

14   *U.S. v. Moe*.  All right.  So the script prior to closing

15   arguments and closing jury instructions, this is on the

16   forfeitability, so this is after the verdict has been

17   rendered.  So let's -- so if the verdict is rendered guilty,

18   for example, the right to -- so this is what we have to -- I

19   have to ask you several things.  This is the instruction.  The

20   right to jury determination of forfeitability does not fall

21   within the Six Amendment right to jury trial.  I'm just

22   telling you the law right now.  However, pursuant to Rule

23   32.2(b)(5), either party, prosecution or defense, may request

24   that the jury be retained to determine the forfeitability of

25   specific property if it returns a guilty verdict.  So I need

1    to inquire from government and defense Counsel.  So if either

2    one of you ask for it, you guys get the same jury.  If neither

3    of you want it, there's no jury and it will just be decided by

4    me on forfeitability.  This is only if there's a verdict of

5    guilty.  So if the parties do not wish to retain the jury, the

6    Court is the one that determines the nexus of the property and

7    the offense pursuant to Federal Criminal Procedure Rule

8    32.2(b)(1).  32.2(b), as in boy, (1).  If either party

9    requests that the jury be retained for the forfeiture

10   proceeding, I will instruct the parties to submit:

11            One, a witness list; two, jury instructions and I

12   would advise you to look at the Seventh Circuit for guidance;

13   three, special verdict form.  Seventh circuit.  I'm gonna

14   remind you that the jury can only determine the forfeitability

15   as to a specific property.  Any requested money judgment is

16   determined by the Court.

17            Now, I want to inquire too if you wish to proceed

18   with the forfeiture proceeding, immediately in the event a

19   guilty verdict is returned, in some districts a short break is

20   given so that the parties can prepare for this part of the

21   trial and also to give the jurors a break.  So do you want to

22   think about that and then we can talk about it afterwards.

23            MR. GAVRAS:  Thank you.

24            MR. LEMONS:  Thank you.

25            THE COURT:  Very well.  Let's call in the jury.

1   So just thank you everyone for your patience.

2                   MR. GAVRAS:  So judge, I guess we're -- we'll do

3   the resting, I'll make my motion.

4                   THE COURT:  Right.

5                   MR. GAVRAS:  Then we'll go straight to closing?

6                   THE COURT:  Correct.  Then if you want to take a

7   break after his and then do yours, take a ten-minute.  You

8   want do that.  Please rise for the jury.

9                   (Jury in at 2:20 p.m.)

10                  Welcome back, ladies and gentlemen, and now the

11  Court has decided the legal issues with the parties and as you

12  know the defense -- I mean, the prosecution has rested.  They

13  will no longer call any more witnesses for their case in

14  chief.  At this time, the defense may, but they are not

15  required to call any witnesses on their behalf.  So Mr.

16  Gavras.

17                  MR. GAVRAS:  No, judge.  We won't be calling any

18  witnesses.

19                  THE COURT:  The defense rests?

20                  MR. GAVRAS:  Yes.

21                              **DEFENSE RESTS**

22                  THE COURT:  Very well.  Thank you, sir.  All

23  right.  Any -- so ladies and gentlemen, the defense rests.

24  They will not be calling any witnesses and as I told you

25  earlier on in jury instructions that the defense is not

1    required at any time to call any witnesses.  It's not their

2    burden of proof at all.  Okay.  Now, any motions?

3            MR. GAVRAS:  Yes, Your Honor, we reassert the

4    motion that we made previously out of the presence of the jury

5    for Judgment of Acquittal and I just adopt the arguments

6    previously made.

7            THE COURT:  All right.  And you, same arguments

8    --

9            MR. LEMONS:  Yes, Your Honor.

10           THE COURT:  Very well.  And the Court will have

11   the same ruling.  Okay.  Very well.  At this time,

12   prosecution, Mr. Lemons on behalf of United States of America,

13   you may give your opening statement.  After he gives his

14   opening statement, we'll take a ten-minute recess and then

15   Mr. Gavras will give his -- I'm sorry not -- yeah, his opening

16   closing argument, not statement.  Opening closing argument.

17   And then when he's done, we'll take a ten-minute recess.  And

18   then Mr. Gavras will give his opening closing -- well, his

19   closing argument.  And then we'll take a five, ten-minute

20   recess.  And then Mr. Lemons will give his rebuttal closing

21   argument.  Okay.  You may proceed, Mr. Lemons.

22           MR. LEMONS:  Thank you, Your Honor.

23           THE COURT:  You're welcome.

24               **CLOSING ARGUMENT BY THE GOVERNMENT**

25           MR. LEMONS:  May it please the Court.

1          THE COURT:  You may.

2          MR. LEMONS:  Good afternoon.  I want to take this

3     opportunity to thank each of you for sitting here.  You've

4     been away from your jobs, your family and it's not an easy job

5     and the pay is not very good.  But this is probably one of the

6     most important functions, as a citizen, that you can perform.

7     Serving in the military is probably slightly above this, but

8     it's a difficult but necessary job.  And on behalf of the

9     United States and my team, I want to thank you and I'm sure

10    that Mr. Gavras would also extend his gratitude to you.

11          At -- I'm not all that good with all this

12    technology stuff so if the wheels come off the train, don't --

13    don't hold it against me too much.

14          At the beginning of this trial, if you'll

15    remember I think it was last Wednesday, Mr. Gavras and I both

16    spoke to you and told you what we expected that the evidence

17    would show.  And I told you that this case was about three

18    things:  Drugs, money and guns.  And we also told you what we

19    expected that the evidence would show.  And I believe what

20    Mr. Gavras told you is that or insinuated that the drugs that

21    was seized from the defendant's house, they were planted

22    there.  Remember that?  And he intimated that it was probably

23    Gregorio Cruz.  And it was because he said the government

24    didn't really control Mr. Cruz.  But you know from the

25    evidence, and you'll have the plea agreement back there with

1    you, that on June 8, 2015, he was arrested with 60 grams of,

2    as he said, dope, that he bought from the dope dealer.  He

3    didn't get out of jail till the end of July.  Remember, he was

4    arrested in 2015.

5                    So I think the government did have Gregorio Cruz

6    under tight control.  Unless of course you want believe that

7    he got out of jail with over 2,000 grams of dope, almost half

8    a million dollars and, oh, three guns and some boots and

9    planted it in the defendant's house.  That's his defense.

10                   So this is a good time to talk about the law.

11   You'll recall on the first day, I asked you -- we all asked

12   you, could you follow the law.  And there's three things about

13   the instruction beyond a reasonable doubt I'd like to point to

14   you -- point out to you.  One of the things the Court will

15   tell you that beyond a reasonable doubt is not beyond all

16   doubt.  The other thing the Court will tell you and is

17   something I ask you to bring into this courtroom and take into

18   the jury room:  Common sense and everyday experience.  And it

19   is more than speculation.

20                   So reasonable doubt, do you really have any doubt

21   who this dope belonged to?  Really?  So let's start with the

22   Sullivan packages.  And the Sullivan packages, you have the

23   original boxes, but if you'll recall, they were sent to postal

24   mailbox 1101 at the UR Market.  Two of 'em.  And Chona Aguilar

25   called TFO Palacios and told him that we've been watching this

1   box and here's a couple of packages.  And what did Debra Epps

2   tell you about those packages.  She did a database search, no

3   William Sullivan attached to those -- to that mailbox and that

4   there was a fictitious name that the package had been sent

5   for.  The reason people do that is, use your common sense,

6   nobody wants to get caught with all of that dope.

7           Exhibit 35, and if you'll recall, Special Agent

8   Williamson told you that one gram equals a Sweet'N Low packet.

9   And what did we have on the two Sullivan packages,

10  2,233 grams.  Over two kilos.  Two kilos equal or kilo equals

11  2.2 pounds.  Not very good at math, but that's almost five

12  pounds of methamphetamine, was in those boxes.  And when you

13  open the boxes up, there were these shoes.  You'll recall Greg

14  Cruz told you, he was given the pair of shoes that looked like

15  that.  And inside the shoes, as you can see from the box, were

16  spheres of methamphetamine.  Now there's a big deal.  This big

17  or this big or that big.  We know that they were round when

18  they were in there.  So packages they're taken back to the DEA

19  office and Inspector Epps told you she looked at these

20  packages, these boxes, the Sullivan boxes, the ones with the

21  fingerprint powder on them.  And she demonstrated to you with

22  the black light, the little dots that were on top.  They were

23  only visible to a black light.  And she demonstrated that to

24  you on both boxes.  Packages were taken, the dogs sniffed 'em,

25  they opened 'em and they start removing those various items

1    from the two packages.  So let's look at the Court's

2    instruction on attempted possession with intent to deliver.

3              The Court is going to instruct you that, first,

4    the defendant intended to possess the methamphetamine.  And

5    that second, the defendant did something that was a

6    substantial step towards committing the crime.  So he picked

7    'em up, him and his girlfriend, or him and a young woman

8    picked 'em up at the UR Market and left them in the car.

9              Well, you could may say, well, he didn't take 'em

10   in the house, but the Court will instruct you on

11   circumstantial evidence.  And if you'll recall and we'll get

12   to that a little later, we found identical boots in his

13   closet.  We found spheres of methamphetamine inside this

14   Pelican case.  Just like the ones removed from the Sullivan

15   package.  Like these.  And he left it in the car.  Defense

16   Counsel say, well, he left it out and so somebody planted it

17   there.  If it was really his methamphetamine, he would have

18   put it in the safe.  The safe was so full of money, he

19   couldn't put anything else in there.  You saw all the money

20   that was out in the safe.  And then he couldn't put all his

21   money in there, he stuffed it in Wendy's bags inside the

22   dresser.  That's pretty safe way to keep your money, put it in

23   a Wendy's bag, hide it in the dresser.  That's a safe way to

24   smoke -- to hide it.  Common sense, ladies and gentlemen.

25   That's all I ask you to use.

1        So the agents take the packages to the UR Market,

2   wait, Toyota -- red Toyota arrives.  And so what do we have?

3   Well, this guy had the -- not want accept responsibility, he

4   sends the girl, the woman, the young lady, pick up his

5   packages of dope.  And then he gets out of the car, and he

6   checks on her, he's there.  Same car.  Let the girl get

7   caught.  Let me keep walking.  So now, you know, I keep moving

8   and changing, but this case is kind of fluid like that and I

9   hope you can keep up with me.  So let's talk about Gregorio

10  Cruz.

11       Greg Cruz told you he got a plea bargain.  And

12  plea bargain is not a get-out-of-free -- get-out-of-jail-free

13  card.  If I did something silly, like recommend to the Court

14  let him go and you read that particular passage there, the

15  Court has the last word in sentencing, not me.  I only make a

16  recommendation.  But be that as it may, he's a snitch, he's

17  looking at a lot of time in jail.  We know he's got drug cases

18  all over the place.  He was arrested for two drug cases in

19  2014, he pled guilty to 'em.  He pled guilty in a case that

20  I'm prosecuting him on and you'll have the plea agreement, and

21  then he catches another case.  So he knows his business and so

22  he's doing what he thinks is in his best interest.  But the

23  one thing you can't deny, is that he knows his business.  You

24  saw him testify.  And the Court will give you an instruction

25  on how to judge a witness.  Gotta look at what's in it for

1    him.  Well, what's in it for him is he's hoping that this will

2    help him at sentencing.  And this is -- he's got some serious

3    problems.  But he knows his stuff.  So what did he tell you,

4    he tells you one gram of ice on Guam sells for $600.  And

5    that's pretty much the same thing that Special Agent Kirk

6    Williamson told you and Special Agent Bishop told you.  $600 a

7    gram.  And if you divide it into a plate, which is one of ten

8    points, the profit suddenly zooms to a thousand dollars a

9    gram.  That's worth more than an ounce of gold.

10           So he started off smaller with the defendant,

11   three to five grams at a time, and then he stepped up to ten

12   grams and then he stepped up to an ounce.  And I believe his

13   testimony was he was buying ice from the dope dealer, gotta

14   send his girlfriend to get in trouble, because he don't want

15   to take the heat, he was buying it, $10,000, and an ounce is

16   28.3 grams.  You could fact-check me on the math, kind of like

17   they do at the debates.  When you break down the cost per gram

18   at $10,000, you're buying it at $357.14, which he was selling

19   for $600, which means that Greg Cruz was making $242.86 profit

20   on each gram he sold.  That's 40 percent markup.  That's a

21   pretty good markup for selling it.  As Gregorio said, business

22   was good.  And he was seeing the defendant approximately once

23   a week.  So this was good business for Gregorio Cruz.  One

24   dope dealer to another dope dealer.  And you notice that

25   Gregorio is a little bit angry at Mr. Gavras.  And that was

the wrong person for him to be angry at, but nevertheless he
was angry and why? We found out through Mr. Gavras probing
him, Justin Cruz, big bad dope dealer threatened his wife.
And why would he do that? He doesn't want anybody coming in
and talking bad against him because he doesn't want to take
responsibility for all his drugs. So while we're talking
about snitches, let's move on to Peter Santos. Again, he's
got a plea agreement, not a get-out-of-jail-free card. The
Court has the final say in what happens to him. So what did
he tell you? He told you he sold drugs for the defendant's
cousin, Jacob. And he said he had been to the defendant's
house many times, but only two times to buy drugs. And that
kind of makes sense, because he works for Jacob. The big bad
dope dealer, he's more into it with Jacob and we know he was
arrested at the defendant's house on the day that the two
Sullivan packages came in and that the defendant sent his
girlfriend to pick it up and he gives you this story that he
went over there to drop off a dog collar.

          Did any agent -- did anybody testify that they
found drug -- I mean, a dog collar in his car? They told you
they found the scale that's typically used to weigh drugs. He
told you he had about $2,000 cash on him. He had some
marijuana. Now, why would you show up at a dope dealer's
house on the day he gets a load in with your scale and $2,000?
Why? Why would you do that? You know why, he's coming there

1  to buy from the dope dealer.  But that's not the end of it.

2  So he gets arrested, and he's in jail.  And he's appointed a

3  lawyer and he told you his lawyer's name was Shane Black.  And

4  he didn't want Shane Black because Shane Black's father is

5  Fred Black, who's a federal prosecutor.  Didn't feel too

6  comfortable with that.

7          So he wrote this note or as Officer Angoco called

8  it, a kite.  You'll get this back in the jury room.  And what

9  he wrote is, "Bro, I need ten before Monday, my hearing date.

10  I need a new lawyer."  I guess that's lawyer.  "Can you make

11  it happen, yes or no?  My hearing is at 3:00 p.m.  I told you

12  what they want me to do and I won't do that so long as I get a

13  new lawyer, let me know ASAP."  And he said that he had had

14  this conversation didn't sell here when Justin asked him to

15  take the rap for him and I think he was pretty blunt about

16  what his response was.  It was heck no, only he didn't use the

17  word heck.  But that was before he was worried about Shane

18  Black.  So what did he get back?  "I told Jake to give you,

19  because I don't have shit.  They took everything.  But can you

20  take the rap?"  There he goes again, drug dealer doesn't want

21  to take responsibility for his putting all those drugs in this

22  island.  "Can you take the rap?  And say everything is yours?"

23  A lot of drugs there.  "And I will take care of you and your

24  son for the rest of my life."  He says -- and then in

25  handwriting -- that was printed, "Your mom will have the ten

before dinner today.  So you better not say shit about me,

Peter, because I'm fighting for my life.  No effing way."

Doesn't want to take responsibility.  And guess what, Peter

gets a new lawyer, Howard Trapp.  You have his plea agreement.

He came through for him because doesn't want to take the rap,

the big bad dope dealer, sends his girlfriend in, asks Peter

to take the rap.  Big bad boy.  So you can believe some of

what Peter says, none of what Peter says or all of it.  That's

what the Court is gonna instruct you as to every witness that

the government's call [sic].  You believe some of it, all of

it or none of it.  It's really up to you.  And Court will give

you certain factors to use in making that decision; whether

there's a bias, does the witness have something to gain, the

witness's manner testifying and then just using your common

sense, okay.  If they say something that's totally stupid, you

should reject it.  And that's for any witness that I've called

during this trial.

       And about No. 47, that kite there, Peter didn't

give this to us.  Testimony was, Lieutenant Limo called

Officer Angoco, Officer Angoco's folks in his presence search

the cell, they removed that kite, gave it to Lieutenant Limo,

who called TFO Palacios, who gave it to Jeremiah Cruz where

it's been until this trial.  So he didn't give that to us.  We

took it.  We found it.  So on July 17th, Special Agent Kirk

Williamson obtains a search warrant for the defendant's

1    residence.  And we know from the testimony that the task force

2    is there, the DEA task force.  That consisted of people from

3    GPD, Guam Customs, you heard a lot of Guam Customs officers

4    testify during this case and DEA agents.  And so you see the

5    young lady that the big bad drug dealer sent in to UR Market

6    to get his drugs, there she is in handcuffs.  And then we go

7    through the house or the outside of the house, jet skis, boat,

8    two scooters, a Jeep, the certificate of ownership for a 2015

9    Lexus, the certificate of ownership for that Jeep, we got

10   invoices for jewelry, well, you heard any evidence about a

11   job?  And I want a job that pay me enough so I can have

12   $478,000 in my house, a Lexus, a boat.  I want this job.

13   That's where he got the money.  That's how he financed his car

14   and his boat and his lifestyle.  That stuff right there.

15           So you've seen his toys.  So let's move on to

16   possession.  Okay.  And I believe the Court will instruct you

17   -- I almost need a magnifying glass for this.  The defendant

18   knowingly possessed methamphetamine hydrochloride.  You think

19   this got in his house by accident?  You think Greg Cruz broke

20   out of jail and planted it there?  This is his dope.

21           Second, the defendant possessed it with the

22   intent to distribute it to another person.  Well, we know that

23   Peter Santos's boss got his dope from the drug dealer there.

24   We also know that Peter Santos sold dope through Jacob Cruz.

25   We also know that from late 2013 until June 2015, Gregorio

1   Cruz was buying dope from this defendant every week and he

2   stepped up to an ounce a week. $10,000. 28.3 grams a week.

3   Do the math. So then we go inside the defendant's house. And

4   so we got a yellow Pelican case full of money. We got a money

5   counter. How many y'all got a money counter in your house? I

6   don't. I'm sure most people don't except for the big bad drug

7   dealer. There we go. Got my gun. Got my drugs. I'm bad.

8   I'm Justin Cruz, the big bad dope dealer. We got dope in the

9   drawer. Dope in the drawer.

10                  (Pointing to screen.)

11                  We got money in the drawer. We got balls of ice

12  in this Pelican case that was under his bed. And the total

13  amount of drugs in his house from the drawers and the Pelican

14  case was 2,349 grams. And remember, a thousand grams is a

15  kilo and each kilo equals 2.2 pounds. I didn't do the math on

16  this one, but we got a lot of dope here. You can do the math

17  on that one. And in the closet, here we go -- I mean, in the

18  dresser, here we go, a 171 grams, 99 percent pure ice. That's

19  this little one. Okay. Just so you don't forget, that

20  Sweet'N Low packet, one gram of ice, $600. There's the safe.

21  Look at all that money in this safe.

22                  And well let's see, he couldn't put his dope in

23  there because his money was in there. So as I said earlier,

24  Wendy's bags in the dresser, because he didn't have any room

25  in the safe. Look at all that money. $478,000. That's a lot

1    of money.  That's a lot of these.

2              (Holding up bag of ice.)

3              More pictures.  But this is the really

4    fascinating.  I guess Greg Cruz, when he broke out of jail and

5    planted the stuff, he went and got shoes just like the ones in

6    the Sullivan package and put 'em in the top, so I can see Greg

7    Cruz now carrying this and this and all of this -- I guess he

8    plants the guns too and the guns into his house during the

9    time the DEA was doing controlled delivery that they didn't

10   tell anybody about other than law enforcement people, I guess

11   he got lucky when he planted those things in his house.

12             MR. GAVRAS:  Mr. Lemons, your microphone.

13             MR. LEMONS:  So -- and just to be sure, it was

14   1,491 grams of methamphetamine in here.

15             THE COURT:  I'm sorry, what are you pointing to,

16   for the record?

17             MR. LEMONS:  I'm sorry, in this Pelican case,

18   Exhibit 38.  And what else did we find on the floor of his

19   house?  This one little piece of paper kind of brings it all

20   together.  It was in his house.  And it's a Customs sheet

21   addressed to a Sarah or from a Sarah Jenkins in San Diego.

22   And it was sent to an address in Mangilao.

23             And in this particular package, this is in his

24   house, of course you can believe that Greg Cruz dropped this

25   in there if you want, but Wrangler work boots, work shirts,

work pants.  Same thing you'll find on the Customs sheets, the
Customs forms that were on the Sullivan packages.

Finally, we have the red Toyota.  If you'll
recall, Postal Inspector Kaufman drew that circle, that's
right by the house and why is that important?  Because he got
the two unopened Sullivan packages from the red Toyota.  And
as Special Agent Williamson informed you that people will
leave these packages containing dope and wait and try and
outwait -- basically try and outwait police and hopefully the
battery to the tracking device has stopped transmitting.  And
he didn't need it right away because you saw all the dope he
had in his house.  He could wait two days, five days a week,
but the car is parked right by his house.  I don't think too
many people will take his dope out his house, you take your
pick, this one, this one, or you could take this one (opening
gun stand).  Ouch.  And he can get really make sure he gets
his target.  Some gun for you.  But that's the tool of the
trade.  You got that much money, you got that much dope, you
probably need some protection.

So unless you believe those guns for hunting and
that he can't open a checking or savings -- he probably can't
because somebody is gonna ask where all that money came from.
We know where it came from, dope.  In the end, this is about
money, and dope.  Another Tony Montoya [sic] wannabe.  So I'll
ask you this question, please don't answer me.  Even though I

1   answered your question the other day about my age.  Do you

2   really have a reasonable doubt as to the guilt of this man?

3   Do you really have any doubt this dope, that was in his house,

4   is his?  Do you have any doubt that he got these shoes?  And

5   we know that the pair he gave to Gregorio Cruz had two balls

6   of dope in it because Gregorio took one, as a finder's fee,

7   and gave him the other.  Do you really have any doubt about

8   this defendant's guilt?  Any doubt?  Not just a reasonable

9   doubt, do you have any doubt?  Again, use your common sense.

10  Where would you keep your money, your drugs, your vehicles,

11  the titles to your vehicles, where would you keep it at?  Your

12  house.  And that's why the agents took the pictures of the

13  registration forms, of the receipts, that's why they took

14  pictures of the dope and the money in the drawers and that's

15  why they took pictures of the safe that was closed until the

16  dope dealer gave up the combination.  How would he know the

17  combination?  Because it's his safe, it's his money, it's his

18  drugs, it's his gun.  And I'm going to ask you to do something

19  that he doesn't want to do, hold him responsible for this and

20  find him guilty.  The evidence is clear.

21          Now, I'm done for this time.  This is called the

22  Opening Closing.  And because I have the burden of proof, as I

23  told you the first day when we started this, I get to speak

24  last.  And I will have the last word and when that's over,

25  you'll start to do your real job and that is to put all the

1    facts that you've heard over the last two weeks together and

2    come to a decision.  So thank you and I will be addressing you

3    again later either this afternoon or tomorrow morning.  We'll

4    see how it goes.  Thank you very much.

5             THE COURT:  Thank you, Mr. Lemons.  You want to

6    take a little recess then, Mr. Gavras, or are you ready to go?

7             MR. GAVRAS:  I'm ready to go.

8             THE COURT:  Okay.  Jurors, you're okay?  All

9    right.  Good.  Very well.  Mr. Gavras now will present his

10   closing arguments on behalf of his client.  Why don't we just

11   take a five-minute recess.  I think -- for the restroom break.

12   Let's just take a real quick break.  Let's take a ten-minute

13   recess and come back.  Please rise for the jury and then we'll

14   continue on.

15            (Jury out at 3:04 p.m.)

16            THE COURT:  We're outside presence of the jury.

17   I think Jeremiah was scared.  You were pointing that to him

18   and to Belinda and all those other guys.  You're gonna wipe

19   out your entire staff there.  All right.  Ten minutes, you

20   guys.  My gosh.

21            (Recess taken at 3:05 p.m.)

22            (Back on the record at 3:27 p.m.)

23            THE COURT:  *USA v. Justin Cruz.*  All Counsels

24   present, defendant is present and we'll call in the jury.

25            How long do you think you'll be, about an hour?

```
 1                    MR. GAVRAS:  Over.

 2                    THE COURT:  Over?

 3                    MR. GAVRAS:  Yes.

 4                    THE COURT:  Rover.  Okay, 4:30-ish.  Oh, maybe

 5      even 5?

 6                    MR. GAVRAS:  Yes, Your Honor.

 7                    THE COURT:  So we'll do your rebuttal tomorrow.

 8                    MR. LEMONS:  Oh, that's fine.

 9                    THE COURT:  Does that help?

10                    MR. LEMONS:  Yes.

11                    THE COURT:  Okay.  Let's call in the jury.  Thank

12      you for putting that firearm down.  Your whole staff -- your

13      whole team was...

14                    (Laughing.)

15                    I didn't say anything.  I didn't want to call

16      attention to it.  Okay.

17                    MR. LEMONS:  I wasn't gonna point it that way.

18                    THE COURT:  Yeah, you would have been in big

19      trouble, dear.

20                    (Laughing.)

21                    MR. GAVRAS:  I was wondering when way --

22                    THE COURT:  I'm surprised the marshal didn't say

23      anything.  Please rise for the jury.

24                    (Jury in at 3:28 p.m.)

25                    THE COURT:  Again, welcome back, ladies and
```

1   gentlemen of the jury.  And now as I have indicated,

2   Mr. Gavras has an opportunity to present his closing argument

3   on behalf of his client, Mr. Justin Cruz.  Justin Robert White

4   Cruz.  You may proceed.

5           MR. GAVRAS:  Ladies and gentlemen, on behalf of

6   my client Justin and myself, I want to thank you.  And I get

7   -- and Your Honor, thank you.

8           THE COURT:  Well, thank you.

9           MR. GAVRAS:  Appreciate it.

10          THE COURT:  I've never had somebody thank me

11  before opening closing.

12          (Laughing.)

13          Thank you.  That's fine.

14                  **CLOSING ARGUMENT BY DEFENSE**

15          MR. GAVRAS:  You're welcome.  And Mr. Lemons,

16  thank you.  Ladies and gentlemen, you -- you've got to see a

17  lot and a lot has been put on you.  And I'm always inclined to

18  apologize, because I know what it's like not only to have

19  your, I don't know, two weeks and a day, now it's gonna be

20  longer than that, taken from you, but getting yanked around

21  and not knowing what's going on.  And it is definitely you

22  know a person feels a little disrespected when you're bopped

23  around like that.  And you don't know what's going on and

24  you're not really -- can't be told everything.  But I wanted

25  to take a minute on that and it's a minute and it kind of

1   veers off into -- I want to talk to you about that for a

2   second.  The -- people talk about the rights of the United

3   States citizen.  We're in United States Court.  We're not in

4   local Court.  So all gonna be United States stuff.  People

5   talk about the rights of United States citizen and they look

6   to the Bill of Rights:  The First Amendment, you know, that

7   guarantees freedom of speech, freedom of religion, freedom of

8   association; Second Amendment, which is you know, the

9   firearms amendment; the Fifth Amendment, the right not to

10  testify.  I believe it also has an implicit equal protection;

11  and Sixth Amendment, right -- people look at the Bill of

12  Rights as securing people's rights.  And that's what you'll

13  always hear about.  But it's not the Bill of Rights and I'll

14  tell why you it's not the Bill of Rights.  Because if you look

15  at some of the most repressive governments around the world,

16  if you look at the old Soviet Union, if you look at Communist

17  China today, they have a much more expansive and detailed Bill

18  of Rights, guarantees of the citizen, freedom of speech,

19  freedom of this, freedom than what we do.  So why is it that

20  we're free people and they're not?  And I'll tell you what it

21  is.  It's the separation of powers.  It's because we divide

22  power of government into what people normally say is three

23  branches:  The executive, which is president; the legislature,

24  which is Congress, they make the laws; and the judiciary,

25  which interprets the laws and of course the executive executes

1    the laws.  But it's not three branches, it's four branches.

2    It's the jury system is the fourth branch.  The fourth branch,

3    because if you think what is a government but laws.  Those

4    laws like I say Congress makes it, executive executes it, and

5    the judiciary interprets it, doesn't get applied until a jury

6    decides it gets applied.  So nothing is finished until a jury

7    says so.  And that's why, if you think about it for a second,

8    we stand for you, when you come in the courtroom.  The judge

9    stands for you when you come in the courtroom.  When the

10   President of the United States walks in the room, everybody

11   stands.  When the judge walks in, the judge stands and the

12   president would stand if he were here.  Likewise, we stand for

13   you.  And so I tell you this mostly because I want you to

14   understand that when you're getting jerked around and

15   everything, don't think it's not -- it's a lack of respect,

16   because you are as important as any of those other three

17   branches of government and all you gotta do is think about it.

18   I'm not telling you something that you don't -- you couldn't

19   figure out on your own, because the laws don't get applied

20   until you apply them and we really appreciate it.  Now, I

21   moved the guns over there because guns could be dangerous.

22   Sometimes even playing with 'em can be dangerous and also I

23   don't particularly like them there, it's a little distracting.

24          But the guns bring up an important point and

25   that's how emotionally, perhaps, you should be when you try to

1   judge this case.  We -- Mr. Lemons and I, can be emotional.
2   Of course, my client can be emotional.  I think that's
3   understandable.  Mr. Lemons and I can be emotional even though
4   we're friends, but you know, don't kid yourself about how
5   important this is to us.  You know, we compartmentalize, we
6   don't talk about certain things because we're friends and we
7   know we think very strongly about certain aspects of this
8   case, so it's just not good for the friendship if these things
9   are brought out.
10          But while we can be emotional, your job is not to
11  be emotional.  Of course, it can -- you see this stuff and
12  it's emotional.  I mean, this is -- I think it's in here, well
13  anyway, the meth is poison and it destroys people and I think
14  we had a pretty good indication of that.  Guns can hurt
15  people.  And you know, these guns aren't made for hunting.
16  They don't look like hunting guns to me.  I mean, you could
17  use 'em for hunting, don't get me wrong, but the design is not
18  really hunting.
19          So your job isn't to say to yourselves, well, I'm
20  gonna get emotional and allow yourself to get emotional
21  because I think we could all think back to decisions that
22  we've made in our lives and we can say to ourselves, gee, I --
23  I probably would have made a better decision had I not been
24  emotional.  I know I have.  And I'm sure the same is true for
25  you as well.  And that's why I'm quite sure the judge doesn't

1    allow herself to get emotional.  The president, we don't want

2    our president being emotional.  We don't want Congress being

3    emotional when they do their job, as one of the branches of

4    government, and that's why it's so important.  Likewise, it is

5    just as important for you all not to be emotional about it.

6    Doesn't mean that I'm not gonna get emotional up here, I

7    really don't know.  Doesn't mean Mr. Lemons can't get

8    emotional.  But you're doing something extremely important so

9    I just wanted to mention that to you.

10              Now, getting to opening statement, I don't

11    believe in my opening statement I ever suggested that Gregorio

12    Cruz carried anything over to Justin Cruz's house.  I know you

13    guys may have been taking notes and you can check, but I don't

14    think so.  What I said was, is that when people -- when he

15    went to jail back in June of 2015, he had access to other

16    people.  He could -- and if you remember when I questioned him

17    on the witness stand, I said, "Could you use the phone?"  And

18    he said yes.  And I said, "Could you talk to other --" He said

19    yes.  That's what I said.  I never suggested that it was

20    Gregorio Cruz, while in prison, escaping and doing stuff.  So

21    I wanted to point that out to you.

22              But really I think what I started off with was

23    that you were going to have a window into large-scale

24    methamphetamine dealing.  And I remember telling you that it's

25    a desperate and dangerous world.  And we'll talk about that a

1  little bit more, but I think that's been proved.  I think I

2  told you that the people up there are not like you and me,

3  that they're different, that they -- they're just different.

4  I think that was proof.  I mean, when you look at the

5  decisions made by those people, those two, Gregorio and Peter

6  Santos, they don't make decisions like you do.  And No. 3,

7  we'll talk about this a little bit, but some of the people who

8  get on the witness stand, now I meant Gregorio and Peter

9  Santos, were actually going to seem a little bit more

10  respectful or a little nicer on the witness stand than they

11  are in real life.  Now those -- and I think that was kind of

12  to a certain extent I don't mean to demean anybody or

13  criticize anybody unnecessarily, but I think that was kind of

14  brought out too and we'll go into that.

15          But you know, let me give you just a quick

16  example of Gregorio Cruz.  He's got four outstanding cases

17  right now.  He's got two in Superior Court, he's got two here.

18  He's been given lots and lots of chances.  And actually, he

19  kind of -- maybe to some extent his personality did come out,

20  how he didn't want to testify and everything and Peter Santos,

21  that guy is I think we can all have a lot of sympathy for

22  Peter Santos and we'll talk a little bit more about that too.

23          But what world did you see?  And I probably

24  didn't do a very good job outlining it for you in opening

25  statement, but let's think about it for a second.  You saw a

1  world where in any one location at any one time, there can be

2  millions of dollars of drugs and money.  Think about that for

3  a second.  I don't know how many of us would have said well,

4  here in Guam, wow, we actually have that kind of thing going

5  on at one time.  I'm not talking about over a year.  I'm

6  talking about one time.  That's something that, you know,

7  you'd think you'd see on TV, you know, like Scarface with Tony

8  Montana, you know.  If you are old enough to remember the

9  movie.  But I think the importance of this, this large amount

10  of guns and drugs, millions of dollars of worth, it's the type

11  of money, it's the type of value that causes people to lie,

12  cheat and steal.  That's common sense.

13          Okay.  Mr. Lemons said, "common sense."  That's

14  common sense.  And I also talk to you about we've got some

15  good agents out there and you got the bad guys and you got the

16  good agents out there coming after 'em, all the time.  And the

17  bad guys know it.  What in the world is going on, because

18  these guys, even though they know that the agents are after

19  'em all the time, they know they could face the rest of their

20  life in prison.  It's the money, it's the money, it's the way

21  the meth has burned into their brains and it's a -- like I

22  said, it's a window into a world.  And it's a world where

23  weapons are not uncommon.  You know, who would have ever

24  thought that on Guam we have this type of situation going on.

25  But the thing is, when you combine all this together, you

1  don't get people who act like normal people. They don't act

2  like you, they don't act like me, they don't act like

3  Mr. Lemons. They actually -- Peter Santos, they actually

4  plead guilty to something that they get on the stand and at

5  least very earnestly say they didn't do. But yet, that's how

6  they want to get their sentence reduced is by helping the

7  government. What is going on there? How do you make sense of

8  that and we're gonna talk a little bit more about that. How

9  do you start making decisions within that context of things?

10  Trying to understand it. How do you understand it? Then we

11  get Gregorio Cruz on the witness stand. Same guy. I -- you

12  know, swear to tell the truth, nothing but the truth so help

13  me God. What does he testify to? Oh, Justin, Justin, Justin,

14  comes out -- I don't even ask him a question about Justin.

15  Justin. You may remember when I said, "Sir, why did you say

16  'Justin'? Why is it when I asked you that question, you said

17  'Justin'?" But yet, even though he knows his life depends and

18  this is the guy with four outstanding cases, even though he

19  knows his life depends on telling the truth, the whole truth

20  and nothing but the truth and helping out Mr. Lemons, he

21  doesn't want to answer questions. He didn't want to give me

22  names of people. Well sure, he gave me Justin's name. Do you

23  remember that? Do you remember that his lawyer was here? Had

24  to go up to the witness stand twice. You think after the

25  first -- I mean, after the first time, well maybe the guy is

1    confused.  That's understandable.  I don't know if he has ever

2    testified before anything.  He had to go up there twice and

3    say man you gotta talk.  That's a weird world.

4         And then when you combine in this that they've

5    been smoking methamphetamine for 20 years, 30 years, I

6    remember, Gregorio had gotten off of it.  I think he said for

7    seven or eight years, but essentially 20, 30 years, a lot

8    every day.  Now, this is chaos.  Nothing was shown to you more

9    than just its incredible chaos and the -- I can't explain it

10   all to you.  I can't explain to you -- I have some ideas, but

11   I'm gonna try and separate what we know for sure versus kind

12   of what I'm guessing at.  Okay.  And I think we know for sure

13   this is chaos.  We know for sure Gregorio Cruz didn't want to

14   say those names and didn't want to say Justin's name.  Those

15   are things I think we could probably agree that we know for

16   sure and we'll go into more of it.

17        Now, if we look at this jury instruction that I

18   anticipate the judge is going to be giving you, we see the

19   indictment is not evidence, the defendant has plead not guilty

20   to charges, the defendant is presumed innocent unless and

21   until the government proves the defendant's guilt beyond a

22   reasonable doubt.  Okay.  You've heard that.  I made quite a

23   bit about that before.  But see, I just want to -- want you to

24   bear with me here, we have got so much chaos going on, it's

25   not my burden to explain to you to work it all out.  That's

1   the government's burden.  Now again, I'm going to talk to you
2   about the things we know and then I'm gonna talk to you about
3   the thing that we don't know or we're guessing about or might
4   make sense or might not make sense.  Now, can it get worse?
5   Yeah.  It can get a lot worse.  Because these people know that
6   the only way that they can get time off their sentence is to
7   provide assistance to the government.  Forgive me, not
8   assistance, substantial assistance.  Assistance won't do it.
9   And that's in the plea agreement and we're gonna talk -- the
10  way the plea agreement works, and we can look at it closer
11  later, you know, Mr. Lemons rightfully says that the judge
12  decides, okay, the judge ultimately decides how much of a
13  reduction.  Well, that's good.  I guess.  But how is that
14  triggered?  It's triggered only way one in the plea agreement
15  say this, Mr. Lemons determines -- we'll show you this in the
16  plea agreement, Mr. Lemons determines if they provided
17  substantial assistance.  That then triggers under the law the
18  judge's ability to go down.  Now, think about that for a
19  second.  Is that a good system?  Is that a good system or is
20  that the kind of system that encourages people to not just
21  provide assistance, to not just provide what they know, but to
22  provide, to do it substantially.  In other words, to give more
23  and more and more.  That's what that system -- now the judge
24  gets to decide.  I agree with that.  But that's the first
25  gatekeeper right there.  And the more they do, the more of a

1  downward departure he is going to recommend.  And they know

2  that.  They've been in the business for awfully long time and

3  I asked Gregorio Cruz, I said, do you know for a long time

4  since you started dealing when you were, I forget 18 or 19,

5  using at 18 and 19, and then early 20's, "Did you know that if

6  you got caught, the way you help yourself is by ratting

7  somebody out?"  He said yes.  Now, I don't know how Greg --

8  how old Gregorio is, we could look at it in his plea

9  agreement, but he's known that for an awfully long time and he

10  knows the system.  And I have to say when you combine all this

11  together and there's a lot I've said here already about the

12  substantial assistance, the drug use, the lying, what won't

13  they say?  What wouldn't either of those two gentlemen say?

14          It doesn't even make sense sometimes to listen to

15  Peter Santos especially, but what wouldn't they say?  There's

16  nothing they wouldn't say.  I think to be honest -- you may

17  disagree with me, but I think given everything I've talked

18  about up to now, the things we know, looking into the window

19  of that world, I think you'd agree with me there's nothing

20  they wouldn't say, there's nothing they wouldn't do.

21          The, now judge is going to -- the judge is going

22  to read -- give you a jury instruction and one of the things

23  it's going to say is you should examine the testimony of Peter

24  Anthony Concepcion Santos and Gregorio Blas Cruz, Jr. with

25  greater caution than that of other witnesses.  Well, I think

1   that's an understatement and I think you may agree with me on

2   that.

3        Now, when we started in opening statements, I

4   mentioned to you about what a controlled buy was.  A

5   controlled buy -- and it could be in different senses, but in

6   a general sense, what it is, is if a user gets caught with

7   some meth on him, he is then asked by the police, they give

8   him some money, they say will you go buy drugs from your

9   dealer, so we can -- because the user is caught, he's scared.

10   Now, he may just get probation, but he's scared.  Okay.  And

11   so he has asked to go do this and you may recall that I talked

12   to this about one of the agents, Adam Grey, I believe it was

13   and he said yes, this is what we do and before we do it, we

14   have to pat them down.  And the reason that they have to pat

15   them down is because they know that these people, who are in

16   trouble puts the meth on him or whatever drug it is and go

17   over to somebody and I guess I don't know, trash the money or

18   something, come back and say this somebody over here gave me

19   meth, but he didn't.  That's why they pat them down and you

20   heard him say that.

21        Now, why is that?  Why do they do this?  Because

22   the agents know, police know, the world that I talked to you

23   about.  Police know the world -- this world and that's a

24   small-scale drug dealing.  They're gonna lie.  They're not

25   only gonna lie, but they'll try to set up somebody innocent.

1   That's why they pat them down. Why else would they pat them

2   down? Because they know these people will try to set up

3   somebody innocent.

4         Now, the problem with this is, why don't they

5   just set up their seller, why don't they set up the guy that's

6   higher than them in the chain? Why? It doesn't have a lot of

7   thought to figure out why. We know why. Because it's

8   dangerous. It's that simple. So you don't do it.

9         So you call your supplier -- so you know, what do

10   you do? There are a lot of things that the user might do in

11   that situation. But the one thing the police are most worried

12   about is that they're worried that they're gonna go set up

13   somebody else because like I tell you, this is a world that

14   you and I cannot figure out.

15         Now, if you've got a little guy, somebody who is

16   a user and the police know that they're going -- they're

17   likely to set somebody up so we gotta be cautious about this,

18   so we gotta pat them down, okay, that's a little guy who

19   probably is -- doesn't have a job, doesn't -- it's a really

20   unfortunate individual, who doesn't have very much and he may

21   not have very much at stake. He thinks he's does, right, he's

22   just been arrested by the police, but let's think about this

23   for a second. What about the guy that's busted not with a

24   user amount, but with thousands of dollars. So we got a

25   little guy here. We know that the police believe that he'll

1   lie and do things to hurt innocent people.  But what about the
2   guy who's caught with a couple thousand dollars worth of dope?
3   What's he gonna do?  So we got a little guy and then we got a
4   little bigger guy.  Doesn't it make sense to you that he's
5   gonna do a little bit more.  Lie a little bit more, he'll do a
6   little bit more.  Maybe he's -- see, he's gotta turn in
7   someone above him.  He's a big guy now.  Compared to that
8   user, he's a big guy.  He's gotta go up.  But just like the
9   user, he doesn't want to go to the guy above him.  I think we
10  can all agree on that.  He wants to go to somebody else.  So
11  what does he do?  Well, maybe he sets up that guy instead of
12  telling the police, oh, hey look, I got a little rock from
13  this guy.  Maybe he -- when he goes over to his house, he
14  drops an ounce of meth.  Then he comes back and he tells the
15  police, hey, you know what, that guy got an ounce of meth at
16  his house, why don't you go over there and check it out.  Then
17  he gets the benefit for it and then that guys goes to prison.
18  We know he doesn't want to get the seller.  Just like Gregorio
19  didn't want to talk about that, did he.  That's undisputed.
20          Okay.  So we got the little guy who's just a user
21  and then we got the guy who does -- has a couple thousand
22  dollars.  What about the guy that gets caught with tens of
23  thousands of dollars?  He's up here.  What's he gonna do?
24  What's he willing not to do?  What wouldn't he do if he's got
25  tens of thousands of dollars and he knows he's in serious

trouble?  Maybe he'd go over to someone's house and drop an

ounce, but also drop maybe a couple thousand dollars and tell

the police, you know you've really got somebody over here

because he's gotta go up.  He can't turn in the -- see, he

can't turn in the people below him.  The police are gonna be

like, no man, you know what's up here.  We want what's up

here.  Just like Gregorio didn't want to say it.  We want you

to go up.  So he's gotta do even worse stuff.  Okay, what

about -- we've talked about user, thousands of dollars,

$10,000.  What about the guy that gets caught with a hundred

thousand dollar operation.  What's he not willing to do?

Nothing.  He'd do anything.  He's looking at spending the rest

of his life in prison if he doesn't cooperate.  What wouldn't

he do in this "sick, drug-infested, mind-numbing" world?

Then we've got a case, millions of dollars with

money and drugs.  Millions.  What are these people not willing

to do?  These people know they're dealing with this kind of

money in Guam, which is just the shocking thing of the whole

thing, what aren't they willing -- you think they're gonna do

something like that little user does and just walk in and say

oh, hey, and come back walk in and pretend to do a buy and

come back?  No, they're gonna do it right.  And again, we're

talking about millions of dollars.  So ask yourself, what

would and wouldn't they do?  But I'm saying that's our case.

We're clearly dealing with a methamphetamine operation that

1    has millions of dollars available to it.  What wouldn't they

2    do?

3          So let's go to our facts.  Gregorio Cruz was

4    arrested in June of 2015.  This is kind of a sad -- a sick

5    story, he was at his probation officer, he tested positive for

6    methamphetamine and he gets arrested.  They brought him to his

7    car and they find I don't know how many grams, I think it was

8    less than 100, but it was quite a bit of meth.  66 grams, just

9    in his car.  66 grams, just in his car.  He's got two Superior

10   Court cases, two drug cases, two drug cases and he's doing

11   this.  That's something you and I can't understand the

12   judgment there, the decision-making process.  That's nothing

13   but chaos in that man's life.  According to this plea

14   agreement and it's Government's Exhibit 49.

15          THE COURT:  What?

16          MR. GAVRAS:  39 -- 49.

17          THE COURT:  49?

18          MR. GAVRAS:  Yes.  He is facing 20 years in

19   prison, just on this case.  And then he goes and picks up

20   another federal case.  That man is in trouble, but just like

21   he told me on the witness stand, he's known and he has known

22   it for decades, the one thing he has to do is he has to

23   cooperate with the government.

24          Now, what's he -- what does he tell the

25   government?  He says, yeah, Justin, Justin, Justin.  I can

tell you about Justin.  And what does he tell him?  He says,
yeah, he is going to get some drugs in sometime.  Don't know
when but remember, he didn't know exactly when he said, but
he's gonna get some drugs in sometime because that Mrs. -- the
lady who works at the UR Market said that he -- that she had
to wait until the package came in.  She was watching for a
package to come in to Justin's -- the mailbox that Justin used
there.  And he also tells the government, well, oh, he's gonna
use this dot black light thing.  Remember there was the
demonstration where the lights were dimmed in the courtroom
and he uses that too see if it's tampered with.  Oh, and by
the way, there are going to be boots in that package.

Well, let's compare this to the controlled buy
with the user that, you know, puts a rock on him or what do
they call it a plate or whatever, and he goes in said
something in person.  And remember, the police said this is
what goes on and that's why they searched the person down.
They searched the person just to avoid that because they know
even the little guy, much less the big guys, are going doing
that.  Well, there is no control here.  And there really can't
be.  Okay.  But so the -- the package comes in just like
Gregorio said it would.  What does that mean?  That's why I
asked Gregorio, "Did you have access to a phone?  Did you have
access to other prisoners that can, you know, pass on messages
and things?"  He says yes.  Now again, they can't rat out the

1   guy above them just like the little guy can't.  So is it any

2   wonder that a package arrives at Justin Cruz's place?

3          Now, could Gregorio have been telling the truth?

4   Yeah, could have been telling the truth.  But based on what we

5   have been talking about this far, could have been telling the

6   truth, but do you trust him?  Does it really surprise you that

7   an innocent person can get set up by these people?  I don't

8   think so.  I don't think so.  It's the way it's done and

9   that's why the cops pat them down.

10         Now, remember this, do you remember how reluctant

11  Gregorio was to tell us who was supplying him?  Do you think

12  he was oh, yeah, Justin Cruz, you know, that he's really going

13  to give his supplier away?  I mean, he's in front of the judge

14  that's going to sentence him.

15         First, he has to make the motion for substantial

16  assistance.  Then this judge could sentence him and downward

17  depart.  If he is not answering questions.  They don't want to

18  say.  That's why it's my belief quite so easy for him to say

19  Justin.  It's not so easy to say "these people."  No, I think

20  what Mr. Lemons is gonna say, oh, yeah, well, it switched when

21  Justin got arrested, then he had to find another supplier and

22  Justin told him to go find another supplier and we'll talk

23  about that and then does that make sense?  Think about it for

24  a second.  He won't tell the truth in front of the judge.  His

25  lawyer has to come up here twice.  What do you think he did

1    when he got picked up?  Do you think he wanted to tell the

2    people who were really involved?  If he won't do it in front

3    of the judge, he's not going to do it in front of the police.

4    Now, but it was very easy to point at Justin.  You know, there

5    are some people who when they say black, you can say it's

6    white.  You can be pretty confident that it's white.

7          Now, the Gregorio Cruz -- the Sullivan packages,

8    the one that Gregorio said were coming, they came just like

9    they said -- he said they would -- he said the packages would.

10    There were the secret dots.  There were the boots.  But we've

11    already talked about that.  Call somebody, have it done.

12          Now, let's look at some of the facts to see

13    whether or not everything Gregorio said makes sense.  Number

14    one, the package was just left in the car.  Justin went to his

15    mailbox, a mailbox -- how hard is it for someone to find out

16    where you received your mail?  Even if you receive it through

17    your mom or somebody else, I would say most of us would say

18    that's information we'd give up pretty easily or that you just

19    talk -- I gotta go pick up -- you got with somebody to the

20    post office, whatever.  But the package he just left it in the

21    car, yeah, went to go get it.  He left essentially a million

22    dollars worth -- over a million dollars worth of drugs in the

23    car and just left it there?

24          Now, Mr. Lemons will tell you that he left the

25    car to see if it -- he left it in the car to wait to see if he

had been surveilled, followed. But the DEA agent, the first
one that testified, he said that the vast majority, remember
me using that word and asked him, vast majority, he said the
vast majority of time, the device they put in the package goes
off. Check your notes. I think you will see that. Because I
questioned him. Does it go off a lot of times? Yes.
Majority of the time, yes. Vast majority of the time. Yes,
it didn't go off in this case. I suggested to you in opening
statements, it's because you get a package, you're like hey,
everyone is excited and then you get it and like well, so much
for the excitement, it's not -- to me, you leave it in the
your car. Now that doesn't conclusively prove it. But
remember what the DEA agent said, the vast majority of time
the device they put in the package to alert the agents when
the package is open, goes off. It didn't go off here. But I
think maybe even most -- remember Gregorio came up with this
story about the black light and the dots. He even said that
Justin told him about it and we had a big presentation here
about the black light. Well, where was the black light?
Where was the flashlight? Where was it? It wasn't in the
car. I asked the last witness to testify, I asked him did you
get out car, it wasn't in the car. It wasn't in the house.
Where was it? The central theme to how -- it was gonna be
proven that Justin is the bad guy, is the dope dealer, as
Mr. Lemons says. We had a demonstration, that's why Justin

1    left it in the car because he could know that it had been

2    tampered with, oh, my goodness.  Where is the black light?

3           There's some other problems with Gregorio's

4    testimony.  Do you remember -- I'm sorry, do you remember

5    Gregorio saying the balls of dope are this big?

6           THE COURT:  I'm sorry, for the record just say

7    what that size is because you're being recorded.

8           MR. GAVRAS:  Like I don't know five, six inches.

9    Softball size.  Remember I said softball Mr. Lemons talked

10   about, well, there two different softballs.  But we got

11   softballs.  Well, let's look at Government's Exhibit 5-L.

12   These are the Sullivan packages, the dope that came in the

13   Sullivan packages.

14           There's a ruler.  It's not the greatest picture

15   in the world, but you're gonna see that this is an inch from

16   here to here and this is an inch from here to here and this is

17   like a -- almost another complete inch, maybe three inches.

18   Now, franchise is not a softball make of any make or model of

19   softball that I've ever seen, but here's is 5-L and you guys

20   can take a look at it.  Now, this doesn't necessarily prove

21   everything because the dope, the balls of dope that Gregorio

22   were talking about, weren't the Sullivan package.  He was in

23   jail then.  So it was when he was dealing with, he says,

24   Justin before.  But what did he say?  Let's think about what

25   he said.  That two of these packages were in one of these

1  boots, two of these balls of dope.  So maybe they were as big

2  as he -- let's say they were as big as he said.  Okay, this is

3  Government's Exhibit 39-D.

4           THE COURT:  Sorry, 39 what?

5           MR. GAVRAS:  39-D.

6           THE COURT:  D, as in dog.  Okay, thank you.

7           MR. GAVRAS:  So you take this softball.  I think

8  that was Gregorio's word.  Softball.  You put one of 'em in

9  here, and you put another one in here, are they going to fit?

10 Maybe, maybe not.  But more importantly, he says that Justin

11 put two of them in here and gave him the boot.  I think they'd

12 be bulging out of here.  What do you think?  Maybe, maybe not.

13 I'm not saying -- look, this is a world of chaos, and I can't

14 explain everything, I'm gonna tell you the things that I

15 believe we can agree on for sure and things we can't, but I

16 think this is highly questionable.  You know and the other

17 interesting thing, perhaps the most interesting thing about

18 the boots is where are the boots Justin gave him?  Where are

19 they?  They were never presented to you as evidence.

20          Now think about it for a second.  Gregorio

21 supposedly needed these boots.  It was supposedly an accident

22 that the drugs were in them.  So he needed these boots and

23 these are good boots.  He was cooperating with the government

24 because he started dealing -- this was end of 2013 he claims

25 he started dealing with Justin.  2014 he got picked up 2015.

1  I don't know he could have lost the boots.  I don't know how

2  many of you would lose a pair of boots like this.  Where are

3  they?  If the whole gist of this case is the black light,

4  which wasn't even found and the boots, where is the boots?

5  Where is an explanation for where the boots -- yeah, I got rid

6  of 'em, I gave 'em to my son, I did this, I did that, where

7  are they?

8            My wife was threatened.  That kind of came out of

9  the blue.  My wife was threatened by Justin.  Where is she?

10 Okay.  Gregorio has four ongoing cases.  He has absolutely no

11 credibility.  He's been doing meth for 20 or 30 years.  He

12 lies, he lies to judges when he says he's going to obey his

13 probation.  He has zero credibility and I think we can all

14 agree to that.  Okay.  Okay.  I suppose Justin could have

15 threatened his wife, but nobody is going to believe Gregorio.

16 So where is his wife?  Why?  I mean, is this what Justin has

17 to defend himself against?  And maybe the government doesn't

18 quite believe him because if you notice, in the indictment

19 which you're gonna get, Justin wasn't charged in that.  He was

20 charged on the stuff with Peter Santos, he was never charged

21 with that.  My God, you threatened somebody with -- now he did

22 say it was an implicit threat.  He did say that, he said oh,

23 you better not testify, but that's what he's being charged

24 with, with Peter Santos.  So why isn't he being charged?

25 Because they don't believe him.  Maybe they didn't get around

1    to it.  I don't know, they're busy.  But why isn't she here to

2    testify?  Why can't she face her accusers?

3              And then this -- and again, this just raises

4    questions, this isn't something I know for sure.  Justin tells

5    'em to find a new supplier?  See, Gregorio has to explain,

6    Justin ends up getting arrested, well Gregorio where are you

7    getting -- where are you getting your drugs, Gregorio?  Well,

8    let's blame Justin.  Justin told me to get a new supplier.

9    You know, he can't just say, hey, I went out and pound the

10   pavement and I checked with my contacts and got a new

11   supplier.  No, he's gotta say oh, it was Justin's fault.

12   Really?  He's so focused on saying Justin, here in Court and

13   to the police, that that's just what continually comes out of

14   his mouth, Justin, Justin, Justin.  Justin got -- the guy

15   that's selling -- how many people here -- these people don't

16   think straight, but you know we have to attribute some logic

17   to this.  We have to try to figure it out.  We can't just

18   excuse what they say when it hurts Justin.  Oh, you and ignore

19   that, that's just crazy, they're crazy, so it when it hurts

20   Justin they're crazy.  You gotta excuse them.  So believe it,

21   Justin's bad.  Well, no, it's not fair.  Not only they have

22   the burden of proof, does it make sense to you that a supplier

23   of anything, maybe particularly drugs, would say, hey, you

24   know you gotta go look for another supplier.

25             But you see, Gregorio has to have an explanation

as to how he knows how Justin receives drugs.  So he says, how
am I gonna know that?  I'll tell them that Justin explained it
all to me.  Why would you -- you wouldn't explain that to
somebody.  You wouldn't tell somebody, you know this -- to
your buyer, you're not gonna share your secrets like that.
Maybe, maybe you would, maybe you wouldn't.  But are you gonna
tell 'em to go get another supplier so you cut yourself out.
He says oh, we're smoking meth, everybody says everything,
yeah that's real convenient.  That's real convenient and
again, I admit these people are crazy, these people will say
anything, but what the government wants you to do is believe
'em when it hurts Justin and not -- and if it doesn't make
sense, just excuse it.  It doesn't make sense that you tell
somebody else to cut your own throat.  You're selling
something, you want them to continue to buy from you.
Everybody knows that, even drug users.  But he has to explain
how he supposedly knew how Justin does the mail.  So he has to
invent the story.  That's my guess.  I don't know if it sounds
reasonable to you, but that's my guess.

You know, there's something else I bring up to
you.  You probably heard the expression, "Don't get high on
your own supply."  I don't know.  It was big when I was
little, younger.  "Don't get high on your own supply."  The
reason is, you can't be a successful drug user if you're
getting high.  You just -- you just can't do it.  You saw

those two, do you think those two, by themselves, could have

accumulated millions of dollars worth of drugs and money?

Maybe.  Because I'm talking about because they're just smoking

too much or injecting too much or however they do it.  Okay.

Well, guess what, Gregorio said Justin smokes meth or does

meth.  I guess, he said smoked.  I'm not sure.  But well, but

Justin supposedly has this vast supply of money and drugs

everywhere.  And with the one instance, he's a meth user, but

he's able to stay on top of this empire.  I'm sure it happens.

But it's just a strange thing for me.  You guys can determine

that on your own.  I'm just trying to bring up some things.

Now, the other thing about Gregorio's testimony

that concerned me and I asked him, you know, he was able to

identify all the photographs inside Justin's house and

everything and then I said, "Did you meet with the prosecutor

ahead of time?"  Yeah.  "Did you go over the photograph with

the prosecutor?"  Yeah, I did.

Now, the judge is going to read you a jury

instruction that says that attorneys are allowed to interview

witnesses.  And I don't have a problem with that.  But think

about it for a second, are you gonna show 'em everything you

want 'em to testify to, are you just making sure?  I mean, he

didn't say he was shown photos of like six other people's

homes and he had to guess which ones were Justin's.  No, these

were photos put in front of them here and said is this

1    Justin's house?  Is this -- what's -- he -- I mean, he's a

2    little bit in trouble, but he's not a complete idiot.  He's

3    not comatose.  You put the picture in front of him, you know

4    that's important.

5              Now, I talked to you about the failure of the

6    task force to secure the house.  Now we've already talked

7    about -- a lot -- maybe -- about how these people will set

8    people up.  Okay, so just like on the controlled buy with a

9    little dealer, not to mention these people, but with the

10   little dealer, you want to make sure that they're not in

11   control of the truth because the little dealer will go to an

12   innocent person who's already got some meth on him and then

13   say hey, I got it from this guy.  That's why they pat them

14   down.  So you control -- if you're the police, you control the

15   situation.  What did the DEA agent -- the same DEA agent said

16   the vast majority of times the device goes off.  He also said

17   this, that when drugs are found on somebody, say a mile or two

18   away from their home or further, he said again, this phrase

19   vast majority of times law enforcement searches the person's

20   residence where they live.  Well, that makes sense.  Of course

21   it does.  Of course they're gonna do that.  You find somebody

22   with some dope on 'em, a lot of dope on 'em, you're gonna say

23   hey, judge, we want to go search this person's house.  Well,

24   do you think the law enforcement are the only people who know

25   that?  Or do you think, like Mr. Lemons said, people who know

1   the business.  He said it over and over, they know the

2   business.  They know that.  And actually, it's not a lot of

3   thought.  You know that.  I mean, if you thought about it,

4   okay, well, if I were gonna be a drug dealer and I got caught,

5   do you think they'd search --  yeah, I think they'd search my

6   house.  These people know it.  Now, think about it for a

7   second.  If they showed up, if the DEA showed up at Justin's

8   house and let's say -- let's just say it was completely empty

9   or let's just say there were some couches and a TV and a video

10  game, well, maybe then they'd start to doubt the whole

11  delivery of the Sullivan packages.  Maybe then they'd start to

12  say, you know boys maybe we've been had.  So these people know

13  it.  People in the business know they're gonna go to that

14  house.

15          Now, if we think about it, Deborah Epps

16  testified.  She was the postal inspector that did the

17  experiment with the black light.  She testified when I asked

18  her questions, if you send someone a package, you have the

19  tracking number and you can follow where that package is.

20          So you just get on the Internet, over the phone

21  or whatever or you can just monitor the house, but it's pretty

22  easy with the Internet.  Okay.  So Justin -- we don't know

23  where Justin was before he went to the post office.  Let's

24  assume he had been at his house prior to going to the post

25  office.  He drives to the post -- and he may not have been,

1    but he drives to the post office.  And then from the post

2    office to the time he arrives back at his house, the agents

3    testified, it was an hour and a half to two hours.  Well,

4    secure the darn house because these people know that the

5    agents are gonna go there and if there's nothing found, then

6    the Sullivan -- they're gonna start to question whether or not

7    Gregorio told them the truth on the Sullivan packages.  Again,

8    these people had been thinking this stuff for 20 or 30 years

9    and in Mr. Lemons' own words, they know the business.

10           You control it, you control it.  Can you imagine

11   a case where a user -- somebody is on trial for selling a

12   small amount of meth because some user came in and said he --

13   came out and said he bought dope, but then it was discovered

14   the police didn't search that user before he came in my house.

15   Well, what am I gonna say?  I'm gonna say and you would say,

16   why didn't you search that man?  That's fair.  That's what's

17   supposed to be done.  You're supposed to -- because these

18   people can't be trusted, that's why I said to you at the very

19   beginning, you're looking into a window of a world of chaos

20   and blackness and darkness and contradictions.  It's the

21   agent's responsibility to control the situation because

22   especially when they know what these people are like.  So what

23   did they do when they get to the residence?  Did they

24   fingerprint anything?  Nothing.  They know they can because

25   they fingerprinted the Sullivan packages.  They didn't

fingerprint any of that stuff.  How much of that stuff was
Justin's or how much of that stuff was like the drug dealer's?
Say the thousand-dollar drug dealer that goes in, needs to
save himself, doesn't want to report to -- and is this
fanciful -- you know, this stuff is hard to believe.  But how
much -- what do these people have at stake, what is going on
in their minds?  What do we know about the police even if the
smallest of users pulling shenanigans on them?  And what do we
know about Gregorio Cruz getting on that witness stand and not
willing to give up anybody except Justin, Justin, Justin,
Justin?  And then everything is open in the house?  Nothing is
locked?  Does that make sense to you?  Well, why not
fingerprint it?  Why not the boots fingerprinted?  Why not the
guns fingerprinted?  Why not?  You're not gonna get something
everything time.  You're not.  It's not like patting somebody
down, which you have to do, or making sure the house isn't
violated, is secure.  That's something you should just do.
It's not a guarantee you're going to get something, but you
know they think sometimes they can get something, they
fingerprinted the Sullivan packages.

Peter Santos, he says he's known Justin for
20 years.  He says he's picked up drugs from him twice.  I
said, "When?"  I don't know.  And then I think you may
remember I said something like, "So may not have been twice?"
And he's like yeah, maybe.  But that's -- he's just a problem

1  child.

2        But why did he plead guilty?  Exhibit No. 48 is

3  his plea agreement.  Okay.  Exhibit No. 48 is his plea

4  agreement.  The United States and the defendant stipulate and

5  agree to the following facts:  Defendant was born in -- okay,

6  on July 17th, the co-defendant received a package that he

7  believed to contain, that's Justin by the way, a large

8  quantity of methamphetamine.  Federal agents intercepted the

9  package, we talked all about that, searched the package and

10  recovered meth.  Agents replaced the meth with sham.  We know

11  that.  That evening the defendant drove to his co-defendant's

12  residence with the intent to purchase methamphetamine.  Okay,

13  goes on.  So he testified, I mean he -- actually he did

14  testify.  He testified at his plea hearing.  He was under

15  oath.  When he pled guilty, he said this was true.  Under oath

16  to a judge.  Said this was true.  Federal Court.  And then

17  when he gets up on the stand, he said nah, I was bringing the

18  dog collar.  Now, I think one of the most interesting -- and

19  actually it sounded believable.  Now, whether you could

20  believe these people from the way their demeanor is or not,

21  I'll leave that up to you, but it sounded somewhat believable,

22  but he did show up -- he did -- he's a drug dealer.  But

23  that's what he said.  So do we believe him when he testified

24  up here in front of this judge or do we believe him when he

25  pled guilty?  Which is it?  He's their witness -- you don't

1   send people to prison based upon contradictions like that.

2   It's not fair.  They have the burden of proof.  Now, let's

3   think about it a little bit further.  Now, you may remember

4   that the first time you heard about Peter Santos's story about

5   this dog collar was when I questioned him.  See, Mr. Lemons

6   didn't talk to him about why he was over.  Check your notes.

7   Mr. Lemons, on direct examination, didn't talk to him about

8   why he was over at Justin's place.  Well, that's odd, because

9   the part I just read to you, gosh that's bad for Justin,

10  isn't?  That would be bad for Justin because it said he went

11  over to Justin's to get drugs.  But Mr. Lemons didn't ask him

12  that.  I don't know why.  Maybe because Mr. Lemons knew what

13  Justin was going to say.

14              And how sad it is.  Who knows what's going on?

15  It's chaos.  He said to me -- I go, "Did you tell your lawyer

16  there?"  He said, yeah, but he told me to sign it anyway.

17  What?  Howard Trapp told him to do this and it was best for

18  him?  Again, we're talking -- I want you to stop here, this is

19  really important.  We're not talking about little guys, little

20  guys, little guys, big guys, big guy, the biggest, what goes

21  on with these people and their lawyers?  They've got to point

22  at somebody.  They've got to do things.  But when you're

23  talking about millions of dollars at one time, that's -- what

24  about the following month, the following month.  What's goes

25  on -- I said Justin, I said "Peter, Mr. Santos, did you tell

1    your lawyer?"  Yeah, I told my lawyer.  Why did -- he said

2    this would be best for me and then he knows, because in his

3    plea agreement and we need to go over this because I mentioned

4    it earlier -- the United States -- this is Peter Santos's plea

5    agreement, it's Exhibit No. 48, this is the same thing in

6    Gregorio's, it's done all the time, this is the agreement that

7    encourages them, the more they give the government the lower

8    sentence they get.  The United States agrees to recommend at

9    sentencing that the Court impose a sentence at the low-end of

10   the guideline if however -- okay, so without doing anything,

11   they get the low-end of the guideline range, that is a little

12   something.  If however the United States determines that the

13   defendant -- the United States, that's Mr. Lemons, has

14   provided substantial assistance in the investigation or

15   prosecution of another person, the United States agrees to

16   move the Court at sentencing pursuant to 5K1.1 to impose a

17   sentence below the otherwise applicable guideline range.  The

18   determination of whether a defendant has provided substantial

19   assistance rests entirely within the discretion of Mr. Lemons.

20   And then there's the part about the Court not needing to

21   accept it.  Defendant acknowledges that even if the United

22   States makes such a motion, the Court is not required to

23   reduce the defendant's sentence.  Yeah, at the very end.  What

24   do you think he thinks?  In fact I asked him, what do you

25   think, what do you gotta do, gotta help, gotta give

substantial assistance. That's what he said. He knows. Did

he give substantial assistance? Oh, my God he just

contradicted his plea agreement. Why would he do that? Why

would he do that? If it was a lie that he said in his plea

agreement, why not just stick to it and save himself? Why? I

don't know why. It's chaos. It's impossible to know why.

He's under oath both times. He is -- I don't -- oh, yeah and

I told Mr. Trapp -- Mr. Trapp just said go ahead -- this is

what you get into when you're dealing with this, try to figure

it out.

Now Mr. Lemons -- yeah, Mr. Lemons talked about

exhibit -- Government's Exhibit 47. And you'll remember it as

this note. Can you believe Peter Santos? Is there anything

these people will do or won't do? I talked to him about

Exhibit 47. Mr. Santos couldn't remember who gave it to him.

I asked him that. Mr. Santos said he doesn't recognize

Justin's writing. He didn't know Justin's writing. Mr.

Santos also said that it looked to him like there were three

people's handwriting on this. I'll let you decide, but it was

his note. Who's the third person? How does that make sense?

Why does it make sense that he wouldn't just stick with his

plea agreement? I don't know. I know you can't trust this

stuff, though. That's what I know. I think we can agree we

can't figure out a lot of things. But I think we can agree we

can't trust this stuff.

         Now, why didn't he -- if Justin gave the money to
his mother or had the money delivered to his mother, why isn't
his mother here to testify that she received the money some
way, somehow?  Actually, Mr. Trapp didn't even testify because
it's not attorney client-privilege, it's -- but why isn't mom
here?  Why?  How many -- how many unimportant unanswered
questions does the defense have to defend against?

         Now, perhaps this isn't a fair thing to say and
I'm just guessing, it kind of occurred to me, I don't think
Peter Santos is quite as slow as he plays he is because too
much of it doesn't make sense.  I can't figure out what game
he's playing, but he's playing a game.  He's playing a game
that he played with his attorney, that he played with the
Court -- federal Court that he pled guilty in front of, that
he pled when he was testifying.  He was playing some sort of
game.  I don't know what the truth is, but I suggest to you
that he's not going to cut his own throat up there by saying
he brought a dog collar and going against his plea agreement.
He's not gonna cut his own throat with substantial assistance
because he understood that unless there was a reason.  I don't
know what the reason is.  The very beginning of this I told
you, I couldn't tell you everything.  I wouldn't be able to
explain everything.  But I think he's playing a game.  I don't
think it's something that the judge can figure out, I don't
think Mr. Lemons -- I don't think any of us can figure out.

1          THE COURT:  Can I just have Counsels come up to

2  the bench for a second.

3          (Sidebar.)

4          THE COURT:  Just checking the time.

5          MR. GAVRAS:  I think I've gone --

6          THE COURT:  Just checking his time.  Do you want

7  to finish tonight or go -- finish it tomorrow morning?

8          MR. GAVRAS:  I --

9          THE COURT:  -- you know.

10          MR. GAVRAS:  Getting them out of here is a good

11  idea.  I'm sorry.

12          THE COURT:  No, you're fine.  I'm just worried

13  because they're a little restless right now.

14          MR. GAVRAS:  Yeah, I'd rather wait till tomorrow

15  morning.

16          THE COURT:  How much longer?

17          MR. GAVRAS:  I would say 20, 30 minutes tops.

18          THE COURT:  Why don't we finish tomorrow.  I'm

19  sorry to interrupt you.  They're getting -- a little like...

20          MR. LEMONS:  I'm okay with it.

21          THE COURT:  How come you're walking so slow?

22          MR. GAVRAS:  He hurt his hand.

23          THE COURT:  I said, why is he walking slow not --

24          MR. LEMONS:  -- for an hour, I have a bad knee so

25  it takes me a little while to -- gotta get some juice in it.

1                    (End of sidebar.)

2                    THE COURT:  Excuse me.  Thank you, ladies and

3     gentlemen of the jury.  I just wanted to check the time so

4     we're gonna go ahead and recess for the evening and we're

5     going to finish closing arguments tomorrow.  Keep an open

6     mind.  Sorry about that, but I don't want to keep going too

7     much longer on this.  I think it's gonna -- might take a

8     little longer than 5.  And so I spoke to the lawyers, so

9     please be here at 8:15.  We'll start up at 8:30 sharp.

10    Mr. Gavras will complete his closing and Mr. Lemons will

11    present his rebuttal closing and I'll give my jury

12    instructions.  And so that -- we're done with all legal

13    issues, so I'm sorry about the delay today.  But we were

14    working honestly working last night and today.  So keep an

15    open mind, do not form or express any opinion on this case

16    until it's submitted to you and I will see you tomorrow

17    morning for the concluding instructions and concluding

18    arguments at 8:30 a.m.  All right?  Thank you, have a great

19    evening.  Please rise for the jury.

20                   (Jury out at 4:37 p.m.)

21                   THE COURT:  And thank you, Mr. Gavras and

22    Mr. Lemons for that schedule.  I'll see all of you tomorrow

23    morning.  I'll see all of you tomorrow morning.  Right?  Okay,

24    thank you.

25                   MR. LEMONS:  Yes.

1          THE COURT:  Thank you.

2          THE CLERK:  Court's adjourned.

3          (Proceedings concluded at 4:38 p.m.)

4                    * * *

5   -------------------------------------------

6          CERTIFICATE OF OFFICIAL REPORTER

7   CITY OF HAGATNA          )
                             )  ss.
8   TERRITORY OF GUAM        )

9          I, Veronica F. Reilly, Official Court Reporter for

10  the United States District Court of Guam, do hereby certify

11  the foregoing pages, 1 to 108, to be a true and correct

12  transcript, to the best of my ability, of the proceedings held

13  in the above-entitled matter.

14          Dated this 28th day of July, 2017.

15                         /s/Veronica F. Reilly
                           Veronica F. Reilly
16

17

18

19

20

21

22

23

24

25